UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUIS NOEL CRUZ,<br>            Petitioner | : | CIV. NO. 3:11CV787(JCH) |
| v. | : | CRIM. NO. 3:94CR112(AHN) |
| UNITED STATES OF AMERICA,<br>            Respondent | : | NOVEMBER 6, 2017 |

### <u>PETITIONER'S POST-HEARING MEMORANDUM</u>

Petitioner Luis Noel Cruz submits this post-hearing memorandum to aid the Court in its determination of the issue: "[D]oes the rule in <u>Miller</u> apply to those whose chronological age barely exceeds eighteen, but who have all the characteristics described in <u>Miller</u> that vitiate the justification for lifetime imprisonment without parole[?]" <u>Ruling Re: Motion for Reconsideration</u>, Doc. 99 at *9, July 12, 2017.

#### <u>Introduction</u>

In its order granting the hearing, the Court stated, "The question of who qualifies as a juvenile has not been before the Supreme Court since <u>Roper</u> [v. Simmons, 543 U.S. 551 (2005)]," <u>Ruling Re: Motion for a Hearing</u>, Doc. 86 at *28, April 3, 2017.

The Court seeks two areas of evidence: national consensus and scientific findings.

Regarding national consensus, the Court stated, "it must analyze the objective indicia of national consensus, if any exists, of a uniform line between adolescence and adulthood. This objective indicia....includes whether the imposition of life without parole or capital punishment for those who are 18 years old has been rejected by the legislatures of states, the frequency or infrequency of its imposition even where it remains legal, and whether this is a trend towards abolition whenever it is considered....

[W]hile evidence from state cases is useful to show what the current state practice is, the court's analysis could also benefit from evidence of what the various practices of the states are, as determined by the state legislatures," Id at *26.

Regarding scientific findings, the Court stated it "must review scientific evidence to determine whether those who are 18 have the same diminished culpability and risk understanding that their younger counterparts do." Id at *27.

In its subsequent order denying the Government's motion for reconsideration, the Court framed the issue as follows: "The question, as the court sees it, is whether the rule that there is no penological justification for a lifetime of incarceration applies equally to Luis Cruz as it did to Evan Miller." at Ruling Re: Motion for Reconsideration, *supra*, at *9.

This memorandum shows that the correct answer to these question is yes. It proceeds as follows: Part One summarizes the scientific evidence presented to the Court through the testimony of Dr. Laurence Steinberg, as well as other research concluding that a person remains categorically an adolescent through age twenty-one. Part Two summarizes the testimony of Mr. Cruz and compares it to the science. Part Three presents an overview of the law, showing that there is a clear national consensus against inflicting the law's harshest penalties upon adolescents.

The inescapable conclusion is that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Roper, *supra*, 543 US at 569. The reason why Roper did not draw the line at twenty-one  is because the evidence was not there to support it—and the defendant was seventeen, so there was no call for it. Today, there is.

Part One: The Science

> Although eighteen- to twenty-one-year-olds are in some ways similar to individuals in their midtwenties, in other ways, young adults are more like adolescents in their behavior, psychological functioning, and brain development. Thus, developmental science does not support the bright-line boundary that is observed in criminal law under which eighteen-year-olds are categorically deemed to be adults.
>
> Elizabeth Scott, Richard Bonnie & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category,* 85 Fordham Law Rev. 641, 645 (2016), Petitioner's Exhibit One.

Professor Steinberg—whose expertise is beyond question and whose C.V. is Petitioner's Exhibit Three—began his testimony with a definition of adolescence. It is age ten through twenty. T. 9/13/17, 6. Adolescence can be divided into three phases. Early adolescents are age ten through thirteen, middle adolescents are age fourteen through seventeen and late adolescents are age eighteen through twenty. Generally, adolescents are:

•more impulsive than adults,

•prone to engage in risky and reckless behavior,

•motivated less by punishment and more by reward,

•less oriented to the future and more oriented to the present, and

•susceptible to the influence of others. T. 9/13/17, 6.

With late adolescents in particular, risk taking and reward seeking intensifies when they are in unsupervised groups of their peers. T. 9/13/17, 24.

"The social brain" is a brain system that is more active during adolescence. It is responsible for how we perceive other people, judge their opinions of us and their emotions, expressions and so on. In particular, adolescents are more sensitive than adults to:

•their standing within a social group,

3

•the impressions they make on others, and

•the opinions others have of them.

This explains why humans' behavior in groups changes as they get older. T. 9/13/17, 25-26. Specifically relevant to the question of sentencing—and to the facts of this case as described by Mr. Cruz, see infra, which involve hot cognition, peer influence, fear, sensitivity to status, and so on—is this: "[U]nder conditions of emotional arousal when hot cognition is operating, adolescents are less likely to pay attention to the downside of a risky decision, and they're more focused on the rewards of it, so it means that the prospect of being punished for something....is less salient than it is to an adult." T. 9/13/17, 29. This is why the deterrent effect of punishment is not effective as to adolescents. They are not paying attention to negative consequences during hot cognition, the way they would during cold cognition, or the way an adult would in either case.

The two brain systems most directly relevant to adolescence are the cognitive control system and the limbic system. The cognitive control system is made of the pre frontal cortex (PFC), located directly behind the forehead, and its connections. It is responsible for self regulation—defined as the ability to control behavior, thoughts and emotions—and advanced thinking skills such as logical reasoning and planning ahead. It is the rational center. T. 9/13/17, 7-8.

The Limbic System is a deep structure within the brain, responsible for processing emotion and social information, and experiencing reward and punishment. It is the emotional center. T. 9/13/17, 7-8.

The rational PFC and the emotional Limbic System are both always active, and they are always in communication. During adolescence, however, their communication

is temporarily disrupted due to a phenomenon called maturational imbalance. During puberty, the emotional Limbic System is stimulated, while the rational PFC develops very gradually, resulting in situations during which the Limbic System overwhelms the PFC. T. 9/13/17, 9. The analogy is, if the Limbic System is a car's engine and the PFC is the car's brakes, then during adolescence our brain is a hot-rod with bad brakes.

This maturational imbalance makes adolescents particularly vulnerable during stressful situations. Of cognition, Dr. Steinberg defined two varieties: hot and cold. When we must make choices under emotionally aroused circumstances—such as when we are angry or enthusiastic or afraid or in groups—we are using hot cognition. When we make choices while calm, unaroused, solo, we use cold cognition. T. 9/13/17, 10.

During cold cognition, we use basic thinking abilities that are developed by age sixteen. During hot cognition, we use those basic thinking abilities, plus emotional regulation, which is still developing through the mid-twenties. The effect is demonstrable up to age twenty-four. T. 9/13/17, 25.

Petitioner's Exhibit Two, a scholarly article, adds a pithy graph to our understanding of hot cognition versus cold cognition. It shows that when late adolescents must think under stress, they buckle like children.

FIGURE 1. AGE OF MAJORITY IN THE CONTEXT OF RECENT
DEVELOPMENTAL SCIENCE



Alexandra Cohen, Richard Bonnie, Kim Taylor-Thompson and BJ Casey, *When Does a Juvenile Become and Adult? Implications for Law and Policy*, 88 Temple Law Rev. 769, 771 (2016).

Late adolescents are "absolutely" more similar to mid-adolescents than they are to adults in this area. T. 9/13/17, 70.

Dr. Steinberg explained that, while research specifically into late adolescence is relatively recent, he is "absolutely certain" to a reasonable degree of scientific certainty that the hallmark characteristics of adolescence continue through at least age 20. T. 9/13/17, 71. He explained that, prior to the advent of Functional Magnetic Resonance Imaging (fMRI), scientists were unable to study the active workings of living brains. T. 9/13/17, 14. Prior to fMRIs, scientists believed that the brain was fully developed once it reached its adult size, at age ten or eleven. Through the mid- to late-aughts, the research focused on juveniles under age eighteen. Roper came out in 2005. By around 2010, however, research was showing that the same mental immaturity was lasting even longer. The question whether the law should reconsider cutting off its protections at age eighteen prompted the article that is Petitioner's Exhibit Two. T. 9/13/17, 14.

"The central point of that article is that recent discoveries in psychological science and in brain science as well as changes in society, should ask us to rethink how we view people in the late adolescence period and even to the young adult period in terms of their treatment under the law," T. 9/13/17, 15. Both this article and Petitioner's Two indicate the "broad consensus among scientists" that support Dr. Steinberg's testimony. T. 9/13/17, 19.

Late adolescents are similar to adults—and so are Roper's mid-adolescents—in that all three groups perform similarly under cold cognition. T. 9/13/17, 19. The scientific question before this Court is whether late adolescents also share the attributes of mid-adolescents that trigger the constitutional protections the Supreme Court has already recognized for mid-adolescents.

The answer is, they do. In the area of risk-taking, Dr. Steinberg testified that this actually *peaks* at about age 19. T. 9/13/17, 64. <u>See</u> <u>also</u> Laurence Steinberg, et. al., *Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation,* Developmental Science 00, *1 (2017), Appendix 1.

In *Around the World*, the U-shaped trajectory of sensation seeking as compared to the upward ascent of self-regulation followed by a plateau is captured in the following two graphs:



**FIGURE 1**   Age differences in scores on *composite* variables: sensation seeking (top) and self-regulation (bottom) in the whole sample. Composite scores were multiplied by 100 and centered at age 10. Grey shading denotes a plateau/peak, defined as years of age for which the instantaneous rate of change (i.e. the estimated slope of the age curve) did not differ significantly from zero. Dashed lines indicate 95% confidence bands

*Around the World* at *10.

Susceptibility to one's peers remains higher than for adults, as does capacity for change. Reward seeking—which triggers both the PFC and the LS—is at the same level for mid- and late-adolescents, and lower than in adults.

Thus, the central point of Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009, 1016 (2003), the article which informed the Court in <u>Miller v. Alabama</u> 132 S. Ct. 2455, 183 L. Ed. 2d 407, 419 (2012), that "adolescents compared to adults are more impetuous. They are more susceptible to peer pressure and their personalities are less fully formed," T. 9/13/17, 22, is still valid. The only difference today is, Dr. Steinberg would apply the article's conclusions to "the whole adolescent period." <u>Id</u>.

Dr. Steinberg adopted his article *Young Adulthood as a Transitional Legal Category*, *supra*, as fairly representing the contemporary state of the science. In this article, he and Professors Scott and Bonnie ask the question "whether development continues in legally relevant psychological domains beyond age eighteen," <u>Id</u> at 648. In answering this question yes, they declare at the outset:

> At the heart of [juvenile justice reform] is a conception of adolescence as a distinct stage between childhood and adulthood. This conception has supported a classification of juveniles as an intermediate category of offenders who are neither excused for their crimes as children nor deemed fully responsible adults. Juvenile justice programs increasingly respond to the developmental needs of adolescent offenders, recognizing that this is the best means of promoting their productive engagement in society and reducing crime. Young adults between the ages of eighteen and twenty-one constitute a less well-defined category that has only recently received even informal acknowledgment. But this developmental stage has taken on heightened importance as a period of preparation for adult roles. ***We conclude that the research supports a regime that recognizes young adults as a transitional category between juveniles and older adult offenders.***
> <u>Id</u> at 644 (emphasis added).

Much of this article mirrors Dr. Steinberg's testimony. The authors also present the following insights:

•Criminal activity is one symptom of the more general inclination among young adults to engage in risky activity, and much of young adults' crimes are the product of developmental immaturity. <u>Id</u> at 646.

•Developmental change into the early twenties "are now viewed as normative, driven by processes of brain maturation that are not under the control of young people." <u>Id</u> at 647.

•People mature intellectually before they mature emotionally and socially, with declining sensation-seeking and improved self-control between age seventeen and thirty. <u>Id</u> at 648.

•In conditions of negative arousal, eighteen- to twenty-year-olds performed tests of self-control just as badly as thirteen- to seventeen-years olds, while twenty-one- to twenty-four-year-olds performed better. <u>Id</u> at 650.

•The increasing complexity of contemporary American society makes young adulthood/late adolescence a "critical development period," or a "period of dependency and vulnerability," analogous to early childhood. <u>Id</u> at 653-654, 657.

The authors offer in conclusion:

> The monolithic classification of offenders over age eighteen under contemporary law assumes that uniform offense-based sentencing policies directed at adults regardless of age will protect the public and reduce crime. But this strategy is shortsighted to the extent that much young adult crime is the product of immature risk-taking propensities and that investment during this developmental period could facilitate these offenders' transitions to productive adult lives.
>
> <u>Id</u> at 659.

The authors specifically state their view "that mandatory minimum adult sentencing regimes should exclude young adult offenders, just as juvenile offenders are excluded in some states," Id at 662. This is the rational next step from the authors' scientific conclusions.

Figure Two from Petitioner's Exhibit Two, *When Does a Juvenile Become an Adult? Implications for Law and Policy*, *supra*, shows in a picture what all the words in this case say, that impulse control does not plateau until some time after age twenty-one.



Id at 780.

This graph shows that impulse control does not clearly peak and plateau until about age twenty-five.

The above graph coincides neatly with a graph published in Inst. of Med. & Nat'l Res. Council, Investing in the Health and Well-Being of Young Adults, (Richard J. Bonnie et al., eds, 2015) at *359.

Here is the age-crime curve:



FIGURE 8-1 The age-crime curve.

This shows that youth crime is related directly to undeveloped self-regulation.

*When Does a Juvenile Become an Adult?, supra*, contains a graph showing that late adolescents are as malleable as children when faced with social cues such as warm or frightened faces:

FIGURE 3. HEIGHTENED SENSITIVITY TO SOCIAL AND EMOTIONAL CUES IN
TEENS RELATIVE TO CHILDREN OR ADULTS (SOMERVILLE ET
AL. 2011; DREYFUSS ET AL. 2014)



<u>Id</u> at 782.

The authors conclude as follows:

Our findings show that, relative to adults over twenty-one, young adults show diminished cognitive capacity similar to that of adolescents, under brief and prolonged negative arousal (see Figure 5). ***This behavioral pattern was paralleled by less adultlike recruitment of prefrontal circuitry in teens and young adults, consistent with relatively protracted development of the prefrontal cortex into the early twenties.*** In contrast, young adults' performance did not differ significantly from either teens or adults in nonemotional situations. Positive emotional arousal impacted teens more than either young adults or adults, underscoring the point that developmentally informed age lines may differ from one context to another.

FIGURE 5. YOUNG ADULTS, LIKE TEENS, HAVE POORER COGNITIVE CONTROL AND LESS PREFRONTAL ACTIVITY TO THREAT CUES THAN ADULTS. (COHEN ET AL. IN PRESS)



Id at 786 (emphasis added).

Thus, the authors make clear that there are major differences between late adolescents, and those over 21, that pertain directly to this case.

The same is true of people around the world. See *Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation, supra,* Appendix 1. The earliest Dr. Steinberg found, at which self control plateaued, was twenty-two. T. 9/13/17, 63. Indeed, rather than quibble about whether a line should be drawn at eighteen—he actually sees no clear line between age seventeen and eighteen— he would set the quibble-range at twenty-one or twenty-two. T. 9/13/17, 61-63. He would place the age of complete neurobiological maturity at no earlier than twenty-two or twenty-three. T. 9/13/17, 12.

Other authorities have stated the same conclusions, again and again.[1]

---

[1] See, e.g., "The Teenage Brain," special issue, *Current Directions in Psychological Science* 22, no. 2 (2013), Dosenbach, N., et al. (2011). Prediction of individual brain maturity using fMRI. *Science*, *329*, 1358–1361; Fair, D., et al. (2009). Functional brain networks develop from a "local to distributed" organization. *PLoS Computational Biology*, *5*, 1–14, Hedman A., van Haren N., Schnack H., Kahn R., & Hulshoff Pol, H. (2012). Human brain changes across the life span: A review of 56 longitudinal magnetic resonance imaging studies. *Human Brain Mapping, 33*, 1987-2002; Pfefferbaum, A., Rohlfing, T., Rosenbloom, M., Chu, W., & Colrain, I. (2013). Variation in longitudinal trajectories of regional brain volumes of healthy men and women (ages 10 to 85 years) measured with atlas-based parcellation of MRI. *NeuroImage, 65*, 176-193; Simmonds, D., Hallquist, M., Asato, M., & Luna, B. (2014). Developmental stages and sex differences of white matter and behavioral development through adolescence: A longitudinal

In conclusion, the science is as clear as day: People under 21 are not yet adults, and should not be punished as such.

<u>Part Two: Testimony of the Petitioner and its Significance</u>

**Petitioner's Testimony:**

Luis Noel Cruz was born in Boston, and grew up partly in Puerto Rico and partly in Bridgeport, CT. In Bridgeport he experienced "a lot of crime," including drug dealing and violence. "From an early age, I saw people getting shot or killed." This was all part of daily living. T. 9/29/17, 9. Fights were common. Noel, who is physically small, was robbed, shot and jumped several times. On one such occasion he was attacked on his girlfriend's doorstep by three aggressors. After initially resisting, he curled up into a fetal position. The assailants beat his head into the concrete steps so badly that "I was

---

diffusion tensor imaging (DTI) study. *NeuroImage*, *92*, 356-368; Somerville, L., Jones, R., & Casey, B.J. (2010). A time of change: behavioral and neural correlates of adolescent sensitivity to appetitive and aversive environmental cues. *Brain & Cognition, 72*, 124-133; Casey, B. J., et al. (2010). The storm and stress of adolescence: Insights from human imaging and mouse genetics. *Developmental Psychobiology*, *52*, 225-235; Steinberg, L. (2008). A social neuroscience perspective on adolescent risk-taking. D*evelopmental Review*, *28*, 78-106; Van Leijenhorst, L., Moor, B. G., Op de Macks, Z. A., Rombouts, S. A. R. B., Westenberg, P. M., & Crone, E. A. (2010). Adolescent risky decisionmaking: Neurocognitive development of reward and control regions. *NeuroImage, 51*, 345—355; Cohen, A., Breiner, K., Steinberg, L., Bonnie, R., Scott, E., Taylor-Thompson, K., . . . Casey, B.J. (2016). When is an adolescent an adult? Assessing cognitive control in emotional and non-emotional contexts. *Psychological Science*, *4*, 549-562; Steinberg, L., Cauffman, E., Woolard, J., Graham, S., & Banich, M. (2009). Are adolescents less mature than adults? Minors' access to abortion, the juvenile death penalty, and the alleged APA "flip-flop". *American Psychologist*, *64*, 583-594; Cauffman, E., Shulman, E., Steinberg, L., Claus, E., Banich, M., Graham, S., & Woolard, J. (2010). Age differences in affective decision making as indexed by performance on the Iowa Gambling Task. *Developmental Psychology, 46*, 193-207; Braams, B., van Duijvenvoorde, A., Peper, J., & Crone, E. (2015). Longitudinal changes in adolescent risk-taking: A comprehensive study of neural responses to rewards, pubertal development and risk taking behavior. *Journal of Neuroscience, 35*, 7226-7238; Shulman, E., & Cauffman, E. (2014). Deciding in the dark: Age differences in intuitive risk judgment. *Developmental Psychology, 50,* 167-177

watching what was happening from 15 feet above the air." <u>Id</u>, 9, 11. Afterwards, he got up and walked home. <u>Id</u>, 12.

At home, Noel's father abused alcohol and suffered from psychological problems. He would keep very quiet and then "explode." He kept a lock on the food in the pantry, and Noel grew up believing this was normal. T. 9/29/17, 10.

When the Latin Kings appeared in the neighborhood, Noel was drawn to them. "It was something to be a part of. It was a brotherhood family. You know, you gain respect. You're accepted. You were never alone." T. 9/29/17, 12-13. His childhood friend sponsored his membership into the gang at age sixteen. T. 9/29/17, 18.

The influence of the Latin Kings over Noel was not to be soft or taken as a punk; to gain respect by fighting and getting money in the streets. T. 9/29/17, 14. Repeatedly on cross-examination Noel stated that the ethic he was raised on was not to speak to any figure of authority, be that police, corrections officers, probation officers, judges or even your own lawyer.  T. 9/29/17, 27-76.

The Latin Kings was a hierarchical organization, but Noel never held a position of authority. His responsibility was to "assist meetings, pay dues, learn the literature and abide by the rules and regulations of the organization," T. 9/29/17, 16. His reward was: "No matter where you went as soon as you saw a Latin King, you being a member of the Latin Kings, you automatically fit in…. It wasn't like he had to know you or you had to know him personally. Just the fact that he was a Latin King that was—that meant that, you know, you would be accepted there." T. 9/29/17, 13.

The Latin Kings called their leaders' orders "missions." A mission could be anything, including murder. The Latin Kings had a prayer, "The Warrior Prayer," in which one asked "a higher power to bless the mission that you were about to do." T.

9/29/17, 14. Generally speaking, if you disobeyed the order, the mission would be accomplished regardless, and then that mission would be done to you. T. 9/29/17, 19, 74.

After a while, Noel saw "the workings of" the Latin Kings, including betrayals and "power grabs." Then his son was born. At one meeting a crown leader appeared to offer amnesty to all those who wished to turn in their Latin King identification and paperwork and colors. Noel went home, gathered those items, returned and attempted to accept. She "looked at me kind of funny." She asked if he was sure. He said he was. She appeared to accept his resignation. T. 9/29/17, 16-17.

The night of the murders, May 13-14, 1994, was busy. Noel was twenty weeks past his eighteenth birthday, and still tangled up in the neighborhood lifestyle. The Government went into a point-by-point analysis of this on cross examination. What is essential is this: An order had gone to Noel's childhood friend that Ra Ra (Arosmo Diaz), a member of the Latin Kings, had to be killed. Noel's friend set up the logistics of the murder without Noel knowing that this is what he was doing. Noel believed that they were obtaining guns for the purpose of dealing with some "black guys" that were giving his friend trouble. T. 9/29/17, 37. This was a pretext; there was a lot of driving around and going to different streets and buildings. See generally Id at 27-74. Once Ra Ra was waiting in a car for them—along with Tyler White—Noel's friend pulled him between two buildings and told him what they really had to do. Noel answered that he did not want to kill anybody. Id at 18. His friend told him that the Latin Kings were debating what should happen to Noel, because of his "disrespecting and trying to get out." Id at 19. The friend continued, "man, you put me in a fucked-up position," and shot his gun in

the air. Believing he would be murdered if he did not carry out the murder,[2] within less than five minutes he was in the car with his victims, pulling the trigger. Id at 19, 77.

Afterwards, Noel never told anybody. He was unable to formulate a strategy, based on these facts, with his lawyer. It never occurred to him to cooperate. Ra Ra was a "prime example" of what happened to you if you did that. "He was targeted for being suspected of cooperating with the Government." And so Noel went to trial, and was convicted, and was sentenced to four terms of mandatory life without parole, plus thirty years. T. 9/29/17, 21.

He began his sentence in "the hole." Because he was so young, the facility did not know how to handle him. He was filled with a sense of hopelessness. T. 9/29/17, 22.

Once he returned to general population, two other inmates began teaching him the law. This was around 1997. He also began "a psychology-based program" called

---

[2] Noel, a small teenager, can hardly be singled out for a lack of fortitude in this regard. The twenty-eight-year-old government's witness Gilberto Rosario, for example, was Chief Enforcer in the Latin Kings. Tr. Vol. 2, Tab 7, 7/21/95, 36. He established street credentials to the jury in the following fashion:
"Q. What did you do to the correctional officer?
A. I was president of the Latin Kings at the time. Officer called me a punk. I snuffed him, man.
Q. What do you mean by snuffed him?
A. I beat his ass.
Q. Why did you do that?
A. We had a reputation to live up to."
Id at 10.
And yet that same toughguy also testified as follows, on cross examination, about the eighteen-year-old Jessica Suarez:
"Q. When....you ordered a beat down of—that little girl back there, were you saving your ass there too?
A. It was her or me.
Q. What physical threat could she have been to you?
A. She didn't have none to me.
Q. But you were saving your ass then too?
A. I was."
Id at 141-142.

CODE, which helped him cope with his situation, and was taught conflict resolution. T. 9/29/17, 22-23 By 1999—*when he was about twenty-four years old*—he had renounced the Latin Kings, and was on his way to being the "model inmate" the Government characterized him as. <u>Id</u>, at 70, 78. He now teaches programs to other inmates, translates educational programs from English into Spanish and translates religious services both ways. <u>Id</u>, 25. He has received one disciplinary ticket during his entire term of incarceration, "for going from my job assignment to the unit." <u>Id</u>, 78. He has been working consistently in UNICOR Project Management since May 28, 2002. <u>Petitioner's Exhibit Four</u> at *5.

### The Significance of Petitioner's Testimony:

The trajectory of Luis Noel Cruz's life is a case study in the science and the law of this case. He came from an underprivileged background in which he was subjected daily to fear and violence, and during his adolescence he fell prey to the siren song of crime. He is far from unique in this.

> Both cases before us illustrate the problem. Take Jackson's first. As noted earlier, Jackson did not fire the bullet that killed Laurie Troup; nor did the State argue that he intended her death. Jackson's conviction was instead based on an aiding-and-abetting theory; and the appellate court affirmed the verdict only because the jury could have believed that when Jackson entered the store, he warned Troup that "[w]e ain't playin'," rather than told his friends that "I thought you all was playin'." See 359 Ark., at 90-92, 194 S.W.3d, at 759-760; *supra,* at ____, 183 L. Ed. 2d, at 424. To be sure, Jackson learned on the way to the video store that his friend Shields was carrying a gun, but his age could well have affected his calculation of the risk that posed, as well as his willingness to walk away at that point. All these circumstances go to Jackson's culpability for the offense. See *Graham*, 560 U.S., at ____, 130 S. Ct. 2011, 176 L. Ed. 2d 825 ("[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability"). And so too does Jackson's family background and immersion in violence: Both his mother and his grandmother had previously shot other individuals. See Record in No. 10-9647, pp. 80-82. At the least, a sentencer should look at such facts before depriving a 14-year-old of any prospect of release from prison.
>
> That is true also in Miller's case. No one can doubt that he and Smith committed a vicious murder. But they did it when high on drugs and alcohol consumed with the adult victim. And if ever a pathological background might

have contributed to a 14-year-old's commission of a crime, it is here. Miller's stepfather physically abused him; his alcoholic and drug-addicted mother neglected him; he had been in and out of foster care as a result; and he had tried to kill himself four times, the first when he should have been in kindergarten. See 928 So. 2d, at 1081 (Cobb, J., concurring in result); Miller App. 26-28; *supra,* at ____, 183 L. Ed. 2d, at 430. Nonetheless, Miller's past criminal history was limited--two instances of truancy and one of "second-degree criminal mischief." No. CR-03-0915, at 6 (unpublished memorandum). That Miller deserved severe punishment for killing Cole Cannon is beyond question. But once again, a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty.

      We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. *Graham*, 560 U.S., at ____, 130 S. Ct. 2011, 176 L. Ed. 2d 825 ("A State is not required to guarantee eventual freedom," but must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S., at 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1; *Graham*, 560 U.S., at ____, 130 S. Ct. 2011, 176 L. Ed. 2d 825. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

      <u>Miller</u>, *supra*, 132 S. Ct., 2468-69.

It is not a coincidence that <u>Miller</u>'s central holding follows directly after such facts. The facts compel the conclusion, as they do here.

In particular, it is uncontested that Noel pulled the trigger less than five minutes after he was given the mission. He was given the order by his friend, who was shooting his own gun in the air to cure Noel's reluctance, cursing and telling Noel the Latin Kings were debating what to do with him after he disrespected them by trying to leave. One can hardly find clearer facts supporting the truth behind the following <u>Miller</u> factors:

> [C]hildren are constitutionally different from adults for sentencing purposes. Their " 'lack of maturity' " and " 'underdeveloped sense of responsibility' " lead to recklessness, impulsivity, and heedless risk-taking. *Roper*, 543 U.S., at 569, 125 S. Ct. 1183, 161 L. Ed. 2d 1. They "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; **they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings.**
>     Miller, *supra*, 132 S. Ct. at 2459 (emphasis added).

Not only was the general environment horrific, this crime was committed in a frenzy of hot cognition. Noel's prefrontal cortex was overwhelmed by his Limbic System. His "social brain" was howling. Noel was not merely seeing a picture of a frightened face while a college buddy was watching him take a campus psychology test. He was faced with a clear and present threat delivered by his childhood friend, and the need to make an *immediate* decision. His only adult supervision was the Latin Kings hierarchy, the same adults who ordered him to redeem himself by carrying out murder. The potential penalty for violating the law was less a factor, in Noel's mind, than the penalty for disobeying the crown; and the result of committing murder was his to keep his own life and be redeemed with the crown. "*Miller's* reference to 'lack[ing] the ability to extricate themselves from horrific, crime-producing settings' could be taken to refer not only to a child's inability to avoid the familial abuse that produced propensity to crime, but also to the adolescent's ability (or inability) to resist **specific crime settings as they unfolded**." Thomas Grisso and Antoinette Kavanaugh, *Prospects for Developmental Evidence in Juvenile Sentencing Based on Miller v. Alabama*, Psychology, Pub. Policy and Law, Vol. 22, No. 3, 235-249, 242 (2016) (emphasis added), Appendix 2.

Finally, Noel's spectacular evolution within the Bureau of Prisons proves the truth of the law.

> Petitioner has discussed in his submission to this Court his evolution from a troubled, misguided youth to a model member of the prison community.

> Petitioner states that he helped establish an inmate boxing team, of which he later became a trainer and coach. He alleges that he has contributed his time and labor to the prison's silkscreen department and that he strives to offer advice and serve as a role model to other inmates. These claims have not been tested or even addressed by the State, so the Court does not confirm their accuracy. The petitioner's submissions are relevant, however, as an example of one kind of evidence that prisoner might use to demonstrate rehabilitation.
> Montgomery v. Louisiana, *supra*, 136 S. Ct. at 736.

In conclusion, Petitioner's testimony in this case compels the conclusion that his crime was the direct result of a disastrous adolescence. Therefore the Eighth Amendment requires that he be accorded a meaningful opportunity for release, and a new sentencing hearing, so that he may "demonstrate the truth of *Miller*'s central intuition — that children who commit even heinous crimes are capable of change." Id.

## Part Three: National Consensus

"You can't say with a straight face that 18-year-olds are adults and 17-year-olds are not. You just can't."

--Lisa Jacobs, program manager at the Center for Criminal Justice Research, Loyola University, Chicago, as quoted in Sarah Barr, "States consider options for young adults in justice system," (January 4, 2017), available at http://jjie.org/2017/01/04/states-consider-options-for-young-adults-in-justice-system/ (last viewed Oct. 24, 2017).

### The Importance of National Consensus

National consensus, while important, is not the most important factor in cases like this, wherein science enlightens law. This case is about the science of culpability. In Moore v. Texas, 137 S. Ct. 1039, 1048 (2017), which is about executing the intellectually disabled, Justice Ginsburg emphasized the superiority of scientific consensus over the discretion of the states:

> In Hall v. Florida, [134 S. Ct. 1986 (2014)] we held that a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70.... Although *Atkins* [*v. Virginia*, 122 S. Ct. 2242 (2002)] and *Hall* left to the States "the task of developing

appropriate ways to enforce" the restriction on executing the intellectually disabled, ....States' discretion, we cautioned, is not "unfettered[,]".... Even if "the views of medical experts" do not "dictate" a court's intellectual-disability determination.... ***the determination must be "informed by the medical community's diagnostic framework***[.]" We relied on the most recent (and still current) versions of the leading diagnostic manuals—the DSM-5 and AAIDD-11.... Florida, we concluded, had violated the Eighth Amendment by "disregarding established medical practice.".... We further noted that Florida had parted ways with practices and trends in other States.... *Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. ***But neither does our precedent license disregard of current medical standards.***

Moore v. Texas, *supra*, 317 S. Ct. at 1048-49 (emphases added).

Brief interlude: National consensus is not the only parallel between adolescence and cognitive disabilities. The inappropriateness of bright lines is as well. Two years before Moore, the Supreme Court in Brumfield v. Cain, 135 S. Ct. 2269 (2015) vacated a decision of a state post-conviction court and remanded for a hearing. Although an I.Q. of seventy is typically the cut-off for cognitive disability, the lower court erred in its conclusion that having an I.Q. of seventy-five made the petitioner ineligible for a hearing on his mental disability. Just as youth is more than a chronological fact, "an IQ test result can not be assessed in a vacuum." Id at 2277.

Back to national consensus: Just four years before the release of Miller v. Alabama, 132 S. Ct. 2455 (2012), forty-three states allowed juvenile life without parole (LWOP). See Connie de la Vega and Michelle Leighton, Sentencing our Children to Die in Prison: Global Law and Practice, 42 U.S.F. L. Rev. 983, 1029 (2008), Appendix 4. In 2008, for certain crimes, juvenile LWOP was *mandatory* in Arkansas (age 14+), Connecticut (age 14+), Delaware (any age), Florida (any age), Illinois (age 13+), Indiana (age 16+), Iowa (age 14+), Louisiana (age 15+), Massachusetts (age 14+), Minnesota (age 14+), Missouri (age 12+), Nebraska (any age), New Jersey (age 14+), New York (any

age for a terrorist act), North Carolina (age 13+), Ohio (age 14+), Pennsylvania (any age), South Carolina (any age), South Dakota (age 10+), Texas (age 10+), Virginia (age 14+) and Washington (age 15+). Thus <u>Miller</u>'s decision relied primarily on science to strike down the specifically enacted mandatory sentencing laws of nearly half the states in the country. This is a heavy hand over local practice, as well it should be in the area of fundamental human rights.

The science in this case is as clear as it was in <u>Miller</u>, because <u>Miller</u> relied on the exact varietal of scientific evidence—indeed, on the same *expert*—as that presented by Petitioner. <u>Miller</u> followed <u>Roper</u>'s line because the defendants in <u>Miller</u> were under eighteen. So was the defendant in <u>Roper</u>. There was no call for a different line based on the controversy before the court. Furthermore, in 2005 the scientific basis for defining adolescence as over eighteen was not fully developed. Today it is, and to disregard such clear contemporary evidence would, of itself, violate <u>Moore</u>. Notwithstanding this, Your Honor need not make a choice between scientific consensus and national consensus. They both point in the same direction: It is now commonly accepted among Americans that our brains are not fully mature until our mid-twenties.

<u>Historical Context</u>

From the start of the twentieth century until the present day, there have been three distinct policy phases regarding juvenile offenders.[3] First, at the turn of the twentieth century, the Progressive reform movement advanced a conception of juvenile offenders that separated them from their adult counterparts and urged a focus on their care and rehabilitation.

---

[Footnotes from <u>When Does a Juvenile Become and Adult</u>, *supra*, re-numerated in accordance with this brief's footnote enumeration]:

[3] Kim Taylor-Thompson, *Minority Rule: Redefining the Age of Criminality*, 38 N.Y.U. Rev. L. & Soc. Change 143, 147-48 (2014); *see also* Kristin Hemming, *Criminalizing Normal Adolescent Behavior in Communities of Color: The Role of Prosecutors in Juvenile Justice Reform*, 98 Cornell L. Rev. 383, 388-91 (2013) (describing the "emerging view of childhood and adolescence as distinct developmental stages").

[4] Second, toward the end of the twentieth century, politicians, academics and the media advanced a competing conception of the adolescent offender. They redefined adolescent offenders as a new, younger breed of criminal whose predatory conduct necessitated nothing less than adultlike interventions and punishment. The third phase in justice policymaking has begun to emerge in the last decade. Spurred in part by legal rulings, fiscal constraints, and developmental science findings, policymakers have begun to retreat from the earlier wave of punitive approaches in addressing adolescent behavior and have instead gravitated toward a more nuanced understanding of the developmental traits that distinguish adolescents from adults.

When Does a Juvenile Become an Adult?, *supra*, at 772.

Luis Noel Cruz received mandatory LWOP in 1996, the very heart of the second stage described above, the discredited age of mass incarceration (especially of minorities[5]) and of viewing troubled kids (especially minorities[6]) as superpredators.

United States Sentencing Commission

The agency tasked with scrupulously analyzing federal sentencing nationwide is the United States Sentencing Commission (the Commission). "For even though the [United States Sentencing Guidelines] are advisory rather than mandatory, they are, as

---

[4]Toward the end of the first phase, critics of the juvenile court began to question its informality, complaining that the rehabilitative goals of the Court were simply a cover for intervention and punishment without procedural safeguards for the child. So, the Supreme Court extended certain, but not all, constitutional protections afforded to an adult accused. *See In re* Gault, 387 U.S. 1, 56 (1967). But the extension of adultlike constitutional safeguards may have weakened the moral foundations of the juvenile court by supporting the view that courts should treat adolescents as adults. *See, e.g.*, Nat'l Research Council, Reforming Juvenile Justice: A Developmental Approach 38 (Richard J. Bonnie et al. eds., 2013) ("Ironically, the procedural reforms that youth advocates had promoted appeared to support the legitimacy of an adversarial regime that ignored developmental differences between juveniles and adults."); Kim Taylor-Thompson, *States of Mind/States of Development*, 14 STAN. L. & POL'Y REV. 143, 147 (2003) ("The more that juvenile legal institutions and procedures have begun to mirror their adult counterparts, the more difficult the task has become to distinguish between adolescents and adults in any meaningful way or to justify the continued existence of a separate system of adjudication for youths. Extension of adult-like constitutional status may have contributed to the perception that courts *could* treat adolescents as adults. That courts *should* treat adolescents as adults then deceptively seemed only a small step.").
[5] See Connie de la Vega and Michelle Leighton, *Sentencing our Children to Die in Prison: Global Law and Practice*, 42 U.S.F. L. Rev. 983, 993 (2008), Appendix 4.
[6] Id.

we pointed out in [<u>Rita v. United States</u>, 127 S. Ct. 2456 (2007)], the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." <u>Gall v. United States</u>, 128 S. Ct. 586, 594 (2007).[7] This makes the Commission a litmus of national consensus.

In a May 2017 report by the Commission, *Youthful Offenders in the Federal System* (*Youthful Offenders*), Appendix 3, the Commission begins by defining a youthful offender as a person "age 25 or younger at the time they are sentenced in the federal system." <u>Youthful Offenders</u> at *1.

> Traditionally, youthful offenders often have been defined as those under the age of 18, but for purposes of this study, the Commission has defined youthful offenders as a federal offender 25 years old or younger at the time

---

[7] <u>Gall</u>, which was released before <u>Graham</u> and <u>Miller</u>, contains an interesting section approving of a district court judge's discretion to consider the basic of wisdom of <u>Roper</u> intuitively applied to a twenty-one year-old defendant.

> In summary, the District Judge observed that all of Gall's criminal history, "including the present offense, occurred when he was twenty-one-years old or younger" and appeared "to stem from his addictions to drugs and alcohol." *Id.,* at 122, 123. The District Judge appended a long footnote to his discussion of Gall's immaturity. The footnote includes an excerpt from our opinion in *Roper v. Simmons,* 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which quotes a study stating that a lack of maturity and an undeveloped sense of responsibility are qualities that " 'often result in impetuous and ill-considered actions.'" The District Judge clearly stated the relevance of these studies in the opening and closing sentences of the footnote:
>
> > "Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five.... [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant."
> > App. 123, n. 2.
>
> Given the dramatic contrast between Gall's behavior before he joined the conspiracy and his conduct after withdrawing, it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future. Indeed, his consideration of that factor finds support in our cases.
>
> > <u>Gall</u>, 128 S. Ct. at 601.

of sentencing. The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average.
    Youthful Offenders at *5.

The Commission's report begins with a historical context which resonates with the three stages described above in When Does a Juvenile Become an Adult?, *supra*, at 772. Before the "superpredator" era, in 1950, the Youth Corrections Act (YCA), 18 U.S.C. §§ 5005, *et seq.* (repealed by Pub. L. 98—473, 98 Stat. 2027, Title II, § 218(a)(8) (Oct. 12, 1984)), was passed "to provide guidance to federal judges when sentencing a 'young offender' under the age of 22, and a 'young adult offender' between the ages of 22 and 26, that included segregation from adult offenders in prison and alternatives to imprisonment, such as rehabilitation and treatment." Youthful Offenders at *3. "The YCA was repealed when Congress enacted the Sentencing Reform Act in 1984." Id. This was the beginning of the era of mass incarceration. See generally, Sentencing our Children to Die in Prison: Global Law and Practice, supra.  The Sentencing Reform Act also eliminated the parole system.[8] This was another imprescient policy choice. Under Montgomery v. Louisiana, 136 S. Ct. 718, 736 (2016), the opportunity for parole protects youth from being forced to serve a disproportionate sentence in violation of the Eighth Amendment.

The Commission's report affirms recent scientific findings such as that presented by Petitioner. It examines the actual sentencing of youthful offenders in the federal system between 2010 and 2015. During this time period, federal courts sentenced 86,309 youthful offenders. This is eighteen percent of the total defendants sentenced.

---

[8] See "Summary: H.R. 5773—98th Congress (1983-1984), available at https://www.congress.gov/bill/98th-congress/house-bill/5773 (last viewed Oct. 24, 2017).

Youthful Offenders at *2. "There was a steady decline in the number of youthful offenders sentenced each year." Id at *13.

Most importantly, of those 86,309 youthful offenders, only ninety-six received life imprisonment. "These 96 offenders represent just one-tenth of one percent of all youthful offenders." Id at *48. Of those ninety-six, eighty-five were twenty-one or older at sentencing. Id. Luis Noel Cruz would have been one of those other eleven; he had turned twenty years old a mere thirty-six days before his sentencing on January 30, 1996. Between 2010 and 2015 only five defendants who received life were younger than twenty at sentencing, and a mere ***one of them was eighteen.*** Id.

One person out of nearly half a million in the federal system between 2010 and 2015 was eighteen years old at the time of sentencing, and received a life sentence. This is as clear an indicia as can be found that today's federal courts have turned away, almost entirely, from life sentences for late adolescents.

Bredhold v. Kentucky

As a reference point on legal analysis of national consensus, Your Honor might consider the analysis performed by the court in Commonwealth v. Bredhold, No. 14-cr-161 (Fayette Co. Aug, 1, 2017), Appendix 5. Bredhold declared Kentucky's death penalty statute unconstitutional as applied to defendants under age twenty-one. The Kentucky court, having heard the live testimony of Dr. Steinberg, turned to the question whether there is a national consensus against the execution of late adolescents. It found that such a consensus does exist.

> Since *Roper*, six (6) states[9] have abolished the death penalty, making a total of nineteen (19) states and the District of Columbia without

[Footnotes from Bredhold, re-numerated in accordance with this brief's footnote enumeration]:

a death penalty statute. Additionally, the governors of four (4) states[10] have imposed moratoria on executions in the last five (5) years. Of the states that do have a death penalty statute and no governor-imposed moratoria, seven[11] have *de facto* prohibitions on the execution of offenders under twenty-one (21) years of age, including Kentucky. Taken together, there are currently thirty states in which a defendant who was under the age of twenty-one (21) at the time of their offense would not be executed—ten (10) of which have made their prohibition on the death penalty official since the decision in *Roper* in 2005.

Of the thirty-one (31) states with a death penalty statute, only nine (9) executed defendants who were under the age of twenty-one (21) at the time of their offense between 2011 and 2016.[12] Those nine (9) states have executed a total of thirty-three (33) defendants under the age of twenty-one (21) since 2011—nineteen (19) of which have been in Texas alone.[13] Considering Texas an outlier, there have only been fourteen (14) executions of defendants under the age of twenty-one (21) between 2011 and 2016, compared to twenty-nine (29) executions in the years 2006 to 2011, and twenty-seven (27) executions in the years 2001 to 2006 (again, excluding Texas).[14] In short, the number of executions of defendants under twenty-one (21) in the last five (5) years has been cut in half from the two (2) previous five- (5) year periods.

Looking at the death penalty as practically applied to all defendants, since 1999 there has been a distinct downward trend in death sentences and executions. In 1999, 279 offenders nationwide were sentenced to death, compared to just thirty (30) in 2016 – just about elven (11) percent of the number sentenced in 1999.[15] Similarly, the number of defendants actually executed spiked in 1999 at ninety-eight (98), and then gradually

---

[Footnotes from <u>Bredhold</u>, cont'd.]:

[9] The states that have abolished the death penalty since *Roper* and year of abolition: Connecticut (2012), Illinois (2011), Maryland (2013), New Jersey (2007), New Mexico (2009) and  New York (2007).

[10] The governors of Pennsylvania and Washington imposed moratoria on the death penalty in  2015 and 2014, respectively. The governor of Oregon extended a previously imposed moratorium in 2015. The governor of Colorado granted an indefinite stay of execution to a death row inmate in 2013.

[11] Kansas and New Hampshire have not executed anyone since 1977. Montana and Wyoming  have never executed anyone who was under twenty-one (21) years of age at the time of their offenses, and they currently have no such offenders on death row. Utah has not executed anyone  who was under twenty-one (21) years of age at the time of their offense in the last fifteen (15) years, and no such offender is currently on Utah's death row. Idaho and Kentucky have not executed anyone who was under twenty-one (21) years old at the time of their offense in the last fifteen (15) years.

[12] Chart of Number of People Executed Who Were Aged 18, 19 or 20 at Offense from 2000 to Present, By State [current as of February 29, 2016]

[13] *Id.*

[14] *Id.*

[15] Death penalty Information Center, Facts About the Death Penalty (Updated May 12, 2017),  downloaded from https://deathpenaltyinfo.org/documents/FactSheet.pdf.

decreased to just twenty (20) in 2016—only two of which were between the ages of eighteen (18) and twenty (20).

Contrary to the Commonwealth's assertion, it appears there is a ***very clear national consensus toward restricting the death penalty, especially in the case where defendants are eighteen (18) to twenty-one (21) years of age***. Not only have six more states abolished the death penalty since *Roper* in 2005, four more have imposed moratoria on executions, and seven more have *de facto* prohibitions on the execution of defendants eighteen (18) to twenty-one (21). In addition to the recent legislative opposition to the death penalty, ***since 1999 courts have also shown a reluctance to impose death sentences on offenders, especially those eighteen (18) to twenty-one (21).*** "[T]he objective indicia of consensus in this case—the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today our society views juveniles ... as 'categorically less culpable than the average criminal.'" *Roper*, 543 U.S. at 567 (quoting *Atkins*, 536 U.S. at 316). Given this consistent direction of change, this Court thinks it clear that the national consensus is growing more and more opposed to the death penalty, as applied to defendants eighteen (18) to twenty-one (21).

Bredhold at *5-6 (emphases added).

Although Bredhold is about the death penalty, and this case is about mandatory life imprisonment without parole (LWOP), Miller and Graham both emphasize that death and LWOP are, for teenagers, "the same in name only." Miller v. Alabama, 132 S. at 2466, citing Graham, 130 S. Ct. at 2011. Therefore, the national consensus argument is identical, and the analysis in Bredhold is highly persuasive.

People v. House

Petitioner cited People v. House, 2015 IL App (1st) 110580, Appendix 6, in earlier briefs; however two aspects of it warrant revisitation here. First, rehearing was denied on March 27, 2017, so the decision stands. Second, it contains a sound passage about national consensus specifically on the question of late adolescent LWOP:

"It is widely recognized by many legal scholars that the United States Supreme Court is moving rather quickly towards abolishing life without parole sentences for juvenile offenders entirely." Maureen Dowling, Note *Juvenile Sentencing in Illinois: Addressing the Supreme*

*Court Trend Away From Harsh Punishments for Juvenile Offenders,* 35 N. Ill. U. L. Rev. 611, 619 (2015).

"There are several parts of the analyses of each case that point to this inevitable shift. First, each case acknowledges that the decisions are directly contrary to our historical understanding of juvenile sentencing. The Court rejects the notion of looking at sentencing 'through a historical prism' in favor of the evolving moral and ethical standards of society. This opens up the Court to abolish life without parole sentences for juveniles, even though traditionally it is a widely practiced and accepted sentence. Second, each opinion makes it clear that simply because a majority of state sentencing statutes do not currently agree with the decisions, this will not affect the outcome. This argument goes hand-in-hand with the Court's rejection of historical sentencing standards. Again, the Court has left open the possibility of abolishing the harshest sentence available to juveniles. Finally, the Court repeatedly emphasizes the differences between juveniles and adults as an explanation for why each should be sentenced differently. The continued focus on these differences further bolsters the argument for abolishing life sentences without the possibility of parole for juveniles." *Id.* at 619–20.

"The Supreme Court has followed a clear path away from life without parole sentences. Following the reasoning laid out by the Court in these three cases, it can easily be seen how the Court would deal with abolishing the sentence entirely." *Id.* at 627. As this note observes, several states have responded to *Miller* by imposing "*de facto*" life sentences through lengthy term-of-years sentences. *Id.* at 620. However, "These de-facto life sentences are not consistent with the language or analysis found in both *Miller* and *Graham.* A prison sentence that will last sixty or more years does not allow courts to show juvenile offenders any clemency. Furthermore, despite the lengthy discussion about the differences between adults and juveniles, de-facto life sentences do not give courts any opportunity to take the differences into account when determining a sentence." *Id.* at 621. We also observe that the Iowa Supreme Court in *State v. Null,* 836 N.W.2d 41 (Iowa 2013)expanded the principles of *Miller* to hold mandatory minimum sentences for juvenile offenders to be unconstitutional.

People v. House, *supra* at ¶¶ 92-93.

This same reasoning applies with equal force to the instant case.

United States Department of Justice (DOJ)

Last year, a report was prepared for the DOJ "to identify those programs addressing the developmental needs of young adults involved in the criminal justice system." Connie Hayek, Environmental Scan of Developmentally Appropriate Criminal

<u>Justice Responses to Justice-Involved Young Adults</u>, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, June, 2016 at *1, Appendix 7. Young adults were defined as "persons between the ages of 18 to 25 years." <u>Id</u> at *2.

The report identifies a plethora of initiatives and innovations nationwide designed to protect late adolescents. For example, there are Young Adult Courts in San Francisco, CA (began 2015 for age 18-25), <u>Id</u> at *25; Omaha, NE (begun 2004 for up to age 25), <u>Id</u> at *26; Kalamazoo County, MI (begun in 2013 for age 17-20), <u>Id</u> at *27; Lockport City, NY, <u>Id</u> at *28 and New York, NY (begun 2016 for age 18-20) <u>Id</u> at *29.

The report also details probation/parole programs, <u>Id</u>, *30-35; programs led by prosecutors, <u>Id</u>, *36-40, community based programs, hybrid programs, prison programs and so on. The report is exhaustive and shows a nationwide, growing nonpartisan recognition of the need to protect late adolescents from the full brunt of criminal penalties.

Another study by the DOJ "focused on ages approximately 15-29.... The authors conclude that 'young adult offenders age 18-24 are more similar to juveniles than to adults with respect to their offending, maturation, and life circumstances," <u>Investing in the Heath and Well-Being of Young Adults</u>, *supra* at *361.

Clearly, the federal-level consensus is that late adolescents are categorically different from adults.

<u>United States Supreme Court Precedent</u>

We look to national consensus as demonstrative of our nation's evolution. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.... The Amendment must draw its meaning from the evolving standards of decency

that mark the progress of a maturing society." <u>Atkins v. Virginia</u>, 536 U.S. 304, 311

(2002), citing <u>Trop v. Dulles</u>, 356 U.S. 86 (1958).

    "The evidence of national consensus against the death penalty for juveniles is

similar, and in some respects parallel, to the evidence <u>Atkins</u> held sufficient to

demonstrate a national consensus against the death penalty for the mentally retarded."

<u>Roper v. Simmons</u>, *supra*, 543 U.S.at 564.

> It is not so much the number of these States that is significant, but
> the ***consistency of the direction of change.*** Given the well-known
> fact that anticrime legislation is far more popular than legislation
> providing protections for persons guilty of violent crime, the large number
> of States prohibiting the execution of mentally retarded persons (and the
> complete absence of States passing legislation reinstating the power to
> conduct such executions) provides powerful evidence that today our
> society views mentally retarded offenders as categorically less culpable
> than the average criminal. The evidence carries even greater force when it
> is noted that the legislatures that have addressed the issue have voted
> overwhelmingly in favor of the prohibition. Moreover, even in those States
> that allow the execution of mentally retarded offenders, the practice is
> uncommon. Some States, for example New Hampshire and New Jersey,
> continue to authorize executions, but none have been carried out in
> decades. Thus there is little need to pursue legislation barring the
> execution of the mentally retarded in those States. And it appears that
> even among those States that regularly execute offenders and that have no
> prohibition with regard to the mentally retarded, only five have executed
> offenders possessing a known IQ less than 70 since we decided *Penry*. The
> practice, therefore, has become truly unusual, and it is fair to say that a
> national consensus has developed against it.
>     <u>Atkins</u>, supra, 536 U.S. at 315-16 (emphasis added).

This passage from <u>Atkins</u> applies well to the instant case. The direction of the

change away from inflicting the law's harshest penalties on adolescents is crystal clear.

The direction of change in the area of cognitive disability since <u>Atkins</u> was vindicated in

<u>Moore v. Texas</u>, *supra*. Just so, the directions of the change in <u>Miller</u> was vindicated in

<u>Montgomery v. Louisiana</u>, *supra,* which, in holding <u>Miller</u> to be retroactive because it is

a substantive rule of law, observed:

In support of its holding that a conviction obtained under an unconstitutional law warrants habeas relief, the S*iebold* Court explained that "[a]n unconstitutional law is void, and is as no law." [Ex Parte Seibold, 100 U.S. 371, 376 (1880).] A penalty imposed pursuant to an unconstitutional law is no less void because the prisoner's sentence became final before the law was held unconstitutional. There is no grandfather clause that permits States to enforce punishments the Constitution forbids. To conclude otherwise would undercut the Constitution's substantive guarantees.

Montgomery v. Louisiana, *supra*, 136 S. Ct. at 731.[16]

The more the Supreme Court writes about this issue, the less it becomes about the age of the offender *per se*, and the more it becomes about recognizing the hallmark characteristics of adolescence.

It is clear after *Montgomery* that the Eighth Amendment requires more than mere consideration of a juvenile's age before the imposition of a sentence of life without parole. It requires that a sentencer decide whether the juvenile offender before it is a child "whose crimes reflect transient immaturity" or is one of "those rare children whose crimes reflect irreparable corruption" for whom a life without parole sentence may be appropriate. 577 U.S. at ___ (slip op., at 18). There is thus a very meaningful task for the lower courts to carry out on remand."

Tatum v. Arizona, 137 S. Ct. 11,  (mem.) (2016), (*Sotomayor* concurring).

If Your Honor finds that Luis Noel Cruz's behavior, at eighteen, reflected such transient immaturity, it must follow that his sentence violates the Eighth Amendment.

State Criminal Statutes

States around the country have been responding to the new science and case law. It nonetheless remains true that the "line between childhood and adulthood is drawn different ways by various states." Thompson v. Oklahoma, 487 U.S. 815, 824 (1988).

---

[16] The Government has argued that § 2255 forbids the Court from considering the Second Circuit's certification of the Petitioner's claim. The Court has already dispensed with this argument in its motion denying reconsideration. Therefore, Petitioner shall not address that defense in this memorandum. It is worth noting here, however, that this passage resonates against any statutory prohibition on the making of this constitutional claim.

This is not a hindrance to Petitioner's claim now, just as it was not for the <u>Thompson</u> Court.

States around the country offer greater protections over youthful offenders into their early twenties. Following are examples of some statutes.

**Alabama:** <u>See</u> Ala. Code § 15-19-1, et. seq, known as the Youthful Offender Act of 1975. "The Youthful Offender Act is intended to extricate persons ***below twenty-one years of age*** from the harshness of criminal prosecution and conviction. It is designed to provide them with the benefits of an informal, confidential and rehabilitative system." <u>Raines v. State</u>, 294 Ala 360, 363 (Alabama 1975) (emphasis added).

**California**: <u>See</u> Cal. Penal Code § 3051(a)(1): "A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was ***under 23 years of age*** at the time of his or her controlling offense" (emphasis added).

**Colorado:** <u>See</u> C.R.S.A. § 18-1.3-407(1)(c)(2): "For the purposes of public safety, academic achievement, rehabilitation, the development of pro-social behavior, or reentry planning for youthful offenders, the executive director or his or her designee may transfer any offender ***age twenty-four years or younger*** and sentenced to the department of corrections into and out of the youthful offender system at his or her discretion" (emphasis added).

**Florida:** In a section of Florida's statutory scheme entitled "Continuing care for young adults," Florida law defines "child" as "an individual who has not attained 21 years of age" and "young adult" as "an individual who has attained 18 years of age but who has not attained 21 years of age." Fla. Stat. Ann. § 39.6251.

In the criminal context, Fla. Stat. Ann. § 958.04, Judicial disposition of youthful offenders, provides:

> (1) The court may sentence as a youthful offender any person:
> (a) Who is at least 18 years of age or who has been transferred for prosecution to the criminal division of the circuit court pursuant to chapter 985;
> (b) Who is found guilty of or who has tendered, and the court has accepted, a plea of nolo contendere or guilty to a crime that is, under the laws of this state, a felony if the offender is ***younger than 21 years of age*** at the time sentence is imposed; and
> (c) Who has not previously been classified as a youthful offender under the provisions of this act; however, a person who has been found guilty of a capital or life felony may not be sentenced as a youthful offender under this act...

**Georgia:** Ga. Code Ann. § 42-7-2(7) provides: "'Youthful offender' means any male offender who is ***at least 17 but less than 25 years of age*** at the time of conviction and who in the opinion of the department has the potential and desire for rehabilitation" (emphasis added).

GA Code. Ann. § 35-3-37(j)(4) provides for the expungement of misdemeanors of youthful offenders who have stayed out of trouble.

**Hawai'i**: Haw. Rev. Stat. Ann. § 706-667(1) provides: "….A young adult defendant is a person convicted of a crime who, at the time of the offense, is ***less than twenty-two years of age*** and who has not been previously convicted of a felony as an adult or adjudicated as a juvenile for an offense that would have constituted a felony had the young adult defendant been an adult" (emphasis added). It does not apply to murder.

Haw. Rev. Stat. Ann. § 712-1256(1) provides: "Upon the dismissal of such person and discharge of the proceeding against the person under <u>section 712-1255</u>, this person, if the person was ***not over twenty years of age*** at the time of the offense, may apply

to the court for an order to expunge from all official records all recordation relating to the person's arrest, indictment, or information, trial, finding of guilt, and dismissal and discharge pursuant to this section" (emphasis added).

**Indiana**: Ind. Code Ann. § 11-14-1-5 defines "youthful offender" as an offender who "is *less than twenty-one (21) years of age*" (emphasis added). It does not apply to those sentenced to greater than eight years.

**Michigan**: The Holmes Youthful Trainee Act of 1927, which originally protected youths up to age twenty-one, in 2015 was revised to allow for the expungement of the record of a youthful offender *up to age twenty-four*. See Mich. Comp. Laws Ann. § 762.11. For those over age twenty-one, the prosecutor's consent is required, and it does not apply to any "felony for which the maximum penalty is imprisonment for life," or a" major controlled substance offense."

**New Jersey**: NJ Stat. Ann. § 2C:43-5 provides: "Any person who, at the time of sentencing, is *less than 26 years of age* and who has been convicted of a crime may be sentenced to an indeterminate term at the Youth Correctional Institution Complex...." (emphasis added). However: "This section shall not apply to any person less than 26 years of age at the time of sentencing who qualifies for a mandatory minimum term of imprisonment without eligibility for parole, pursuant to subsection c. of N.J.S. 2C:43-6; however, notwithstanding the provisions of subsection c. of N.J.S. 2C:43-6, the mandatory minimum term may be served at the Youth Correctional Institution Complex...." Id.

33A N.J. Prac., Criminal Law § 46:11 (5th ed.) provides: "Any person who was *21 years of age or younger* at the time the person committed certain drug related

offenses is eligible for an expedited proceeding to expunge the records relating to those convictions" (emphasis added).

**North Carolina**: <u>See</u> N.C. Gen. Stat. § 15A-145.2. "Expunction of records for first offenders ***not over 21 years of age*** at the time of the offense of certain drug offenses" (emphasis added).

**New York:** CPL 720.35 classifies a youthful offender as a person charged with a crime alleged to have been committed when he/she was at least sixteen years old and ***less than nineteen years old.***

**Oklahoma:** Though the statute strictly limits eligibility to nonviolent offenders, Okla. Stat. tit. 22, § 996 provides: "As used in the Delayed Sentencing Program for Young Adults: "Offender" means any adult ***eighteen (18) through twenty-one (21) years of age*** as of the date of a verdict of guilty or a plea of guilty or nolo contendere...." (emphasis added).

**South Carolina**: S.C. Code Ann. § 24-19-10(d)(ii) defines as a youthful offender anybody charged with a misdemeanor or a relatively less serious felony, up to ***age twenty-four.***

S.C. Code Ann. § 22-5-920 provides for expungement of youthful offenders' nonviolent crimes.

**Virginia**: VA Code Ann. § 19.2-311(B)(1) establishes a Youthful Offender Program for any person who was "convicted before becoming ***twenty-one years of age***," not counting murder convictions. (emphasis added).

**Vermont**: VT H.95, signed in 2016, raises the age of juvenile jurisdiction over criminal matters to twenty-one, except for the most serious crimes.

**West Virginia**: W.V. Code § 25-4-6 provides separate facilities for those ***under age twenty-five.***

W.V. Code § 61-11-26 provides for expungement of misdemeanors committed "***between the ages of eighteen and twenty-six***," (emphasis added).

The exemption of protections for adolescents who commit the most serious crimes does not undermine petitioner's argument. Petitioner does not argue that he should have been tried in juvenile court, or that he should have received a diversionary program. He admits his crime was serious and his penalty should reflect that. These laws are intended to deal with the top, wide part of the criminal justice system's funnel—crimes that would never be considered for prosecution in federal court.

As of 2003—two years before <u>Roper</u>—thirty-five states had already extended "dispositional jurisdiction beyond age eighteen." <u>Young Adulthood</u>, *supra*, at 666, n. 156. By 2016, all fifty states, the District of Columbia, American Samoa, Guam, Northern Mariana, Puerto Rico and the Virgin Islands had done so. <u>See</u> Angel Zang, <u>U.S. Age Boundaries of Delinquency 2016</u>, National Center for Juvenile Justice. Geography, Policy, Practice & Statistics: *StateScan* at *2, July, 2017, Appendix 8. This study shows a unanimous national consensus that late adolescents require extra protections from the criminal law. Indeed, there is *more* consensus that turning eighteen does not magic away one's immaturity, than there is that seventeen is the proper jurisdictional age for juvenile court. This matters. To be clear, Petitioner is *not* claiming that he should have been prosecuted as a juvenile. The Constitution allows the Government to indict eighteen-year-olds. What the Constitution does *not* allow is the imposition of the law's harshest penalties upon individuals, such as Noel, who demonstrate the hallmark characteristics of youth. Therefore, the consensus about the age of juvenile court

38

jurisdiction does not inform the question before this Court. More relevant is our society's view of the extended age of juvenile supervision, because that better informs the question whether non-juvenile adolescent defendants should be sentenced to death or LWOP. Our nationwide practice of going easier on adolescents *after* they are no longer technically juveniles provides the answer.

Compare the report above with its 2014 counterpart, Appendix 9. Even within the narrow window of these two years, the direction is unmistakable and ratchet-like. Iowa's extended age rose from nineteen to twenty; Nebraska's rose from eighteen to twenty; Rhode Island's rose from eighteen to twenty. New Hampshire's upper age of juvenile court jurisdiction went from sixteen to seventeen. Locally, Massachusetts had raised its age from sixteen to seventeen in 2003[17] and Connecticut had done the same in 2007 under Connecticut General Statutes § 46b-121(a)(2).

To the extent that legislatures have not carved out special laws protecting late adolescents who have committed the most serious crimes, this is indicative of an implicit practice among judges and prosecutors of *not* imposing draconian sentences upon late adolescents. Given our nation's scrappy political temperament, it would not seem worth crafting such highly specialized legislation for such a small and politically unpopular group.

Finally, to the extent that state legislators might habitually exhibit the outmoded folk wisdom of *malitia supplet actatem*—translated as "the malice supplies the age," also expressed as *do the crime, do the time*—this Court might excuse their

---

[17] Massachusetts' Department of Youth Services 2016 Raise the Age Report, December 2016, available at http://www.mass.gov/eohhs/docs/dys/dys-raise-the-age-report-2016.pdf (last viewed November 6, 2017).

imperfections. Old habits die hard. In 1786, Before the 12-year-old, cognitively disabled, chronic domestic violence victim, African-American/Native American Hannah Ocuish was about to be publicly hanged for murder in New London, her minister preached, "Sparing you on account of your age, would, as the law says, be of dangerous consequence to the publick, by holding up an idea, that children might commit such atrocious crimes with impunity." Frances E. Jensen, _The Teenage Brain A Neuroscientist's Survival Guide to Raising Adolescents and Young Adults_, 1, at *262 (1st Ed. 2015). Two centuries later, Luis Noel Cruz was only six years older than Hannah Ocuish at the time of his crime, yet the ghost of her sentence haunts his.

Federal Statutes

The Gun Control Act of 1968, 18 U.S.C. § 922(b)(1), (c)(1) (1968) prohibits individuals under age twenty-one from purchasing handguns from Federal Firearms Licensees. The National Minimum Drinking Age Act of 1984, 23 U.S.C. § 158 (Am. 2012) prohibits individuals under age twenty-one from purchasing alcohol. The Foster Care Act of 2008, § 201(a), 122 Stat. 3949 (2008) permits states to define "child" as "an individual….who has not attained 19, 20 or 21 years of age…." Id.

These three Acts "are not the products of a runaway Congress keen on imposing its perceptions of maturity on the nation. Rather, these three laws reflect modern cultural perceptions of prolonged adolescence. Society treats eighteen- to twenty-year-olds as less than fully mature adults." Andrew Michaels, _A Decent Proposal: Exempting Eighteen- to Twenty-Year-Olds From the Death Penalty_, 40 N.Y.U. Rev. L. & Soc. Change 139, 155 (2016).

<u>Foster Care</u>

The majority of states establish twenty-one as the line at which children age out of foster care[18]. Other states that do not establish the line at twenty-one, nevertheless set it above eighteen[19]. Vermont sets it at age twenty-two.[20] In a report prepared for and edited by the Director for the ABA's Center on Children and the Law, several authors in 2004 and 2008 explained this phenomenon in a positive light, illuminated by the same concerns Petitioner presents. Appendix 10.

<u>Tobacco</u>

Since 2016, five states (California, Maine, New Jersey, Hawai'i and Oregon)  have raised the age to buy cigarettes from eighteen to twenty-one, and as of October 10, 2017, at least 270 localities have done the same.[21]

---

[18] **Alabama,** Ala. Code § 38-7-2(1); **Alaska,** Alaska Stat, § 47.10.080(c); **Arizona,** Ariz. Rev. Stat. Ann. § 8-501(B); **California,** Cal. Welf. & Inst. Code § 303(a); **Colorado,** Colo. Rev. Stat. § 19-3-205(2)(a); **Connecticut,** Conn. Gen. Stat. Ann. § 17a-93(a); **Delaware,** Del. Code Ann. tit. 10, § 929(a); **Washington, D.C.,** D.C. Code Ann. § 16-2303; **Florida,** Fla. Stat. Ann. § 39.013(2); **Georgia,** Ga. Code Ann. § 15-11-2(10)(c); **Idaho,** Idaho Code Ann. §§ 39-1202(3) & (9); 705, **Illinois,** Ill. Comp. Stat. Ann. § 405/2-31(1); **Indiana,** Ind. Code Ann. § 31-28-5.8-5(a); **Kansas,** Kan. Stat. Ann. § 38-2203(c); **Kentucky,** Ky. Rev. Stat. § 620.140(1)(d)-(e); **Maryland,** Md. Code Ann., Cts. & Jud. Proc. § 3-804(b); **Michigan,** Mich. Comp. Laws Ann. § 772.981-85; **Minnesota,** Minn. Stat. Ann. § 260C.451; Mo. Ann. Stat. § 110.04 (12); **Nebraska,** Neb. Rev. Stat. Ann. §§ 43-905 & 43-4502; **Nevada,** Nev. Rev. Stat. Ann. § 432B.594; **New Hampshire,** N.H. Rev. Stat. Ann. § 169-C:4; **New Jersey,** N.J. Stat. Ann. § 30:4C-2.3; **New York,** N.Y. Fam. Ct. Act § 1087(a); **Ohio**, Ohio Rev. Code Ann. § 2151.81; **Oregon**, Or. Rev. Stat. Ann. § 419B.328; **Pennsylvania**, 42 Pa. Const. Stat. Ann. § 6302; **South Dakota**, S.D. Codified Laws § 26-6-6.1; **Tennessee,** Tenn. Code Ann. §§ 37-1-102(4)(G) & 37-2-417(b); **Texas,** Tex. Fam. Code Ann. § 263.602; **Virginia,** Va. Code Ann. § 63.2-905.1; **Washington,** Wash. Rev. Code Ann. § 74.13.031(16); **West Virginia,** W. Va. Code Ann. § 49-2B-2(x); and **Wyoming,** Wyo. Stat. Ann. § 14-3-431(b).

[19] **Maine,** (age twenty), Me. Rev. Stat. tit. 22, §§ 4037-A(1) & (5); **New Mexico,** (age nineteen), N.M. Stat. Ann. § 32A-4-25.3; **Wisconsin,** (age nineteen), Wis. Stat. Ann. § 48.355(4).

[20] Vt. Stat. Ann. tit. 33, § 4904.

[21]https://www.tobaccofreekids.org/assets/content/what_we_do/state_local_issues/sales_21/states_localities_MLSA_21.pdf (last viewed Oct. 24, 2017).

Marijuana

Marijuana decriminalization laws—all of which are very recent—have a total

consensus. Wherever marijuana has been legalized for recreational use, the age of

majority has been set at twenty-one.[22]

The International Context

Dr. Steinberg testified briefly that his findings apply globally. This is documented

in his article Around the World, *supra*. Countries around the world have implemented

policies that are more advanced than in the United States, as discussed in Petitioner's

reply memo filed last year, Doc. #67.

The United States remains well behind our cultural counterparts. Decisions of the

European Court of Human Rights are persuasive authority in the area of determining

"values shared with a wider civilization." Lawrence v. Texas, 539 U.S. 558, 560 (2003).

In 2013, the European Court of Human Rights held that *any* sentence of mandatory life

imprisonment violates Article Three of the European Convention on Human Rights,

which prohibits inhuman or degrading treatment or punishment. Vintner and Others v.

The United Kingdom, Applications 66069/09, 130/10 and 3896/10 (2013), Appendix 11.

Our closest cultural sibling, The United Kingdom, now must adhere to a higher standard

---

[22] National Conference of State Legislatures, "Marijuana Overview," updated as of August, 2017,
available at http://www.ncsl.org/research/civil-and-criminal-justice/marijuana-overview.aspx
(last viewed Oct. 24, 2017). See also, *e.g.*, **Alaska,** Alaska Stat. §§ 17.37.10-17.37.80 & 17.38.02;
**Arizona,** Arizona Revised Statutes § 36-801; **Arkansas,** Arkansas' HB 1400; **Colorado,**
Colorado CRSA Const. Art. 18, § 16; **California,** Proposition 64; **Delaware,** Senate Bill No. 17;
**Maine,** Rev. Stat. tit. 22, 2421-2430; **Maryland,** Section 5-601.1; **Massachusetts,** Mass. Gen.
Laws. ch. 94G, § 7, Mass. Gen. Laws. ch. 94G § 13(b), and An Act for the Humanitarian Medical
Use of Marijuana; **Michigan,** Compiled Laws 333.26421; 21 O.R.S. § 475B.180; **Minnesota,**
Session Laws 2014, CHAPTER 311--S.F.No. 2470; **New Hampshire,** 21. House Bill 573; **New
York,** Compassionate Care Act, S7923/46357E

of punitive restraint than Petitioner seeks in this case. <u>Vintner</u> is binding law over all

twenty-eight member-nations of the European Union.

Finally, the following graph tells the broader story in a different way.



Image from Wikipedia's home page: Countries that have ratified the
Convention on the Rights of the Child.[23]

The countries in green are those who have ratified the U.N. Convention on the Rights of

the Child.[24] The country in purple has not. We are truly unusual in this regard. Even our

long-steadfast ally in refusal, Somalia, ratified the convention two years ago.[25] There is

an absolute civilization-wide consensus that children are different, which the United

---

[23]https://en.wikipedia.org/wiki/Convention_on_the_Rights_of_the_Child#/media/File:Convention_on_the_Rights_of_the_Child.svg (last viewed Oct. 24, 2017).
[24] GA Res. 44/25, Annex, U.N. GAOR, 44th Sess., Supp. No. 49, at 167, U.N. Doc. A/44/49 (Nov. 20, 1989).
[25] <u>See</u> "Joint statement on Somalia's ratification of the Convention on the Rights of the Child—*Somalia becomes 196th State Party to the Convention*," available at
https://www.unicef.org/media/media_85718.html (last viewed November 6, 2017).

States—because of its cruel child sentencing practices and irrational distrust of international values—should no longer be reluctant to join.

## <u>CONCLUSION</u>

There is no penological justification to allow the sentence of mandatory life without parole to stand, as to Luis Noel Cruz. For the foregoing reasons, Petitioner's sentence should be declared cruel and unusual in violation of the Eighth Amendment to the United States Constitution; the sentence should vacated, and a new sentencing hearing should be ordered forthwith.

Respectfully Submitted,

The Petitioner——Luis Noel Cruz

By_____/s/_____
W. Theodore Koch III
Fed. Bar #ct26854
P.O. Box 222
Niantic, CT 06357
Phone: 860-739-0721
fax: 860-434-9483
wtkoch3@gmail.com

NOTICE OF SERVICE

I hereby certify that on November 6, 2017, a copy of the foregoing motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CV/ECF Filing System.

/s/_____
W. Theodore Koch III, Esq. Fed Bar # ct26854
P.O. Box 222
Niantic, CT 06357
Phone: 860-739-0721/Fax: (860) 434-9483

And by U.S. Mail to:

Luis Noel Cruz, 11887-014
D.W Wyatt Detention Facility
950 High Street
Central Falls, RI 02863