Case 3:11-cv-00787-JCH   Document 155-11   Filed 11/00/17   Page 1 of 42



**EUROPEAN COURT OF HUMAN RIGHTS**
**COUR EUROPÉENNE DES DROITS DE L'HOMME**

GRAND CHAMBER

## CASE OF VINTER AND OTHERS v. THE UNITED KINGDOM

*(Applications nos. 66069/09, 130/10 and 3896/10)*

JUDGMENT

STRASBOURG

9 July 2013

*This judgment is final but may be subject to editorial revision.*

**In the case of Vinter and Others v. the United Kingdom,**
The European Court of Human Rights, sitting as a Grand Chamber composed of:
    Dean Spielmann, *President,*
    Josep Casadevall,
    Guido Raimondi,
    Ineta Ziemele,
    Mark Villiger,

Welcome to HUDOC. This site uses cookies. Read our policy   ✕

Isabelle Berro-Lefèvre,
Dragoljub Popović,
Luis López Guerra,
Mirjana Lazarova Trajkovska,
Nona Tsotsoria,
Ann Power-Forde,
Işıl Karakaş,
Nebojša Vučinić,
Linos-Alexandre Sicilianos,
Paul Lemmens,
Paul Mahoney,
Johannes Silvis, *judges,*
and Michael O'Boyle, *Deputy Registrar,*

Having deliberated in private on 28 November 2012 and on 29 May 2013,

Delivers the following judgment, which was adopted on the last-mentioned date:

## PROCEDURE

1. The case originated in three applications (nos. 66069/09, 130/10 and 3896/10) against the United Kingdom of Great Britain and Northern Ireland lodged with the Court under Article 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by three British nationals, Mr Douglas Gary Vinter ("the first applicant"), Mr Jeremy Neville Bamber ("the second applicant") and Mr Peter Howard Moore ("the third applicant"), on 11 December 2009, 17 December 2009 and 6 January 2010 respectively.

2. The first applicant was born in 1969 and is currently detained at Her Majesty's Prison Frankland. He is represented before the Court by Mr S. Creighton, a lawyer practising in London with Bhatt Murphy Solicitors, assisted by Mr P. Weatherby QC, counsel, and Professor D. van Zyl Smit.

3. The second applicant was born in 1961 and is currently detained at HMP Full Sutton. He is represented before the Court by Mr B. Woods, a lawyer practising in Leeds with Cousins Tyrer Solicitors, assisted by Mr R. Horwell QC and Mr L. Hindmarsh, counsel.

4. The third applicant was born in 1946 and is currently detained at HMP Wakefield. He is represented before the Court by Chivers Solicitors, Bingley, assisted by Mr M. McKone, counsel.

5. The United Kingdom Government ("the Government") were represented by their Agent, Ms L. Dauban of the Foreign and Commonwealth Office.

6. The applicants alleged that the whole life orders which had been imposed on them amounted to ill-treatment contrary to Article 3 of the Convention.

7. The applications were allocated to the Fourth Section of the Court (Rule 52 § 1 of the Rules of Court). In its judgment of 17 January 2012, a Chamber of that Section composed of Judges Garlicki, David Thór Björgvinsson, Bratza, Hirvelä, Nicolaou, Bianku, De Gaetano and also of T.L. Early, Section Registrar, decided unanimously to join the applications, to declare the applicants' complaints concerning Article 3 admissible and the remainder of the applicants' complaints inadmissible. The Chamber also held, by four votes to three, that there had been no violation of Article 3 in respect of each applicant. A concurring opinion of Judge De Gaetano and a joint partly dissenting opinion of Judges Garlicki, David Thór Björgvinsson and Nicolaou were appended to the judgment.

8. On 9 July 2012, pursuant to a request by the applicants dated 12 April 2012, the Panel of the Grand Chamber decided to refer the case to the Grand Chamber in accordance with Article 43 of the Convention.

9. The composition of the Grand Chamber was determined according to the provisions of Article

26 §§ 4 and 5 of the Convention and Rule 24 of the Rules of Court. At the final deliberations, Işıl Karakaş, substitute judge, replaced András Sajó who was unable to take part in the further consideration of the case (Rule 24 § 3 of the Rules of Court).

10. The applicants and the Government each filed further written observations (Rule 59 § 1 of the Rules of Court) on the merits.

11. A hearing took place in public in the Human Rights Building, Strasbourg, on 28 November 2012 (Rule 59 § 3 of the Rules of Court).

There appeared before the Court:

(a) *for the Government*
  Ms L. DAUBAN,                                    *Agent*,
  MR D. PERRY QC,
  MR L. MABLY,                                     *Counsel*,
  MR J. GUESS,
  Ms.A. FOULDS,                                    *Advisers*;

(b) *for the applicants*
  MR R. HORWELL QC,
  MR P. WEATHERBY QC,
  MR L. HINDMARSH,                                 *Counsel,*
  MR S. CREIGHTON,
  MR B. WOODS,
  PROF D. VAN ZYL SMIT,                            *Advisers*.


The Court heard addresses by Mr Perry and Mr Weatherby and their answers in reply to questions put by the Court.


# THE FACTS

## I. THE CIRCUMSTANCES OF THE CASE

### A. Introduction

12. Since the abolition of the death penalty in England and Wales, the sentence for murder has been a mandatory sentence of life imprisonment. Currently, when such a sentence is imposed, the trial judge is required to set a minimum term of imprisonment, which must be served for the purposes of punishment and retribution, taking into account the seriousness of the offence. The principles which guide the trial judge's assessment of the appropriate minimum term are set out in schedule 21 to the Criminal Justice Act 2003 (see paragraphs 38–39 below). Once the minimum term has been served, the prisoner may apply to the Parole Board for release on licence.

Exceptionally, however, "a whole life order" may be imposed by the trial judge instead of a minimum term if, applying the principles set out in schedule 21, he or she considers that the seriousness of the offence is exceptionally high.

The effect of a whole life order is that the prisoner cannot be released other than at the discretion of the Secretary of State. The power of the Secretary of State to release a prisoner is provided for in section 30(1) of the Crime (Sentences) Act 1997. The Secretary of State will only exercise his discretion on compassionate grounds when the prisoner is terminally ill or seriously incapacitated (see Prison Service Order 4700 set out at paragraph 43 below).

13. Prior to the entry into force of the 2003 Act, it was the practice for the mandatory life sentence to be passed by the trial judge and for the Secretary of State, after receiving

recommendations from the trial judge and the Lord Chief Justice, to decide the minimum term of imprisonment which the prisoner would have to serve before he would be eligible for early release on licence. At the time, the minimum term was also referred to as the "tariff" part of the sentence.

It was also open to the Secretary of State to impose a "whole life tariff" on a prisoner. In such a case, it was the practice of the Secretary of State to review a whole life tariff after twenty-five years' imprisonment to determine whether it was still justified, particularly with reference to cases where the prisoner had made exceptional progress in prison (see the case of *Hindley* at paragraph 46 below).

With the entry into force of the 2003 Act (and, in particular, section 276 and schedule 22 to the Act, which enact a series of transitional measures concerning existing life prisoners: see paragraphs 40 and 41 below), all prisoners whose tariffs were set by the Secretary of State have been able to apply to the High Court for review of that tariff. Upon such an application the High Court may set a minimum term of imprisonment or make a whole life order.

14. This case concerns three applicants who, having been convicted of murder in separate criminal proceedings in England and Wales, are currently serving mandatory sentences of life imprisonment. All three applicants have been given whole life orders: in the first applicant's case this order was made by the trial judge under the current sentencing provisions; in the case of the second and third applicants, who were convicted and sentenced prior to the entry into force of the 2003 Act, the orders were made by the High Court. All three applicants maintain that these whole life orders, as they apply to their cases, are incompatible *inter alia* with Articles 3 and 5 § 4 of the Convention. The facts of the applications, as submitted by the parties, may be summarised as follows.

### B. Mr Vinter

15. On 20 May 1996, the first applicant was sentenced to life imprisonment for the murder of a work colleague, with a minimum term of ten years. He was released on licence on 4 August 2005.

16. He began living with a woman who was to become the victim of his second murder offence. The couple married on 27 June 2006. On 31 December 2006 the first applicant was involved in a fight in a public house and charged with affray (using or threatening unlawful violence). His licence was revoked and he was recalled to prison. In July 2007, having pleaded guilty to the charge of affray, he was sentenced to 6 months' imprisonment. He was released on licence again in December 2007 and returned to live with his wife and her four children. The couple became estranged and the first applicant left the marital home.

17. On 5 February 2008, the first applicant followed his wife to a public house. He had been drinking and had taken cocaine. The couple argued and the wife's daughter, who was present, telephoned the police to alert them to the dispute. The first applicant ordered his wife to get into a car. When the daughter tried to get into the car to protect her mother, the first applicant forcibly removed her. He then drove off with his wife. When the police telephoned her to ascertain if she was safe, the first applicant forced his wife to tell them that she was fine. The first applicant also telephoned the police to tell them that his wife was safe and well. Some hours later he gave himself up to the police, telling them that he had killed her. A post-mortem examination revealed that the deceased had a broken nose, deep and extensive bruising to her neck (which was consistent with attempted strangulation), and four stab wounds to the chest. Two knives were found at the scene, one of which had a broken blade.

18. On 21 April 2008, the first applicant pleaded guilty to murder and instructed his counsel not to make any submissions in mitigation lest it add to the grief of the victim's family. The trial judge considered that the first applicant fell into that small category of people who should be deprived permanently of their liberty. He passed the mandatory life sentence and made a whole life order.

19. The Court of Appeal dismissed his appeal on 25 June 2009. It considered the general principles for determining the minimum term of a mandatory life sentence (as set out in schedule 21 to the 2003 Act; see paragraphs 38 and 39 below). It found that, given the circumstances of the

21 to the 2003 Act: see paragraphs 38 and 39 below). It found that, given the circumstances of the offence, there was no reason whatever to depart from the normal principle enshrined in schedule 21 to the 2003 Act that, where murder was committed by someone who was already a convicted murderer, a whole life order was appropriate for punishment and deterrence.

## C. Mr Bamber

20. On 7 August 1985, the second applicant's parents, his adoptive sister and her two young children were shot and killed. The second applicant was subsequently charged and, on 28 October 1986, convicted of the murders. The prosecution's case was that the murders were premeditated and planned and had been committed for financial gain. It was also alleged that the second applicant had arranged the crime scene so as to mislead the police by making it appear as if his adoptive sister had killed the family and then herself.

21. The trial judge recommended to the Secretary of State that the second applicant serve twenty-five years' imprisonment "as a <u>minimum</u>" (his underlining). On the trial judge's letter to the Secretary of State, the Lord Chief Justice added the comment "for my part I would <u>never</u> release him". In 1988, the Secretary of State imposed a whole life tariff. The practice at the time was not to inform the prisoner of this decision. By letter dated 15 December 1994, the applicant was informed that the Secretary of State had concluded that the requirements of retribution and deterrence could only be satisfied by the second applicant remaining in prison for the whole of his life.

22. In 2008, following the entry into force of section 276 and schedule 22 to the 2003 Act, the second applicant applied to the High Court for review of the whole life tariff. Having regard to schedule 21 to the Act, the High Court concluded that, given the number of murders involved and the presence of premeditation by the second applicant, the offence plainly fell within that category of cases where the appropriate starting point was a whole life order. Having further regard to statements submitted by the victims' next-of-kin and submissions by the second applicant, including reports as to the behaviour and progress he had made in prison, the High Court found that there was no reason to depart from the views of the Lord Chief Justice and the Secretary of State. It therefore imposed a whole life order.

23. The second applicant appealed to the Court of Appeal, which dismissed the appeal on 14 May 2009. The court found that, when the Secretary of State had set a whole life tariff in 1988, he had been provided with two different judicial recommendations: one from the trial judge recommending a minimum term of twenty-five years and one from the Lord Chief Justice recommending that the second applicant should never be released. The Secretary of State had been entitled to choose between those recommendations or to adopt neither of them. The Court of Appeal also found that the whole life order imposed by the High Court was not only correct but, for the purposes of punishment and retribution, fully justified.

24. Relying on its previous judgment in *R v. Bieber* (see paragraph 47 below), it found that no issue arose under Article 3 of the Convention as the whole life order was not an irreducible life sentence as that term had been used in *Kafkaris v. Cyprus* ([GC], no. <u>21906/04</u>, ECHR 2008-...). Finally, it found that the review procedure created by the 2003 Act was compatible with Article 7 of the Convention as, properly construed, the relevant statutory provisions meant a prisoner could not be disadvantaged by the outcome of the review: the term to be served could be reduced, or maintained, but it could not be increased or extended.

25. The second applicant applied to the Court of Appeal to certify that its judgment concerned a point of law of general public importance which ought to be considered by the House of Lords. That application was refused on 23 June 2009.

## D. Mr Moore

26. On 29 November 1996 the third applicant was convicted after trial in the Crown Court at Chester of four counts of murder. The victims were homosexual men and the applicant, himself a

homosexual, was alleged to have committed the murders for his own sexual gratification. Each victim was stabbed many times with a large combat knife which the third applicant had bought for that purpose. The first victim was attacked in his home on 23 September 1995. Soon after, on the weekend of 7 October 1995, the third applicant met his second victim in a bar and arranged to take him home for sex; he instead took him to a forest, stabbed him to death and left the body there. The third victim was stabbed in the caravan where he lived on 30 November 1995. Finally, shortly before Christmas 1995, the third applicant went to a beach which was well-known for homosexual trysts. He met the fourth victim on the beach and stabbed him there.

27. Blood from the first and third victims was found on the third applicant's jacket and on the knife. Property from the first, second and fourth victims was found in his possession. He made extensive admissions about all four murders to the police. The police had been unaware of the second victim until the third applicant mentioned him to them. The body was recovered from the forest with his assistance. At trial, the applicant's defence was that the murders had been committed by someone else, though he admitted to having been present at all the murders save for that of the second victim.

28. After the third applicant was convicted, the trial judge passed the mandatory sentence of life imprisonment and recommended to the Secretary of State for the Home Department that, in his view, the applicant should never be released. Upon review, the Lord Chief Justice reported that he thought the minimum period before eligibility for release should be set at thirty years. On 27 September 2002, the Secretary of State decided to set a whole life tariff.

29. In 2008, pursuant to section 276 and schedule 22 to the Criminal Justice Act 2003, the third applicant applied to the High Court for review of the whole life tariff set by the Secretary of State. In its judgment of 12 June 2008 the High Court rejected the third applicant's submission that it should accept the Lord Chief Justice's recommendation of a minimum term of thirty years. It found that, while weight should be accorded to that recommendation, the Lord Chief Justice did not have regard to the principles set out in schedule 21 as the High Court was required to do. It also rejected the submission that an issue arose under Article 6 of the Convention, given that a whole life tariff had been set by the Secretary of State. The High Court found that the procedure for applying to the High Court under section 276 and schedule 22 of the Act provided the necessary independent review as to whether a prisoner should be released. The court also found that a whole life order was compatible with Articles 3 and 5 of the Convention. Having regard to the general principles for determining the minimum term of a mandatory life sentence (as set out in schedule 21 to the Act), no issue of arbitrariness arose and whether such a sentence was disproportionate depended on the facts of each case.

30. The High Court found that, since the case involved the murder of two or more persons, sexual or sadistic conduct and a substantial degree of premeditation, under schedule 21 the starting point was a whole life order. There were no mitigating features and even the Lord Chief Justice, although recommending a minimum term of thirty years, had shared the trial judge's view that it might never be safe to release the third applicant. There were no reasons, therefore, to mitigate the starting point of a whole life order. The High Court added that, even if the starting point were a minimum term of thirty years, the aggravating features of the murders were such as to make a whole life order appropriate.

31. On 26 February 2009, the Court of Appeal dismissed the third applicant's appeal, finding that the High Court was not only entitled, but clearly right, to conclude that a whole life order was appropriate.

32. It appears that the third applicant, in order to allow him to appeal to the House of Lords, then applied to the Court of Appeal to certify that its judgment concerned a point of law of general public importance which ought to be considered by the House of Lords. On 14 August 2009, he was informed by the Court of Appeal's Criminal Appeal Office that, because the Court of Appeal had refused his application for permission to appeal against sentence (as opposed to granting permission to appeal against sentence and then dismissing the appeal), an application to certify a point of law for the House of Lords could not be made.

point of law for the House of Lords could not be made.

## II. RELEVANT DOMESTIC LAW AND PRACTICE

### A. The Human Rights Act 1998

33. Section 3(1) of the Human Rights Act 1998 ("the Human Rights Act") provides as follows:

> "So far as it is possible to do so, primary legislation and subordinate legislation must be read and given effect in a way which is compatible with the Convention rights."

Section 6(1) of the Act provides that it is unlawful for a public authority to act in a way which is incompatible with a Convention right.

Section 7(1) provides that a person who claims that a public authority has acted in a way made unlawful by section 6(1) may bring proceedings against the authority.

### B. Statutory provisions on mandatory life sentences

#### 1. The Murder (Abolition of the Death Penalty) Act 1965

34. In England and Wales, the mandatory life sentence for murder is contained in section 1(1) of the Murder (Abolition of the Death Penalty) Act 1965.

#### 2. The Criminal Justice Act 2003

##### (a) Part 12, Chapter 7

35. The power of the Secretary of State to set tariff periods for mandatory life sentence prisoners, as contained in section 29 of the Crime (Sentences) Act 1997, was found by the House of Lords to be incompatible with Article 6 of the Convention in *R (Anderson) v. the Secretary of State for the Home Department* [2003] 1 AC 837. This led to the enactment of Part 12, Chapter 7 ("Effects of life sentences") of the Criminal Justice Act 2003 (sections 269 to 277) and schedules 21 and 22 to that Act.

36. Section 269 of the 2003 Act directs a trial judge, in passing a mandatory life sentence, to determine the minimum term which the prisoner must serve before he or she is eligible for early release on licence. By section 269(3), this minimum term must take into account the seriousness of the offence. Section 269(4) allows the trial judge to decide that, because of the seriousness of the offence, the prisoner should not be eligible for early release (in effect, to make a "whole life order"). Section 269(4) only applies to an offender who is 21 years of age or over when he committed the offence. Section 269(5) directs the trial judge, in considering the seriousness of the offence, to have regard *inter alia* to the principles set out in schedule 21 to the Act.

37. Section 276 gives effect to schedule 22 (on transitional cases): see paragraph 40 below.

##### (b) Schedule 21

38. Schedule 21 ("Determination of minimum term in relation to mandatory life sentence") provides for three different "starting points" which may be increased or decreased depending on the presence of aggravating or mitigating features in the offence: a whole life order, a minimum term of thirty years' imprisonment and a minimum term of fifteen years' imprisonment.

39. By paragraph 4(1) of the schedule, if the seriousness of the offence is "exceptionally high" the appropriate starting point is a whole life order. Paragraph 4(2) provides that the following cases would normally fall within this category:

> "(a) the murder of two or more persons, where each murder involves any of the following—
>
> (i) a substantial degree of premeditation or planning,

(i) a substantial degree of premeditation or planning,

(ii) the abduction of the victim, or

(iii) sexual or sadistic conduct,

(b) the murder of a child if involving the abduction of the child or sexual or sadistic motivation,

(c) a murder done for the purpose of advancing a political, religious or ideological cause, or

(d) a murder by an offender previously convicted of murder."

By paragraph 5(1), if the seriousness of the offence does not fall within paragraph 4(1) but is "particularly high", the appropriate starting point in determining the minimum term is thirty years' imprisonment. Paragraph 5(2) provides that the following cases would normally fall within this category:

"(a) the murder of a police officer or prison officer in the course of his duty,

(b) a murder involving the use of a firearm or explosive,

(c) a murder done for gain (such as a murder done in the course or furtherance of robbery or burglary, done for payment or done in the expectation of gain as a result of the death),

(d) a murder intended to obstruct or interfere with the course of justice,

(e) a murder involving sexual or sadistic conduct,

(f) the murder of two or more persons,

(g) a murder that is racially or religiously aggravated or aggravated by sexual orientation, or

(h) a murder falling within paragraph 4(2) committed by an offender who was aged under 21 when he committed the offence."

Paragraphs 6 and 7 provide that, in all other cases, the appropriate starting point in determining the minimum term is fifteen years' imprisonment (twelve years for those less than eighteen years of age).

Paragraphs 8 and 9 provide that, having chosen a starting point, the trial judge should take into account any aggravating or mitigating factors which may result in a minimum term of any length (whatever the starting point), or in the making of a whole life order.

Paragraph 10 provides that aggravating factors include:

"(a) a significant degree of planning or premeditation,

(b) the fact that the victim was particularly vulnerable because of age or disability,

(c) mental or physical suffering inflicted on the victim before death,

(d) the abuse of a position of trust,

(e) the use of duress or threats against another person to facilitate the commission of the offence,

(f) the fact that the victim was providing a public service or performing a public duty, and

(g) concealment, destruction or dismemberment of the body."

Paragraph 11 provides that mitigating factors include:

"(a) an intention to cause serious bodily harm rather than to kill,

(b) lack of premeditation,

(c) the fact that the offender suffered from any mental disorder or mental disability which (although not falling within section 2(1) of the Homicide Act 1957 (c. 11)), lowered his degree of culpability,

(d) the fact that the offender, as provoked (for example, by prolonged stress) in a way not amounting to a

(d) the fact that the offender was provoked (for example, by prolonged stress) in a way not amounting to a defence of provocation,

(e) the fact that the offender acted to any extent in self-defence,

(f) a belief by the offender that the murder was an act of mercy, and

(g) the age of the offender."

**(c) Schedule 22**

40. Schedule 22 ("Mandatory life sentences: transitional cases") enacts a series of transitional measures for those prisoners who were given mandatory life sentences prior to the entry into force of section 269 of the Act and whose minimum terms of imprisonment were set by the Secretary of State. It also applies to those prisoners whom the Secretary of State directed should never be eligible for early release on licence (that is, those prisoners for whom a whole life tariff had been set). Paragraph 3 of the schedule allows both categories of prisoners to apply to the High Court. Upon such an application the High Court must, in the case of a prisoner who is subject to a minimum term of imprisonment set by the Secretary of State, make an order specifying the minimum term that prisoner must serve before he or she is eligible for early release. Under paragraph 3(1)(b), where the Secretary of State notified the prisoner that a whole life tariff had been set, the High Court may make an order that the prisoner should not be eligible for release ("a whole life order").

The minimum term set by the High Court must not be greater than that previously set by the Secretary of State (paragraph 3(1)(a)).

Similar provisions apply to sentences passed after the commencement of the Act in respect of murders committed before commencement. Paragraph 10 provides that the court may not make an order which, in its opinion, is greater than that which the Secretary of State would have been likely to have made under the previous practice.

41. In determining an application under paragraph 3, the High Court must have regard *inter alia* to the seriousness of the offence and, in so doing, must also have regard to the general principles set out in schedule 21 and any recommendations to the Secretary of State by the trial judge or the Lord Chief Justice as to the minimum term to be served by the offender before release on licence (paragraphs 4 and 5 of schedule 22). The offender may also make representations to the High Court, including representations as to his or her behaviour and progress in prison since the offence, before the High Court determines the application. Representations can also be made by the victim or victims' families.

**C. The Secretary of State's discretion to release**

42. Section 30(1) of the Crime (Sentences) Act 1997 provides that the Secretary of State may at any time release a life prisoner on licence if he is satisfied that exceptional circumstances exist which justify the prisoner's release on compassionate grounds.

43. The criteria for the exercise of that discretion are set out in Prison Service Order 4700 chapter 12. This is an order that is issued under the authority of the Secretary of State. It sets out policy and guidance for the management of prisoners serving an indeterminate sentence (including those serving a mandatory life sentence), both during custody and after release on licence. Chapter 12, where relevant, provides:

"The criteria for compassionate release on medical grounds for all indeterminate sentence prisoners (ISP) are as follows:

• the prisoner is suffering from a terminal illness and death is likely to occur very shortly (although there are no set time limits, 3 months may be considered to be an appropriate period for an application to be made to Public Protection Casework Section [PPCS]). or the ISP (Indeterminate Sentenced Prisoner) is bedridden or similarly

incapacitated, for example, those paralysed or suffering from a severe stroke;

and

• the risk of re-offending (particularly of a sexual or violent nature) is minimal;

and

• further imprisonment would reduce the prisoner's life expectancy;

and

• there are adequate arrangements for the prisoner's care and treatment outside prison;

and

• early release will bring some significant benefit to the prisoner or his/her family."

[underlining in the original]

The Order also specifies that compassionate release must be approved personally by a Minister; it is not a decision which is delegated to officials.

44. According to the Government, as of 28 April 2011, 4,900 prisoners were serving mandatory life sentences for murder in England and Wales.

Forty-one prisoners are currently subject to whole life orders (including those held in secure hospitals). Since 2000, no prisoner serving a whole life term had been released on compassionate grounds. In response to a freedom of information request by the first applicant, the Ministry of Justice indicated that, as of 30 November 2009, thirteen life-sentence prisoners who had not been given whole life terms had been released on compassionate grounds.

### D. Relevant domestic case-law on mandatory life sentences and the Convention

#### 1. Case-law on the pre-2003 Act system

45. In *R. v. Lichniak* and *R. v. Pyrah* [2003] 1 AC 903, the House of Lords considered that, in its operation at that time, a mandatory life sentence was not incompatible with either Articles 3 or 5 of the Convention.

Such a sentence was partly punitive, partly preventative. The punitive element was represented by the tariff term, imposed as punishment for the serious crime which the convicted murderer had committed. The preventative element was represented by the power to continue to detain the convicted murderer in prison unless and until the Parole Board, an independent body, considered it safe to release him, and also by the power to recall to prison a convicted murderer who had been released if it was judged necessary to recall him for the protection of the public (Lord Bingham of Cornhill at paragraph 8 of the judgment).

The House of Lords therefore held firstly, that the appellant's complaints were not of sufficient gravity to engage Article 3 of the Convention and secondly, that the life sentence was not arbitrary or otherwise contrary to Article 5 § 1 of the Convention. Lord Bingham added:

"If the House had concluded that on imposition of a mandatory life sentence for murder the convicted murderer forfeited his liberty to the state for the rest of his days, to remain in custody until (if ever) the Home Secretary concluded that the public interest would be better served by his release than by his continued detention, I would have little doubt that such a sentence would be found to violate Articles 3 and 5 of the European Convention on Human Rights ... as being arbitrary and disproportionate."

46. In *R. v. Secretary of State for the Home Department, ex parte Hindley* [2001] 1 AC 410, HL and *R. v. Anderson* [2003] 1 AC 837, HL, the House of Lords found that, under the tariff system then in operation, there was "no reason, in principle, why a crime or crimes, if sufficiently heinous should not be regarded as deserving lifelong incarceration for purposes of pure punishment" (per

Lord Steyn at pp. 416H). Lord Steyn also observed: "there is nothing logically inconsistent with the concept of a tariff by saying that there are cases where the crimes are so wicked that even if the prisoner is detained until he or she dies it will not exhaust the requirements of retribution and deterrence" (p. 417H). The House of Lords also found that the Secretary of State had not unlawfully fettered his discretion in reviewing the cases of prisoners where a whole life tariff was in place after the prisoner had served twenty-five years' imprisonment and reducing the tariff in appropriate cases. The judgment records the Secretary of State's policy statement of 10 November 1997, in which the Secretary of State indicated that he was open to the possibility that, in exceptional circumstances, *including* for example, exceptional progress by the prisoner whilst in custody, a review and reduction of the tariff may be appropriate. The Secretary of State indicated that he would have this possibility in mind when reviewing at the twenty-five year point the cases of prisoners given a whole life tariff and in that respect would consider issues beyond the sole criteria of retribution and deterrence (p. 417A-C).

### 2. Case-law on the 2003 Act system and its compatibility with Article 3 of the Convention

#### (a) R v. Bieber

47. In *R v. Bieber* [2009] 1 WLR 223 the Court of Appeal considered the compatibility of the 2003 Act with Article 3 of the Convention in the light of *Kafkaris v. Cyprus* [GC], no. 21906/04, ECHR 2008-...

Having observed that, in *Kafkaris*, this Court had found that the imposition of an irreducible life sentence might raise an issue under Article 3, the Court of Appeal went on to state:

"39. It seems to us that the Court [in *Kafkaris*] considered that an irreducible life sentence raises an issue under Article 3 in circumstances where it may result in an offender being detained beyond the term that is justified by the legitimate objects of imprisonment. This is implicit in the fact that no issue under Article 3 appears to arise provided that there is, in law and in practice, a possibility of the offender being released, even though it remains possible, or even likely, that no release will be granted in his lifetime. The essential requirement appears to be the possibility of a review that will determine whether imprisonment remains justified.

40.  The legitimate objects of imprisonment are punishment, deterrence, rehabilitation and protection of the public. Where a mandatory life sentence is imposed in respect of a crime, the possibility exists that all the objects of imprisonment may be achieved during the lifetime of the prisoner. He may have served a sufficient term to meet the requirements of punishment and deterrence and rehabilitation may have transformed him into a person who no longer poses any threat to a public. If, despite this, he will remain imprisoned for the rest of his life it is at least arguable that this is inhuman treatment. Thus we have concluded that, where a crime attracts a mandatory and irreducible life sentence regardless of the particular circumstances of the crime, an issue will arise in relation to Article 3.

41.  The decision in *Kafkaris* raises a more difficult issue. Is there some maximum term of imprisonment that can be justified by the objects of punishment and deterrence, after which a prisoner ought to be released if rehabilitation has transformed him into a man who no longer poses a threat of criminal behaviour? If this question falls to be answered in the affirmative, then an irreducible life sentence that may result in detention beyond that term is arguably inhuman and raises an issue under Article 3. The concurring opinion of Judge Bratza and the opinion of the five dissentients suggest that they were of the view that this was indeed the position. The European material to which we have referred suggests that some Member States consider that there is a maximum sentence of imprisonment that can be justified by way of punishment, after which humanity requires that the offender be given the opportunity to demonstrate that he is fit to be permitted back into society.

42. The United Kingdom does not rank among such Member States. Schedule 21 of the 2003 Act proceeds on the premise that some crimes are so heinous that they justify imprisoning the offender for the rest of his life,

however long that may be. The differences in approach between different Member States was recognised by the comment made by in the majority decision in *Kafkaris* at paragraph 104. The Court was in that case dealing with a mandatory life sentence and the approach of the Court must be considered in that context. We do not consider that it follows from the decision of the majority of the Grand Chamber that an irreducible life sentence, imposed by a judge to reflect the appropriate punishment and deterrence for a very serious offence is in potential conflict with Article 3."

48. The Court of Appeal then considered whether it was the imposition of an irreducible life sentence itself which constituted a violation of Article 3 or whether the potential violation could only occur once the offender had been detained beyond the period that could be justified on the ground of punishment and deterrence. The court concluded that it was the latter.

49. On that basis, the Court of Appeal concluded:

"45. While under English law the offence of murder attracts a mandatory life sentence, this is not normally an irreducible sentence. The judge specifies the minimum term to be served by way of punishment and deterrence before the offender's release on licence can be considered. Where a whole life term is specified this is because the judge considers that the offence is so serious that, for purposes of punishment and deterrence, the offender must remain in prison for the rest of his days. For the reasons that we have given, we do not consider that the Strasbourg court has ruled that an irreducible life sentence, deliberately imposed by a judge in such circumstances, will result in detention that violates Article 3. Nor do we consider that it will do so.

46. It may be that the approach of the Strasbourg court will change. There seems to be a tide in Europe that is setting against the imposition of very lengthy terms of imprisonment that are irreducible. Thus it may become necessary to consider whether whole life terms imposed in this jurisdiction are, in fact irreducible.

...

48. Under the current regime the Secretary of State has a limited power to release a life prisoner under section 30 of the Crime (Sentences) Act 1997.

...

At present it is the practice of the Secretary of State to use this power sparingly, in circumstances where, for instance, a prisoner is suffering from a terminal illness or is bedridden or similarly incapacitated. If, however, the position is reached where the continued imprisonment of a prisoner is held to amount to inhuman or degrading treatment, we can see no reason why, having particular regard to the requirement to comply with the Convention, the Secretary of State should not use his statutory power to release the prisoner.

49. For these reasons, applying the approach of the Strasbourg court in *Kafkaris*, we do not consider that a whole life term should be considered as a sentence that is irreducible. Any Article 3 challenge where a whole life term has been imposed should therefore be made, not at the time of the imposition of the sentence, but at the stage when the prisoner contends that, having regard to all the material circumstances, including the time that he has served and the progress made in prison, any further detention will constitute degrading or inhuman treatment.

50. For these reasons we reject the challenge made to the defendant's sentence that is founded on Article 3."

**(b) R. v. Oakes and others**

50. In *R v. Oakes and others* [2012] EWCA Crim 2435 the Court of Appeal again considered the compatibility of whole life orders with Article 3 of the Convention. The court observed:

"Every civilised country embraces the principle encapsulated in Article 3.

...

Simultaneously, however, every civilised country also embraces the principle that just punishment is appropriate for those convicted of criminal offences. These issues relating to just and proportionate punishment are the

subject of rational debate and civilised disagreement. The assessment of what should be deemed to constitute just punishment or inhuman or degrading punishment in a particular circumstance can legitimately produce different answers in different countries, and indeed different answers at different times in the same country. All these are at least in part a consequence of the history of each country. The question whether the whole life order constitutes a breach of Article 3 of the Convention, or indeed of the long established common law principle that the sentence should be proportionate in all the relevant circumstances of the offence and the criminal who has committed it, has been well debated."

The court went on to record that both Laws LJ in *Wellington* (see paragraph 54 below) and the minority of the Chamber in the present case had viewed whole life orders with grave disquiet. However, it noted that the contrary view had also been expressed, *inter alia* in *Hindley* and *Wellington* (see paragraph 46 above and paragraph 57 below). There was a need to give due recognition and respect to legitimate but inconsistent views on the issue.

51. Having reviewed this Court's judgments in *Babar Ahmad and Others v. the United Kingdom* (nos. 24027/07, 11949/08, 36742/08, 66911/09 and 67354/09, 10 April 2012), in *Harkins and Edwards v. the United Kingdom* (nos. 9146/07 and 32650/07, 17 January 2012), and in the present case, the court observed (at paragraph 22 of its judgment):

"From this analysis of the authorities in the European Court, it seems to us clear that the Court has proceeded on the basis that, provided the court has reflected on matters of mitigation properly available to the defendant, a whole life order imposed as a matter of judicial discretion as to the appropriate level of punishment and deterrence following conviction for a crime of utmost seriousness would not constitute inhuman or degrading punishment. In short, it is open to the individual state to make statutory provision for the imposition of a whole life minimum term, and in an appropriate case, as a matter of judicial discretion, for the court to make such an order."

52. Finally, having emphasised that a whole life order was a sentence of last resort, that no statutory provision required a trial judge to make such an order if the interests of justice did not require it, and that the principles set out in schedule 21 were to be applied flexibly, the court concluded:

"The result is that the whole life order, the product of primary legislation, is reserved for the few exceptionally serious offences in which, after reflecting on all the features of aggravation and mitigation, the judge is satisfied that the element of just punishment and retribution requires the imposition of a whole life order. If that conclusion is justified, the whole life order is appropriate: but only then. It is not a mandatory or automatic or minimum sentence.

In these circumstances the provisions of Schedule 21 of the 2003 Act, and paragraph 4 in particular, which enabled the court to make a whole life order in a case of exceptional seriousness are not incompatible with and do not contravene Article 3 of the Convention."

### 3. R (Wellington) v. Secretary of State for the Home Department [2008] UKHL 72

53. The United States requested the extradition of Ralston Wellington from the United Kingdom to stand trial in Missouri on two counts of murder in the first degree. In his appeal against extradition, Mr Wellington argued that his surrender would violate Article 3 of the Convention, on the basis that there was a real risk that he would be subjected to inhuman and degrading treatment in the form of a sentence of life imprisonment without parole.

54. In giving judgment in the High Court ([2007] EWHC 1109 (Admin)), Lord Justice Laws found that there were "powerful arguments of penal philosophy" which suggested that the risk of a whole-life sentence without parole intrinsically violated Article 3 of the Convention. He observed:

"The abolition of the death penalty has been lauded, and justified, in many ways; but it must have been founded at least on the premise that the life of every person, however depraved, has an inalienable value. The destruction of a life may be accepted in some special circumstances, such as self-defence or just war; but retributive punishment is never enough to justify it. Yet a prisoner's incarceration without hope of release is in many respects

in like case to a sentence of death. He can never atone for his offence. However he may use his incarceration as time for amendment of life, his punishment is only exhausted by his last breath. Like the death sentence the whole-life tariff is *lex talionis*. But its notional or actual symmetry with the crime for which it is visited on the prisoner (the only virtue of the *lex talionis*) is a poor guarantee of proportionate punishment, for the whole-life tariff is arbitrary: it may be measured in days or decades according to how long the prisoner has to live. It is therefore liable to be disproportionate – the very vice which is condemned on Article 3 grounds – unless, of course, the death penalty's logic applies: the crime is so heinous it can never be atoned for. But in that case the supposed inalienable value of the prisoner's life is reduced, merely, to his survival: to nothing more than his drawing breath and being kept, no doubt, confined in decent circumstances. That is to pay lip-service to the value of life; not to vouchsafe it."

However, and "not without misgivings", he considered that the relevant authorities, including those of this Court, suggested an irreducible life sentence would not always raise an Article 3 issue.

55. On Wellington's appeal to the House of Lords, all five Law Lords found that, having regard to the powers of clemency and commutation of the Governor of Missouri, his sentence would be just as reducible as the sentence at issue in *Kafkaris*, cited above.

56. They also noted that, in *Kafkaris*, cited above, the Court had only said that the imposition of an irreducible life sentence may raise an issue under Article 3. All five Law Lords found that the imposition of a whole life sentence would not constitute inhuman and degrading treatment in violation of Article 3 *per se*, unless it were grossly or clearly disproportionate. Lord Brown in particular concluded that this Court would not regard even an irreducible sentence as violating Article 3 unless and until the time came when further imprisonment would no longer be justified on any ground – whether for reasons of punishment, deterrence or public protection.

57. Moreover, Lord Hoffmann, Lord Scott, Baroness Hale and Lord Brown all doubted Lord Justice Laws' view that life imprisonment without parole was *lex talionis*. Lord Hoffmann, Baroness Hale and Lord Brown did not accept his premise that the abolition of the death penalty had been founded on the idea that the life of every person had an inalienable value; there were other, more pragmatic reasons for abolition such as its irreversibility and lack of deterrent effect. Lord Scott rejected the view that an irreducible life sentence was inhuman and degrading because it denied a prisoner the possibility of atonement; once it was accepted that a whole life sentence could be a just punishment, atonement was achieved by the prisoner serving his sentence.

58. Wellington's application to this Court was struck out on 5 October 2010, the applicant having indicated his wish to withdraw it: *Wellington v. the United Kingdom* (dec.), no. 60682/08, 5 October 2010.


III. RELEVANT EUROPEAN, INTERNATIONAL AND COMPARATIVE LAW ON LIFE SENTENCES AND "GROSSLY DISPROPORTIONATE" SENTENCES

59. The relevant texts of the Council of Europe, the European Union and other international legal texts on the imposition and review of sentences of life imprisonment, including the obligations of Council of Europe member States when extraditing individuals to States where they may face such sentences, are set out in *Kafkaris*, cited above, at §§ 68-76. Additional materials before the Court in the present cases (and those materials in *Kafkaris* that are expressly relied on by the parties) may be summarised as follows.


**A. Council of Europe texts**

*1. Resolution 76(2)*

60. Starting in 1976, the Committee of Ministers has adopted a series of resolutions and recommendations on long-term and life sentence prisoners. The first is Committee of Ministers

Resolution 76(2) of 17 February 1976, which made a series of recommendations to member States. These included:

"1. pursue a criminal policy under which long-term sentences are imposed only if they are necessary for the protection of society;

2. take the necessary legislative and administrative measures in order to promote appropriate treatment during the enforcement of [long-term] sentences;

...

9. ensure that the cases of all prisoners will be examined as early as possible to determine whether or not a conditional release can be granted;

10. grant the prisoner conditional release, subject to the statutory requirements relating to time served, as soon as a favourable prognosis can be formulated; considerations of general prevention alone should not justify refusal of conditional release;

11. adapt to life sentences the same principles as apply to long-term sentences;

12. ensure that a review, as referred to in [paragraph] 9, of the life sentence should take place, if not done before, after eight to fourteen years of detention and be repeated at regular intervals;"

### 2. Recommendation 2003(23)

61. Recommendation 2003(23) (on the management by prison administrations of life sentence and other long-term prisoners) was adopted by the Committee of Ministers on 9 October 2003. The recommendation's preamble states that:

"the enforcement of custodial sentences requires striking a balance between the objectives of ensuring security, good order and discipline in penal institutions, on the one hand, and providing prisoners with decent living conditions, active regimes and constructive preparations for release, on the other ..."

Paragraph 2 of the recommendation goes on to state the aims of the management of life sentence and other long term prisoners should be:

"– to ensure that prisons are safe and secure places for these prisoners and for all those who work with or visit them;

– to counteract the damaging effects of life and long-term imprisonment;

– to increase and improve the possibilities for these prisoners to be successfully resettled in society and to lead a law-abiding life following their release."

Included in the recommendation's general principles for the management of such prisoners are: (i) individualisation principle (that consideration should be given to the diversity of personal characteristics to be found among life sentence and long-term prisoners and account taken of them to make individual plans for the implementation of the sentence) and; (ii) the progression principle (that individual planning for the management of the prisoner's sentence should aim at securing progressive movement through the prison system) (see paragraphs 3 and 8 of the recommendation). The report accompanying the recommendation (prepared under the auspices of the European Committee of Crime Problems adds that progression has as its ultimate aim a constructive transition from prison life to life in the community (paragraph 44 of the report).

Paragraph 10 (on sentence planning) provides that such plans should be used to provide a systematic approach *inter alia* to: progressive movement through the prison system from more to less restrictive conditions with, ideally, a final phase spent under open conditions, preferably in the community; and conditions and supervision measures conducive to a law-abiding life and adjustment in the community after conditional release.

Paragraph 16 provides that, since neither dangerousness nor criminogenic needs are

Paragraph 16 provides that, since neither dangerousness nor criminogenic needs are intrinsically stable characteristics, risk and needs assessments should be repeated at intervals.

Finally, paragraphs 33 and 34 (on managing reintegration into society) provide:

"33. In order to enable life sentence and other long-term prisoners to overcome the particular problem of moving from lengthy incarceration to a law-abiding life in the community, their release should be prepared well in advance and take particular account of the following:

– the need for specific pre-release and post-release plans which address relevant risks and needs;

– due consideration of the possibility of achieving release and the continuation post-release of any programmes, interventions or treatment undertaken by prisoners during detention;

– the need to achieve close collaboration between the prison administration and post-release supervising authorities, social and medical services.

34. The granting and implementation of conditional release for life sentence and other long-term prisoners should be guided by the principles set out in Recommendation Rec(2003)22 on conditional release."

In respect of paragraph 34, the report accompanying the recommendation states (at paragraph 131):

"Recommendation Rec(2003)23 contains the principle that conditional release should be possible for all prisoners except those serving extremely short sentences. This principle is applicable, under the terms of the Recommendation, even to life prisoners. Note, however, that it is the possibility of granting conditional release to life prisoners that is recommended, not that they should always be granted conditional release."

### 3. Recommendation 2003(22)

62. Recommendation 2003(22) (on conditional release) was adopted by the Committee of Ministers on 24 September 2003. It is summarised at length in *Kafkaris* (cited above, see paragraph 72 of the judgment). In summary, it provides a series of recommendations governing preparation for conditional release, the granting of it, the conditions which may be imposed and procedural safeguards. Among its general principles are paragraphs 3 and 4(a), which provide:

"3. Conditional release should aim at assisting prisoners to make a transition from life in prison to a law-abiding life in the community through post-release conditions and supervision that promote this end and contribute to public safety and the reduction of crime in the community.

4.a. In order to reduce the harmful effects of imprisonment and to promote the resettlement of prisoners under conditions that seek to guarantee safety of the outside community, the law should make conditional release available to all sentenced prisoners, including life-sentence prisoners."

The Explanatory Memorandum accompanying the Recommendation states in respect of paragraph 4:

"Life-sentence prisoners should not be deprived of the hope to be granted release either. Firstly, no one can reasonably argue that all lifers will always remain dangerous to society. Secondly, the detention of persons who have no hope of release poses severe management problems in terms of creating incentives to co-operate and address disruptive behaviour, the delivery of personal-development programmes, the organisation of sentence-plans and security. Countries whose legislation provides for real-life sentences should therefore create possibilities for reviewing this sentence after a number of years and at regular intervals, to establish whether a life-sentence prisoner can serve the remainder of the sentence in the community and under what conditions and supervision measures."

### 4. CPT Working document on Actual/Real Life Sentences

63. A report on "Actual/Real Life Sentences", prepared by a member of the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment ("CPT"), Mr

for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment ("CPT"), Mr Jørgen Worsaae Rasmussen (CPT (2007) 55, 27 June 2007), reviewed various Council of Europe texts on life sentences, including recommendations (2003) 22 and 23, and stated in terms that: (a) the principle of making conditional release available is relevant to all prisoners, "even to life prisoners"; and (b) that all Council of Europe member States had provision for compassionate release but that this "special form of release" was distinct from conditional release.

It noted the view that discretionary release from imprisonment, as with its imposition, was a matter for the courts and not the executive, a view which had led to proposed changes in the procedures for reviewing life imprisonment in Denmark, Finland and Sweden. The document also quoted with approval the CPT's report on its 2007 visit to Hungary in which it stated:

> "[A]s regards "actual lifers", the CPT has serious reservations about the very concept according to which such prisoners, once they are sentenced, are considered once and for all as a permanent threat to the community and are deprived of any hope to be granted conditional release".

The document's conclusion included recommendations that: no category of prisoners should be "stamped" as likely to spend their natural life in prison; no denial of release should ever be final; and not even recalled prisoners should be deprived of hope of release.

### 5. CPT report on Switzerland

64. The CPT's report on its visit to Switzerland from 10–20 October 2011 (25 October 2012 CPT/Inf (2012) 26) contained the following observations on the Swiss system of life imprisonment where a sex or violent offender is regarded as extremely dangerous and his or her condition is assessed as untreatable:

> "The CPT has serious reservations as to the concept of confinement "for life", according which these people, once they have been declared highly dangerous and untreatable, are considered once and for all as presenting a permanent danger to society and are thus formally deprived of all hope of a more lenient enforcement of the sentence or even conditional release. Since the only way the person concerned can be released is through scientific advances, he or she is deprived of any ability to influence his eventual release, for example, by good behaviour in the course of the sentence.
>
> In this respect, the CPT refers to Recommendation (2006) 2 of the Committee of Ministers of 11 January 2006, on the European Prison Rules, as well as paragraph 4(a) of Recommendation (2003) 22 of the Committee of Ministers of 24 September 2003, concerning conditional release, which indicates clearly that the law should allow for the possibility of all convicted prisoners, including those serving a life sentence, benefiting from conditional release. The Explanatory Memorandum to the latter insists that life prisoners should not be deprived of all hope of release.
>
> **The CPT considers therefore that it is inhuman to imprison someone for life without any real hope of release. The Committee strongly urges the Swiss authorities to re-examine the concept of detention "for life" accordingly."** [emphasis in the original]

## B. International criminal law

65. Article 77 of the Rome Statute of the International Criminal Court allows for the imposition of a term of life imprisonment when justified by the extreme gravity of the crime and the individual circumstances of the convicted person. Article 110(3) provides that when a person has served twenty-five years of a sentence of life imprisonment, the Court shall review the sentence to determine whether it should be reduced. Such a review shall not be conducted before that time. Article 110(4) and (5) provide:

> "4. In its review under paragraph 3, the Court may reduce the sentence if it finds that one or more of the following factors are present:

(a) The early and continuing willingness of the person to cooperate with the Court in its investigations and prosecutions;

(b) The voluntary assistance of the person in enabling the enforcement of the judgements and orders of the Court in other cases, and in particular providing assistance in locating assets subject to orders of fine, forfeiture or reparation which may be used for the benefit of victims; or

(c) Other factors establishing a clear and significant change of circumstances sufficient to justify the reduction of sentence, as provided in the Rules of Procedure and Evidence.

5. If the Court determines in its initial review under paragraph 3 that it is not appropriate to reduce the sentence, it shall thereafter review the question of reduction of sentence at such intervals and applying such criteria as provided for in the Rules of Procedure and Evidence."

The procedure and further criteria for review are set out in Rules 223 and 224 of the Rules of Procedure and Evidence.

Rule 223 provides:

**"Criteria for review concerning reduction of sentence**

In reviewing the question of reduction of sentence pursuant to article 110, paragraphs 3 and 5, the three judges of the Appeals Chamber shall take into account the criteria listed in article 110, paragraph 4 (a) and (b), and the following criteria:

(a) The conduct of the sentenced person while in detention, which shows a genuine dissociation from his or her crime;

(b) The prospect of the resocialization and successful resettlement of the sentenced person;

(c) Whether the early release of the sentenced person would give rise to significant social instability;

(d) Any significant action taken by the sentenced person for the benefit of the victims as well as any impact on the victims and their families as a result of the early release;

(e) Individual circumstances of the sentenced person, including a worsening state of physical or mental health or advanced age."

Rule 224(3) provides that, for the application of Article 110(5) of the Statute, three judges of the Appeals Chamber shall review the question of reduction of sentence every three years, unless a shorter interval was established in the decision taken pursuant to Article 110(3). Rule 224(3) also provides that, in case of a significant change in circumstances, those three judges may permit the sentenced person to apply for a review within the three-year period or such shorter period as may have been set by the three judges.

66. Article 27 of the Statute of the International Criminal Tribunal for the former Yugoslavia ("the ICTY") provides that sentences of imprisonment shall be served in a State designated by the International Tribunal. Such imprisonment shall be in accordance with the applicable law of the State concerned, subject to the supervision of the International Tribunal. Article 28 (on pardon or commutation of sentences) provides:

"If, pursuant to the applicable law of the State in which the convicted person is imprisoned, he or she is eligible for pardon or commutation of sentence, the State concerned shall notify the International Tribunal accordingly. The President of the International Tribunal, in consultation with the judges, shall decide the matter on the basis of the interests of justice and the general principles of law."

Similar provisions to Articles 27 and 28 of the Statute of the ICTY are contained in the Statute of the International Criminal Tribunal for Rwanda (Articles 26 and 27), Statute of the Special Court for Sierra Leone (Articles 22 and 23), and the Statute of the Special Tribunal for Lebanon (Articles 29 and 30).

## C. European Union law

67. Article 5(2) of the Framework Decision of the Council of the European Union of 13 June 2002 on the European arrest warrant and the surrender procedures between Member States provides:

> "if the offence on the basis of which the European arrest warrant has been issued is punishable by custodial life sentence or life-time detention order, the execution of the said arrest warrant may be subject to the condition that the issuing Member State has provisions in its legal system for a review of the penalty or measure imposed, on request or at the latest after 20 years, or for the application of measures of clemency to which the person is entitled to apply for under the law or practice of the issuing Member State, aiming at a non-execution of such penalty or measure."

## D. Life sentences in the Contracting States

68. On the basis of the comparative materials before the Court, following practices in the Contracting States may be observed.

First, there are currently nine countries where life imprisonment does not exist: Andorra, Bosnia and Herzegovina, Croatia, Montenegro, Norway, Portugal, San Marino, Serbia and Spain. The maximum term of imprisonment in these countries ranges from twenty-one years in Norway to forty-five years in Bosnia and Herzegovina. In Croatia in a case of cumulative offences, a fifty-year sentence can be imposed.

Second, in the majority of countries where a sentence of life imprisonment may be imposed, there exists a dedicated mechanism for reviewing the sentence after the prisoner has served a certain minimum period fixed by law. Such a mechanism, integrated within the law and practice on sentencing, is foreseen in the law of thirty-two countries: Albania (25 years), Armenia (20), Austria (15), Azerbaijan (25), Belgium (15 with an extension to 19 or 23 years for recidivists), Bulgaria (20), Cyprus (12), Czech Republic (20), Denmark (12), Estonia (30), Finland (12), France (normally 18 but 30 years for certain murders), Georgia (25), Germany (15), Greece (20), Hungary (20 unless the court orders otherwise), Ireland (an initial review by the Parole Board after 7 years except for certain types of murders), Italy (26), Latvia (25), Liechtenstein (15), Luxembourg (15), Moldova (30), Monaco (15), Poland (25), Romania (20), Russia (25), Slovakia (25), Slovenia (25), Sweden (10), Switzerland (15 years reducible to 10 years), the former Yugoslav Republic of Macedonia (15), and Turkey (24 years, 30 for aggravated life imprisonment and 36 for aggregate sentences of aggravated life imprisonment).

In respect of the United Kingdom, the Court notes that, in Scotland, when passing a life sentence, a judge is required to set a minimum term, notwithstanding the likelihood that such a period will exceed the remainder of the prisoner's natural life: see the Convention Rights (Compliance) (Scotland) Act 2001.

Third, there are five countries which make no provision for parole for life prisoners: Iceland, Lithuania, Malta, the Netherlands and Ukraine. These countries do, however, allow life prisoners to apply for commutation of life sentences by means of ministerial, presidential or royal pardon. In Iceland, although it is still available as a sentence, life imprisonment has never been imposed.

Fourth, in addition to England and Wales, there are six countries which have systems of parole but which nevertheless make special provision for certain offences or sentences in respect of which parole is not available. These countries are: Bulgaria, Hungary, France, Slovakia, Switzerland (for sex or violent offenders who are regarded as dangerous and untreatable: see the CPT report at paragraph 64 above) and Turkey.

## E. Germany

69. Article 1 of the Basic Law of the Federal Republic of Germany provides that human dignity shall be inviolable and that to respect and protect it shall be the duty of all state authority. Article 2(2) provides:

> "Every person shall have the right to life and physical integrity. Freedom of the person shall be inviolable. These rights may be interfered with only pursuant to a law."

The compatibility of a mandatory sentence of life imprisonment for a murder of "wanton cruelty" with these provisions was considered by the Federal Constitutional Court in the *Life Imprisonment* case (*lebenslange Freiheitsstrafe*) of 21 June 1977, 45 BVerfGE 187.[1]

The court found that the State could not turn the offender into an object of crime prevention to the detriment of his constitutionally protected right to social worth. Respect for human dignity and the rule of law meant the humane enforcement of life imprisonment was possible only when the prisoner was given "a concrete and realistically attainable chance" to regain his freedom at some later point in time; the State struck at the very heart of human dignity if it stripped the prisoner of all hope of ever earning his freedom.

The court also stressed that rehabilitation was constitutionally required in any community that established human dignity as its centrepiece. An offender had to be given the chance, after atoning for his crime, to re-enter society. The State was obligated – within the realm of the possible – to take all measures necessary for the achievement of that goal. Prisons had a duty to strive towards the re-socialisation of prisoners, to preserve their ability to cope with life and to counteract the negative effects of incarceration and the destructive changes in personality that accompanied imprisonment.

The court recognised, however, that, for a criminal who remained a threat to society, the goal of rehabilitation might never be fulfilled; in that case, it was the particular personal circumstances of the criminal which might rule out successful rehabilitation rather than the sentence of life imprisonment itself.

The court found that, subject to these conclusions, life imprisonment for murder was not a senseless or disproportionate punishment. The fact that, under the Criminal Code, life prisoners generally had a chance to be released after serving a certain length of time meant that the relevant provisions of the Code could be interpreted and applied in a manner which was compatible with the Basic Law.

70. In the later *War Criminal* case 72 BVerfGE 105 (1986), where the petitioner was eighty-six years of age and had served twenty years of a life sentence imposed for sending fifty people to the gas chambers, the court considered that the gravity of a person's crime could weigh upon whether he or she could be required to serve his or her life sentence. However, a judicial balancing of these factors should not place too heavy an emphasis on the gravity of the crime as opposed to the personality, state of mind, and age of the person. In that case, any subsequent review of the petitioner's request for release would be required to weigh more heavily than before the petitioner's personality, age and prison record. This was because the negative effects of sentence became stronger and stronger after an unusually long period of imprisonment.

The Basic Law did not exclude in principle that a life sentence be served in full, especially when the seriousness of the offence required a sentence that was longer than the minimum term for murder. However, even in these cases, it would not be compatible with the Basic Law if release could only be considered in cases of mental or physical infirmity or closeness to death. Release on these grounds would not be compatible with human dignity, or with the need for every prisoner to have a concrete and realistic chance of regaining his freedom, whatever the nature of his crime.

71. In its decision of 16 January 2010, BVerfG, 2 BvR 2299/09, the Federal Constitutional Court considered an extradition case where the offender faced "aggravated life imprisonment until death" (*erschwerte lebenslängliche Freiheitsstrafe bis zum Tod*) in Turkey. The German government had sought assurances that he would be considered for release and had received the reply that the President of Turkey had the power to remit sentences on grounds of chronic illness, disability, or

President of Turkey had the power to remit sentences on grounds of chronic illness, disability, or old age. The court refused to allow extradition, finding that this power of release offered only a vague hope of release and was thus insufficient. Notwithstanding the need to respect foreign legal orders, if someone had no practical prospect of release such a sentence would be cruel and degrading (*grausam und erniedrigend*) and would infringe the requirements of human dignity provided for in Article 1.

### F. Italy

72. Article 27(3) of the Italian Constitution provides that punishments may not be inhuman and shall aim at rehabilitating the convicted.

The Italian Constitutional Court has given four principal judgments on Article 27(3) of the Constitution.

In the first, the court's judgment of 27 June 1974 (204/1974), a prisoner had applied for parole to the Minister of Justice. The Minister of Justice had consulted the judge responsible for the execution of the sentence, who, in turn, referred the case to the Constitutional Court for its opinion on the constitutionality of the relevant law concerning parole, under which decisions on release were to be taken by the Minister. The Constitutional Court found that, on the basis of Article 27(3) of the Constitution, rehabilitation was the aim of every sentence and the right of every prisoner. As such, there should be review of the sentence, carried out by a judge rather than a member of the executive, to determine whether, given the time served, rehabilitation had been achieved. The court also emphasised that, subject to appropriate conditions, parole was essential to achieving the aim of rehabilitation. The same conclusion was reached in respect of those serving life sentences in military prisons by the court in judgment 192/1976, 14 July 1976, concerning two German military officers serving such sentences for crimes committed during World War II.

The court's second judgment, of 7 November 1974 (264/1974), was the result of reference made by the Verona Assize Court of as to whether a life sentence allowed for the rehabilitation of the prisoner and thus whether it was compatible with Article 27(3). Referring to its earlier judgment of 27 June 1974, the court found that there was the possibility of parole (even for life prisoners) and decisions on parole had to be taken by the judiciary rather than the executive. These factors meant rehabilitation of a life prisoner was possible and, as such, the practice of life sentences was compatible with Article 27(3).

The third judgment (21 September 1983, no. 274/1983) concerned the provision in Italian law which, at the time, allowed for the reduction of sentences by twenty days for every six months served but did not apply to those serving life sentences. In declaring the provision unconstitutional, the court recalled that Article 27(3) applied to all sentences without distinction and that the provision allowing for reduction of sentences (which had the stated aim of encouraging rehabilitation) could not in principle be precluded from applying to life sentences. The effect of the judgment was that, in respect of life sentences, the provisions on reduction of sentences applied to the period to be served before a life prisoner became eligible for parole.

The fourth judgment (2-4 June 1997, no. 161/1997) concerned Article 177 of the Criminal Code which provided that if a life prisoner breached any of the terms of his parole (and was thus recalled to prison), then he forfeited any right to apply for parole in the future. Recalling its previous judgments on rehabilitation and the importance of parole to rehabilitation, the Constitutional Court found that the effect of Article 177 was to exclude entirely the possibility of the prisoner's rehabilitation. The court went on to find that the possibility of parole was the only means by which a sentence of life imprisonment could remain compatible with Article 27(3); if there was no such possibility the sentence would be incompatible with Article 27(3). As it stood, Article 177 was therefore unconstitutional. It remained for the legislature to determine the conditions under which parole could be obtained, provided that those conditions complied with the Constitution.

### G. Case-law of other jurisdictions on grossly disproportionate sentences and on life

sentences

### 1. "Gross disproportionality"

73. Prohibitions on grossly disproportionate sentences can be found in the laws or case-law of the following countries:

- Canada (section 12 of Charter of Rights as interpreted in *R v. Smith (Edward Dewey)* [1987] 1 SCR 1045; *R v. Luxton* [1990] 2 SCR 711; and *R v. Latimer* [2001] 1 SCR 3);
- Hong Kong (*Lau Cheong v. Hong Kong Special Administrative Region* [2002] HKCFA 18);
- Mauritius (section 7 of the Constitution; *State v. Philibert* [2007] SCJ 274);
- Namibia (*State v. Tcoeib* [1997] 1 LRC 90 (see paragraph 74 below); *State v. Vries* 1997 4 LRC 1; and *State v Likuwa* [2000] 1 LRC 600)
- New Zealand (section 9 of the New Zealand Bill of Rights Act 1990);
- South Africa (*Dodo v. the State* (CCT 1/01) [2001] ZACC 16; *Niemand v. the State* (CCT 28/00) [2001] ZACC 11); and
- the United States of America (the Eighth Amendment to the Constitution, as interpreted in, *inter alia*, *Graham v. Florida* 130 S. Ct. 2011, 2021 (2010)).

### 2. Life sentences

74. In *State v. Tcoeib* [1997] 1 LRC 90 the Namibian Supreme Court considered the imposition of a discretionary life sentence to be compatible with section 8 of the country's constitution (subsection (c) of which is identical to Article 3 of the Convention). Chief Justice Mahomed, for the unanimous court, found the relevant statutory release scheme to be sufficient but observed that if release depended on the "capricious exercise" of the discretion of the prison or executive authorities, the hope of release would be "too faint and much too unpredictable" for the prisoner to retain the dignity required by section 8. The Chief Justice also observed:

> "[A]n order deliberately incarcerating a citizen for the rest of his or her natural life ... cannot be justified if it effectively amounts to a sentence which locks the gates of the prison irreversibly for the offender without any prospect whatever of any lawful escape from that condition for the rest of his or her natural life and regardless of any circumstances which might subsequently arise. Such circumstances might include sociological and psychological re-evaluation of the character of the offender which might destroy the previous fear that his or her release after a few years might endanger the safety of others or evidence which might otherwise show that the offender has reached such an advanced age or become so infirm and sick or so repentant about his or her past, that continuous incarceration of the offender at state expense constitutes a cruelty which can no longer be defended in the public interest."

The Chief Justice added that such a culture of "mutually sustaining despair" was inconsistent with the Namibian Constitution, which required society to reform and rehabilitate its prisoners during their incarceration.

75. In *de Boucherville v. the State of Mauritius* [2008] UKPC 70 the appellant had been sentenced to death. With the abolition of the death penalty in Mauritius, his sentence was commuted to a mandatory life sentence. The Judicial Committee of Privy Council considered the Court's judgment in *Kafkaris*, cited above, and found that the safeguards available in Cyprus to prevent Kafkaris from being without hope of release were not available in Mauritius. The Mauritian Supreme Court had interpreted such a sentence as condemning de Boucherville to penal servitude for the rest of his life, a sentence to which the provisions of the relevant legislation on parole and remission did not apply. In the view of the Privy Council, this meant the sentence was manifestly disproportionate and arbitrary and so contrary to section 10 of the Mauritian Constitution (provisions to secure protection of law, including the right to a fair trial).

It had also been argued by the appellant that the mandatory nature of the sentence violated section 7 of the Constitution (the prohibition of torture, inhuman or degrading punishment or other

section 7 of the Constitution (the prohibition of torture, inhuman or degrading punishment or other such treatment). In light of its conclusion on section 10, the Privy Council considered it unnecessary to decide that question or to consider the relevance of the possibility of release under section 75 (the presidential prerogative of mercy). It did, however, find that the safeguards available in Cyprus (in the form of the Attorney-General's powers to recommend release and the President's powers to commute sentences or decree release) were not available in Mauritius. The Privy Council also considered any differences between mandatory sentences of death and life imprisonment could be exaggerated and, to this end, quoted with approval the dicta of Lord Bingham in *Lichniak* and Lord Justice Laws in *Wellington* (at paragraphs and 45 and 54 above).

## IV. RELEVANT INTERNATIONAL INSTRUMENTS ON THE REHABILITATION OF PRISONERS

76. The relevant Council of Europe and international instruments on the objectives of a prison sentence, notably as regards the importance to be attached to rehabilitation, were set out in *Dickson v. the United Kingdom* ([GC], no. 44362/04, §§ 28-36, ECHR 2007-V). Where relevant to the present case, those texts may be summarised as follows.

### A. Council of Europe texts

77. In addition to those parts of Recommendations (2003)22 and (2003)23 which refer to rehabilitation and the constructive preparation of prisoners for release, the leading Council of Europe instrument is the 2006 European Prison Rules.
One of the basic principles of the Rules is contained in Rule 6, which provides:

> "All detention shall be managed so as to facilitate the reintegration into free society of persons who have been deprived of their liberty."

Rule 102.1 provides that the regime for sentenced prisoners shall be designed to enable them to lead a responsible and crime-free life. The commentary on the 2006 Rules (prepared by the European Committee on Crime Problems) states that Rule 102 is in line with the requirements of key international instruments including Article 10(3) of the International Covenant on Civil and Political Rights (see paragraph 80 below).
Rule 103 governs the implementation of the regime for sentenced prisoners. Where relevant, it provides:

> "103.2 As soon as possible after such admission [to prison], reports shall be drawn up for sentenced prisoners about their personal situations, the proposed sentence plans for each of them and the strategy for preparation for their release.
>
> ...
>
> 103.4 Such plans shall as far as is practicable include:
>
> a. work;
>
> b. education;
>
> c. other activities; and
>
> d. preparation for release.
>
> ...
>
> 103.8 Particular attention shall be paid to providing appropriate sentence plans and regimes for life sentenced and other long-term prisoners."

Rule 107 (on release of sentenced prisoners) provides *inter alia*: that, in the case of those prisoners with longer sentences, steps shall be taken to ensure a gradual return to life in free

society (Rule 107.2); and that prison authorities shall work closely with services and agencies that supervise and assist released prisoners to enable all sentenced prisoners to re-establish themselves in the community (Rule 107.4).

## B. The United Nations Standard Minimum Rules

78. The United Nations Standard Minimum Rules for the Treatment of Prisoners (1957) include the following guiding principles on sentenced prisoners:

"58. The purpose and justification of a sentence of imprisonment or a similar measure deprivative of liberty is ultimately to protect society against crime. This end can only be achieved if the period of imprisonment is used to ensure, so far as possible, that upon his return to society the offender is not only willing but able to lead a law-abiding and self-supporting life.

59. To this end, the institution should utilize all the remedial, educational, moral, spiritual and other forces and forms of assistance which are appropriate and available, and should seek to apply them according to the individual treatment needs of the prisoners.

60. (1) The regime of the institution should seek to minimize any differences between prison life and life at liberty which tend to lessen the responsibility of the prisoners or the respect due to their dignity as human beings.

(2) Before the completion of the sentence, it is desirable that the necessary steps be taken to ensure for the prisoner a gradual return to life in society. This aim may be achieved, depending on the case, by a pre-release regime organized in the same institution or in another appropriate institution, or by release on trial under some kind of supervision which must not be entrusted to the police but should be combined with effective social aid.

61. The treatment of prisoners should emphasize not their exclusion from the community, but their continuing part in it. Community agencies should, therefore, be enlisted wherever possible to assist the staff of the institution in the task of social rehabilitation of the prisoners ...

...

**Treatment**

65. The treatment of persons sentenced to imprisonment or a similar measure shall have as its purpose, so far as the length of the sentence permits, to establish in them the will to lead law-abiding and self-supporting lives after their release and to fit them to do so. The treatment shall be such as will encourage their self-respect and develop their sense of responsibility.

66. (1) To these ends, all appropriate means shall be used, including religious care in the countries where this is possible, education, vocational guidance and training, social casework, employment counselling, physical development and strengthening of moral character, in accordance with the individual needs of each prisoner, taking account of his social and criminal history, his physical and mental capacities and aptitudes, his personal temperament, the length of his sentence and his prospects after release."

79. References to rehabilitation are also included in Rules 24 and 62 (noting and treating any physical or mental defects which might hamper rehabilitation), Rule 63 (on open conditions), Rule 64 (assistance after release), Rule 67 (classification and individualisation), Rule 75(2) (work), Rule 80 (relations with those outside prison).

## C. The International Covenant on Civil and Political Rights

80. Article 10 of the International Covenant on Civil and Political Rights, where relevant, provides:

"1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of

the human person.

...

3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status."

81. In its General Comment No. 21 (1992) on Article 10, the Human Rights Committee stated *inter alia* that no penitentiary system should be only retributory; it should essentially seek the reformation and social rehabilitation of the prisoner (see paragraph 10 of the comment).

# THE LAW

## I. ALLEGED VIOLATION OF ARTICLE 3 OF THE CONVENTION

82. Before the Grand Chamber, the applicants maintained their complaints that their whole life orders were incompatible with Article 3 of the Convention, which provides as follows:

"No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

### A. The Chamber's conclusions

83. It was common ground between the parties in their submissions before the Chamber that any grossly disproportionate sentence would amount to ill-treatment contrary to Article 3. The Chamber agreed with that proposition (observing that this was a widely accepted and applied test for determining when a sentence would amount to inhuman or degrading treatment) but emphasised that it would only be on "rare and unique occasions" that the test would be met (paragraphs 88 and 89 of its judgment).

84. The Chamber then went on to find that, subject to this general requirement that a sentence should not be grossly disproportionate, it was necessary to distinguish between three types of life sentence (paragraph 90 of its judgment):

(i) a life sentence with eligibility for release after a minimum period had been served;

(ii) a discretionary sentence of life imprisonment without the possibility of parole (that is, a sentence which is provided for in law, but which requires a judicial decision before it can be imposed); and

(iii) a mandatory sentence of life imprisonment without the possibility of parole (that is, a sentence which is set down in law for a particular offence and which leaves a judge no discretion as to whether to impose it or not).

85. The Chamber considered that the first type of sentence was clearly reducible and no issue could therefore arise under Article 3 (paragraph 91 of the judgment).

86. For the second type of sentence, the Chamber observed as follows:

"[N]ormally, such sentences are imposed for offences of the utmost severity, such as murder or manslaughter. In any legal system, such offences, if they do not attract a life sentence, will normally attract a substantial sentence of imprisonment, perhaps of several decades. Therefore, any defendant who is convicted of such an offence must expect to serve a significant number of years in prison before he can realistically have any hope of release, irrespective of whether he is given a life sentence or a determinate sentence. It follows, therefore, that, if a discretionary life sentence is imposed by a court after due consideration of all relevant mitigating and aggravating factors, an Article 3 issue cannot arise at the moment when it is imposed."

87. For those reasons, the Chamber found that an Article 3 issue would only arise when it could be shown: (i) that the applicant's continued imprisonment could no longer be justified on any

be shown: (i) that the applicant's continued imprisonment could no longer be justified on any legitimate penological grounds; and (ii) that the sentence was irreducible *de facto* and *de jure* (see paragraph 92 of the judgment).

88. For the third type of sentence, a mandatory sentence of life imprisonment without parole, the Chamber found that, although greater scrutiny was required as to whether it was grossly disproportionate, such a sentence was not *per se* incompatible with the Convention and an Article 3 issue would only arise in the same way as for a discretionary sentence of life imprisonment without parole.

89. Applying these criteria, the Chamber found the applicants' sentences were, in effect, discretionary sentences of life imprisonment without parole.

90. The Chamber then observed that the Secretary of State's policy of compassionate release appeared to be much narrower than the Cypriot pardoning policy considered in *Kafkaris*, cited above. First, it could conceivably mean that a prisoner would remain in prison, even if his or her continued incarceration could not be justified on legitimate penological grounds, as long as he or she did not become terminally ill or physically incapacitated. Second, the Chamber noted that, under the previous statutory system in England and Wales a review of the need for a whole life order took place after the prisoner had served twenty five years of his or her sentence. No explanation had been provided for the failure to include that review mechanism in the current legislation, the 2003 Act. It was also of some relevance that the Rome Statute of the International Criminal Court provided for an identical review period for life sentences imposed by that court. Third, the Chamber doubted that compassionate release could really be considered release if all that it meant was that a prisoner died at home or in a hospice rather than behind prison walls.

91. However, applying the criteria it had set out at paragraph 92 of its judgment, the Chamber went on to find that an Article 3 issue had not yet arisen in the applicants' cases since they had not demonstrated that their continued incarceration served no legitimate penological purpose. The first applicant had only been serving his sentence for three years (paragraph 95). Although the second and third applicants had served respectively twenty-six and sixteen years in prison, they were effectively re-sentenced in 2008 when they applied to the High Court for review of their whole life orders. The High Court had not considered that either of these applicants' continued incarceration served no legitimate penological purpose; on the contrary, in each case, the High Court found that the requirements of punishment and deterrence could only be satisfied by whole life orders (ibid.).

## B. The parties' submissions

### 1. The Government

92. The Government submitted that the Chamber had been correct to distinguish between the three types of life sentence. Neither a life sentence without parole nor the serving of such a sentence, was in principle incompatible with Article 3. There was a lack of consensus amongst the Contracting States in respect of life sentences, as shown, for instance, by the non-mandatory language of Article 5(2) of the Framework Decision of the Council on the European arrest warrant (see paragraph 67 above). The penal policy of England and Wales was long-standing and well-established. It reflected the view, both of the domestic courts and Parliament, that there were some crimes so grave that they were deserving of lifelong incarceration for the purposes of pure punishment.

93. The Chamber had also been correct to find that, in respect of a discretionary sentence of life imprisonment without parole (that is, in England and Wales, a whole life order), no Article 3 issue would arise at the moment of imposition of the sentence. Indeed, in the Government's submission, it might never arise. For this reason, the Convention did not require a review mechanism for life sentences. A review mechanism would be directed at offering only a tenuous hope of release. The tenuous nature of that hope arose from the fact that a whole life order was imposed to punish the offender for the exceptional gravity of his or her crime, and the gravity of that crime remained constant over time. Article 3 did not require a procedure offering such a tenuous hope. Instead, it

constant over time. Article 3 did not require a procedure offering such a tailored hope. Instead, it required that a prisoner's Convention rights be vindicated if time ever came when continued detention was incompatible with Article 3. In the applicants' cases that issue had not arisen and might never arise.

94. Relying on the Court of Appeal's judgment in *Bieber* and the Secretary of State's power of release contained in section 30 of the 1997 Act (see paragraphs 47 and 42 above), the Government submitted that a whole life order was not an irreducible life sentence. The Secretary of State's power was wide and non-prescriptive. When exercising it, he was required to act compatibly with the Convention. Thus, should the applicants ever seek to contend that their continued detention was not justified on any penological grounds, and if that were shown to be the case, section 30 would enable them to be released. Any decision by the Secretary of State to the contrary would be amenable to judicial review.

95. In addressing the Chamber's observations as regards the lack of a twenty-five year review in the current statutory framework on whole life orders, the 2003 Act, the Government submitted that one of the objectives of the Act had been to judicialise decisions concerning the appropriate terms of imprisonment for the purposes of punishment and deterrence. Schedule 21 to the 2003 Act contained detailed and non-prescriptive guidelines for the setting of minimum terms of imprisonment in life sentence cases. The Government also emphasised that, in all three applicants' cases, their whole life orders had been imposed by independent judges who had taken account of the seriousness of the applicants' offences and all relevant aggravating and mitigating factors. Those decisions had been subject to review by the Court of Appeal.

96. For the foregoing reasons, and for the reasons given by the Chamber in its judgment, in the Government's submission there had been no violation of Article 3 in respect of all three applicants.

### 2. The applicants

97. The applicants maintained that there was a breach of Article 3 in their cases. Despite the Government's submissions, their sentences were irreducible: no whole life prisoner had ever been released under section 30 of the 1997 Act or any other power.

98. The applicants agreed that the Chamber had been correct to distinguish between three types of life sentence. However, the Chamber had then erred in finding that an Article 3 issue did not arise until such a time as there ceased to be legitimate penological grounds to justify continued detention. This approach was flawed because it failed to address two issues: (i) the substantive Article 3 issue that the applicants' whole life orders constituted ill-treatment *ab initio*; and (ii) the procedural requirement for a review to be built into a whole life sentence to ensure there was no breach of Article 3.

99. For the first issue, the applicants accepted that a life prisoner could spend the rest of his or her life in detention because he or she remained a risk to the community and that no Article 3 issue would arise if this occurred. However, a whole life order which was imposed purely for the purposes of punishment directly undermined human dignity, destroyed the human spirit and ignored the capacity for countervailing justifications for conditional release which could arise in the future. The justifications for detention included, as the Chamber had found, punishment, deterrence, public protection and rehabilitation. But the balance of these factors could change over time. An unreviewable whole life order meant that a prisoner would remain incarcerated until death irrespective of whatever changes in these factors might take place in the course of his or her sentence.

Moreover, since the abolition of the death penalty, a whole life order was the only sentence which permanently excluded a prisoner from society and ran counter to the principle of reintegration which was predominant in European penal policy. No Council of Europe text endorsed whole life orders and some bodies, such as the CPT, considered life without parole to be inhuman (see the working document and the report on Switzerland at paragraphs 63 and 64 above). This was supported by the European consensus against the imposition of such sentences, the views of the Italian and German Constitutional Courts, and the views expressed by Supreme Court and

Constitutional Courts around the world (see the relevant comparative law set out at paragraphs 68–75 above). It was also instructive that, in Scotland, whole life orders were not possible and that the Act of the Scottish Parliament which required judges to set minimum terms in all cases had been designed to ensure Scots law was compatible with the Convention (see also paragraph 68 above).

100. For the second issue, the procedural requirement of a review of a whole life order, the applicants submitted that the Government could give no principled reason for the failure to include a twenty-five year review in the 2003 Act. They had not done so in their observations to this Court, or when a statutory amendment to reintroduce that review had been proposed but defeated in the House of Lords in March 2012. Further support for a twenty-five year review could be found in the Rome Statute of the International Criminal Court: the 121 States parties to that Statute had expressly recognised that, even for extremely serious cases like genocide, such a review was necessary.

101. Finally, in support of their complaints that their sentences amounted to ill-treatment, the first and second applicants relied on two expert reports by clinical psychologists, which documented the states of depression and despair in which they now lived, and the deterioration in their personalities which had occurred in the course of their sentences.

## C. The Grand Chamber's assessment

### 1. "Gross disproportionality"

102. The Chamber found that a grossly disproportionate sentence would violate Article 3 of the Convention. The parties accepted that proposition in their submissions before the Chamber and have continued to do so in their submissions to the Grand Chamber. The Grand Chamber agrees with and endorses the Chamber's finding. It also agrees with the Chamber that it will only be on rare and unique occasions that this test will be met (see paragraph 83 above and paragraphs 88 and 89 of the Chamber's judgment).

### 2. Life sentences

103. Since, however, the applicants have not sought to argue that their whole life orders are grossly disproportionate, it is necessary to examine, as the Chamber did, whether those whole life orders are in violation of Article 3 of the Convention on other grounds. The general principles which guide that examination are as follows.

104. It is well-established in the Court's case-law that a State's choice of a specific criminal justice system, including sentence review and release arrangements, is in principle outside the scope of the supervision the Court carries out at the European level, provided that the system does not contravene the principles set forth in the Convention (see *Kafkaris*, cited above, § 99).

105. In addition, as the Court of Appeal observed in *R v. Oakes* (see paragraph 50 above), issues relating to just and proportionate punishment are the subject of rational debate and civilised disagreement. Accordingly, Contracting States must be allowed a margin of appreciation in deciding on the appropriate length of prison sentences for particular crimes. As the Court has stated, it is not its role to decide what is the appropriate term of detention applicable to a particular offence or to pronounce on the appropriate length of detention or other sentence which should be served by a person after conviction by a competent court (see *T. v. the United Kingdom* [GC], no. 24724/94, § 117, 16 December 1999; *V. v. the United Kingdom* [GC], no. 24888/94, § 118, ECHR 1999-IX; and *Sawoniuk v. the United Kingdom* (dec.), no. 63716/00, ECHR 2001-VI).

106. For the same reasons, Contracting States must also remain free to impose life sentences on adult offenders for especially serious crimes such as murder: the imposition of such a sentence on an adult offender is not in itself prohibited by or incompatible with Article 3 or any other Article of the Convention (see *Kafkaris*, cited above, § 97). This is particularly so when such a sentence is not mandatory but is imposed by an independent judge after he or she has considered all of the mitigating and aggravating factors which are present in any given case.

mitigating and aggravating factors which are present in any given case.

107. However, as the Court also found in *Kafkaris*, the imposition of an irreducible life sentence on an adult may raise an issue under Article 3 (ibid.). There are two particular but related aspects of this principle that the Court considers necessary to emphasise and to reaffirm.

108. First, a life sentence does not become irreducible by the mere fact that in practice it may be served in full. No issue arises under Article 3 if a life sentence is *de jure* and *de facto* reducible (see *Kafkaris*, cited above, § 98).

In this respect, the Court would emphasise that no Article 3 issue could arise if, for instance, a life prisoner had the right under domestic law to be considered for release but was refused on the ground that he or she continued to pose a danger to society. This is because States have a duty under the Convention to take measures for the protection of the public from violent crime and the Convention does not prohibit States from subjecting a person convicted of a serious crime to an indeterminate sentence allowing for the offender's continued detention where necessary for the protection of the public (see, *mutatis mutandis*, *T. v. the United Kingdom*, § 97, and *V. v. the United Kingdom*, § 98, both cited above). Indeed, preventing a criminal from re-offending is one of the "essential functions" of a prison sentence (see *Mastromatteo v. Italy* [GC], no. 37703/97, § 72, ECHR 2002-VIII; *Maiorano and Others v. Italy*, no. 28634/06, § 108, 15 December 2009; and, *mutatis mutandis*, *Choreftakis and Choreftaki v. Greece*, no. 46846/08, § 45, 17 January 2012). This is particularly so for those convicted of murder or other serious offences against the person. The mere fact that such prisoners may have already served a long period of imprisonment does not weaken the State's positive obligation to protect the public; States may fulfil that obligation by continuing to detain such life sentenced prisoners for as long as they remain dangerous (see, for instance, *Maiorano and Others*, cited above).

109. Second, in determining whether a life sentence in a given case can be regarded as irreducible, the Court has sought to ascertain whether a life prisoner can be said to have any prospect of release. Where national law affords the possibility of review of a life sentence with a view to its commutation, remission, termination or the conditional release of the prisoner, this will be sufficient to satisfy Article 3 (see *Kafkaris*, cited above, § 98).

110. There are a number of reasons why, for a life sentence to remain compatible with Article 3, there must be both a prospect of release and a possibility of review.

111. It is axiomatic that a prisoner cannot be detained unless there are legitimate penological grounds for that detention. As was recognised by the Court of Appeal in *Bieber* and the Chamber in its judgment in the present case, these grounds will include punishment, deterrence, public protection and rehabilitation. Many of these grounds will be present at the time when a life sentence is imposed. However, the balance between these justifications for detention is not necessarily static and may shift in the course of the sentence. What may be the primary justification for detention at the start of the sentence may not be so after a lengthy period into the service of the sentence. It is only by carrying out a review of the justification for continued detention at an appropriate point in the sentence that these factors or shifts can be properly evaluated.

112. Moreover, if such a prisoner is incarcerated without any prospect of release and without the possibility of having his life sentence reviewed, there is the risk that he can never atone for his offence: whatever the prisoner does in prison, however exceptional his progress towards rehabilitation, his punishment remains fixed and unreviewable. If anything, the punishment becomes greater with time: the longer the prisoner lives, the longer his sentence. Thus, even when a whole life sentence is condign punishment at the time of its imposition, with the passage of time it becomes – to paraphrase Lord Justice Laws in *Wellington* – a poor guarantee of just and proportionate punishment (see paragraph 54 above).

113. Furthermore, as the German Federal Constitutional Court recognised in the *Life Imprisonment* case (see paragraph 69 above), it would be incompatible with the provision on human dignity in the Basic Law for the State forcefully to deprive a person of his freedom without at least providing him with the chance to someday regain that freedom. It was that conclusion which led the Constitutional Court to find that the prison authorities had the duty to strive towards a life

sentenced prisoner's rehabilitation and that rehabilitation was constitutionally required in any community that established human dignity as its centrepiece. Indeed, the Constitutional Court went on to make clear in the subsequent *War Criminal* case that this applied to all life prisoners, whatever the nature of their crimes, and that release only for those who were infirm or close to death was not sufficient (see paragraph 70 above).

Similar considerations must apply under the Convention system, the very essence of which, as the Court has often stated, is respect for human dignity (see, *inter alia*, *Pretty v. the United Kingdom*, no. 2346/02, § 65, ECHR 2002-III; and *V.C. v. Slovakia*, no. 18968/07, § 105, ECHR 2011 (extracts)).

114. Indeed, there is also now clear support in European and international law for the principle that all prisoners, including those serving life sentences, be offered the possibility of rehabilitation and the prospect of release if that rehabilitation is achieved.

115. The Court has already had occasion to note that, while punishment remains one of the aims of imprisonment, the emphasis in European penal policy is now on the rehabilitative aim of imprisonment, particularly towards the end of a long prison sentence (see, for instance, *Dickson v. the United Kingdom* [GC], no. 44362/04, § 75, ECHR 2007-V; and *Boulois v. Luxembourg* [GC], no. 37575/04, § 83, ECHR 2012, with further references therein). In the Council of Europe's legal instruments, this is most clearly expressed in Rule 6 of the European Prison Rules, which provides that all detention shall be managed so as to facilitate the reintegration into free society of persons who have been deprived of their liberty, and Rule 102.1, which provides that the prison regime for sentenced prisoners shall be designed to enable them to lead a responsible and crime-free life (see paragraph 77 above).

116. The relevant Council of Europe instruments set out in paragraphs 60–64 and 76 above also demonstrate, first, that commitment to rehabilitation is equally applicable to life sentence prisoners; and second, that, in the event of their rehabilitation, life sentence prisoners should also enjoy the prospect of conditional release.

Rule 103 of the European Prison Rules provides that, in the implementation of the regime for sentenced prisoners, individual sentence plans should be drawn up and should include, *inter alia*, preparation for release. Such sentence plans are specifically extended to life sentenced prisoners by virtue of Rule 103.8 (see paragraph 77 above).

Committee of Ministers Resolution 76(2) recommends that the cases of all prisoners – including life sentence prisoners – be examined as early as possible to determine whether or not conditional release could be granted. That resolution also recommends that review of life sentences should take place after eight to fourteen years of detention and be repeated at regular intervals (see paragraph 60 above).

Recommendation 2003(23) (on the management by prison administrations of life sentence and other long-term prisoners) emphasises that life sentence prisoners should benefit from constructive preparation for release, including, to this end, being able to progress through the prison system. The recommendation also expressly states that life sentence prisoners should enjoy the possibility of conditional release (see, in particular, paragraphs 2, 8 and 34 of the recommendation and paragraph 131 of the report accompanying the recommendation, all set out in paragraph 61 above).

Recommendation 2003(22) (on conditional release) also makes clear that conditional release should be available to all prisoners and that life sentence prisoners should not be deprived of the hope of release (see paragraph 4(a) of the recommendation and paragraph 131 of the explanatory memorandum, both set out paragraph 62 above).

The Committee for the Prevention of Torture has expressed similar views, most recently in its report on Switzerland (see paragraph 64 above).

117. This commitment to both the rehabilitation of life sentence prisoners and to the prospect of their eventual release is further reflected in the practice of the Contracting States. This is shown in the judgments of the German and Italian Constitutional Courts on rehabilitation and life sentences (set out in paragraphs 69–71 and 72 above) and in the other comparative law materials before the

(set out in paragraphs 69–71 and 72 above) and in the other comparative law materials before the Court. These show that a large majority of Contracting States either do not impose life sentences at all or, if they do impose life sentences, provide some dedicated mechanism, integrated within the sentencing legislation, guaranteeing a review of those life sentences after a set period, usually after twenty-five years' imprisonment (see paragraph 68 above).

118. The same commitment to the rehabilitation of life sentence prisoners and to the prospect of their eventual release can be found in international law.

The United Nations Standard Minimum Rules for the Treatment of Prisoners direct prison authorities to use all available resources to ensure the return of offenders to society (see Rules 58–61, 65 and 66, quoted at paragraph 78 above) Additional, express references to rehabilitation run through the Rules (see paragraph 79 above).

Equally, Article 10 § 3 of the International Covenant on Civil and Political Rights specifically provides that the essential aim of the penitentiary system shall be the reformation and social rehabilitation of prisoners. This is emphasised in the Human Rights Committee's General Comment on Article 10, which stresses that no penitentiary system should be only retributory (see paragraphs 80 and 81 above).

Finally, the Court notes the relevant provisions of the Rome Statute of the International Criminal Court, to which 121 States, including the vast majority of Council of Europe member States, are parties. Article 110(3) of the Statute provides for review of a life sentence after twenty-five years, followed by periodic reviews thereafter. The significance of Article 110(3) is underscored by the fact that Article 110(4) and (5) of the Statute and Rules 223 and 224 of the ICC's Rules of Procedure and Evidence set out detailed procedural and substantives guarantees which should govern that review. The criteria for reduction include, *inter alia*, whether the sentenced person's conduct in detention shows a genuine dissociation from his or her crime and his or her prospect of resocialisation (see Rule 223(a) and (b), set out at paragraph 65 above).

### 3. General conclusion in respect of life sentences

119. For the foregoing reasons, the Court considers that, in the context of a life sentence, Article 3 must be interpreted as requiring reducibility of the sentence, in the sense of a review which allows the domestic authorities to consider whether any changes in the life prisoner are so significant, and such progress towards rehabilitation has been made in the course of the sentence, as to mean that continued detention can no longer be justified on legitimate penological grounds.

120. However, the Court would emphasise that, having regard to the margin of appreciation which must be accorded to Contracting States in the matters of criminal justice and sentencing (see paragraphs 104 and 105 above), it is not its task to prescribe the form (executive or judicial) which that review should take. For the same reason, it is not for the Court to determine when that review should take place. This being said, the Court would also observe that the comparative and international law materials before it show clear support for the institution of a dedicated mechanism guaranteeing a review no later than twenty-five years after the imposition of a life sentence, with further periodic reviews thereafter (see paragraphs 117 and 118 above).

121. It follows from this conclusion that, where domestic law does not provide for the possibility of such a review, a whole life sentence will not measure up to the standards of Article 3 of the Convention.

122. Although the requisite review is a prospective event necessarily subsequent to the passing of the sentence, a whole life prisoner should not be obliged to wait and serve an indeterminate number of years of his sentence before he can raise the complaint that the legal conditions attaching to his sentence fail to comply with the requirements of Article 3 in this regard. This would be contrary both to legal certainty and to the general principles on victim status within the meaning of that term in Article 34 of the Convention. Furthermore, in cases where the sentence, on imposition, is irreducible under domestic law, it would be capricious to expect the prisoner to work towards his own rehabilitation without knowing whether, at an unspecified, future date, a mechanism might be introduced which would allow him, on the basis of that rehabilitation, to be

considered for release. A whole life prisoner is entitled to know, at the outset of his sentence, what he must do to be considered for release and under what conditions, including when a review of his sentence will take place or may be sought. Consequently, where domestic law does not provide any mechanism or possibility for review of a whole life sentence, the incompatibility with Article 3 on this ground already arises at the moment of the imposition of the whole life sentence and not at a later stage of incarceration.

### 4. The present case

123. It remains to be considered whether, in the light of the foregoing observations, the present applicants' whole life orders meet the requirements of Article 3 of the Convention.

124. The Court would begin by observing that, as the Chamber found in its judgment (at paragraph 94), it is not persuaded by the reasons adduced by the Government for the decision not to include a twenty-five year review in the current legislation on life sentences in England and Wales, the 2003 Act (see paragraph 95 above) . It recalls that such a review, albeit vested in the executive, existed in the previous statutory system (see paragraph 46 above).

The Government have submitted that the twenty-five year review was not included in the 2003 Act because one of the intentions of the Act was to judicialise decisions concerning the appropriate terms of imprisonment for the purposes of punishment and deterrence (see paragraph 95 above). However, the need for independent judges to determine whether a whole life order may be imposed is quite separate from the need for such whole life orders to be reviewed at a later stage so as to ensure that they remain justified on legitimate penological grounds. Furthermore, given that the stated intention of the legislative amendment was to remove the executive entirely from the decision-making process concerning life sentences, it would have been more consistent to provide that, henceforth, the twenty-five year review, instead of being eliminated completely, would be conducted within a wholly judicial framework rather than, as before, by the executive subject to judicial control.

125. Moreover, there is a lack of clarity as to the current law concerning the prospect of release of life prisoners. It is true that section 30 of the 1997 Act provides the Secretary of State with the power to release any prisoner, including one serving a whole life order (see paragraph 42 above). It is also true that, in exercising that power – as with all statutory powers – the Secretary of State is legally bound to act compatibly with the Convention (see section 6(1) of the Human Rights Act, set out at paragraph 33 above). As the Government suggested in their pleadings before the Court, it would therefore be possible to read section 30 as not just giving a power of release to the Secretary of State, but as imposing a duty on him to exercise that power and to release a prisoner if it can be shown that his or her continued detention has become incompatible with Article 3, for example, when it can no longer be justified on legitimate penological grounds.

This was, in effect, the reading given to section 30 by the Court of Appeal in *Bieber* and re-affirmed by it in *Oakes* (see, in particular, paragraph 49 above, setting out paragraphs 48 and 49 of *Bieber* and the Court of Appeal's observation that while the section 30 power had been used sparingly, there was no reason why it should not be used by the Secretary of State to effect the necessary compliance with Article 3 of the Convention).

This reading of section 30 ensuring some prospects under the law for release of whole life prisoners would, in principle, be consistent with this Court's judgment in *Kafkaris*, cited above. If it could be established that, in the applicants' cases, a sufficient degree of certainty existed as to the state of the applicable domestic law to this effect, it could not be said that their sentences were irreducible and thus no violation of Article 3 would be disclosed.

126. However, the Court must be concerned with the law as it presently stands on the published policies as well as in judicial dicta and as it is applied in practice to whole life prisoners. The fact remains that, despite the Court of Appeal's judgment in *Bieber*, the Secretary of State has not altered the terms of his explicitly stated and restrictive policy on when he will exercise his section 30 power. Notwithstanding the reading given to section 30 by the Court of Appeal, the Prison

Service Order remains in force and provides that release will only be ordered in certain exhaustively listed, and not merely illustrative, circumstances, namely if a prisoner is terminally ill or physically incapacitated and other additional criteria can be met (namely that the risk of re-offending is minimal, further imprisonment would reduce the prisoner's life expectancy, there are adequate arrangements for the prisoner's care and treatment outside prison, and early release will bring some significant benefit to the prisoner or his or her family).

127. These are highly restrictive conditions. Even assuming that they could be met by a prisoner serving a whole life order, the Court considers that the Chamber was correct to doubt whether compassionate release for the terminally ill or physically incapacitated could really be considered release at all, if all it meant was that a prisoner died at home or in a hospice rather behind prison walls. Indeed, in the Court's view, compassionate release of this kind was not what was meant by a "prospect of release" in *Kafkaris*, cited above. As such, the terms of the Order in themselves would be inconsistent with *Kafkaris* and would not therefore be sufficient for the purposes of Article 3.

128. Moreover, the Prison Service Order must be taken to be addressed to prisoners as well as to prison authorities. It does not, however, include the qualifying explanations, deriving from the Court of Appeal's reasoning in *Bieber* and relied on by the Government in their pleadings before this Court, as to the effect of the Human Rights Act and of Article 3 of the Convention on the exercise of the Secretary of State's power to release under section 30 of the 1997 Act. In particular, the Order does not reflect the possibility – made available by the Human Rights Act – for even whole life prisoners to seek release on legitimate penological grounds some time into the service of their sentence. To that extent, on the basis of the Government's own submissions as to the state of the applicable domestic law, the Prison Service Order is liable to give to whole life prisoners – those directly affected by it – only a partial picture of the exceptional conditions capable of leading to the exercise of the Secretary of State's power under section 30.

129. As a result, given the present lack of clarity as to the state of the applicable domestic law as far as whole life prisoners are concerned, the Court is unable to accept the Government's submission that section 30 of the 1997 Act can be taken as providing the applicants with an appropriate and adequate avenue of redress, should they ever seek to demonstrate that their continued imprisonment was no longer justified on legitimate penological grounds and thus contrary to Article 3 of the Convention. At the present time, it is unclear whether, in considering such an application for release under section 30 by a whole life prisoner, the Secretary of State would apply his existing, restrictive policy, as set out in the Prison Service Order, or would go beyond the apparently exhaustive terms of that Order by applying the Article 3 test set out in *Bieber*. Of course, any ministerial refusal to release would be amenable to judicial review and it could well be that, in the course of such proceedings, the legal position would come to be clarified, for example by the withdrawal and replacement of the Prison Service Order by the Secretary of State or its quashing by the courts. However, such possibilities are not sufficient to remedy the lack of clarity that exists at present as to the state of the applicable domestic law governing possible exceptional release of whole life prisoners.

130. In light, therefore, of this contrast between the broad wording of section 30 (as interpreted by the Court of Appeal in a Convention-compliant manner, as it is required to be as a matter of United Kingdom law in accordance with the Human Rights Act) and the exhaustive conditions announced in the Prison Service Order, as well as the absence of any dedicated review mechanism for the whole life orders, the Court is not persuaded that, at the present time, the applicants' life sentences can be regarded as reducible for the purposes of Article 3 of the Convention. It accordingly finds that the requirements of Article 3 in this respect have not been met in relation to any of the three applicants.

131. In reaching this conclusion the Court would note that, in the course of the present proceedings, the applicants have not sought to argue that, in their individual cases, there are no longer any legitimate penological grounds for their continued detention. The applicants have also accepted that, even if the requirements of punishment and deterrence were to be fulfilled, it would still be possible that they could continue to be detained on grounds of dangerousness. The finding

still be possible that they could continue to be detained on grounds of dangerousness. The finding of a violation in their cases cannot therefore be understood as giving them the prospect of imminent release.

## II. ALLEGED VIOLATION OF ARTICLE 5 § 4 OF THE CONVENTION

132. In their submissions to the Grand Chamber, the applicants maintained their complaint that the absence of a review mechanism in domestic law for their sentences was in violation of Article 5 § 4 of the Convention, which reads as follows:

> "4. Everyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings by which the lawfulness of his detention shall be decided speedily by a court and his release ordered if the detention is not lawful."

However, this complaint was declared inadmissible by the Chamber in its judgment, which delimits the scope of the Grand Chamber's jurisdiction (see, *inter alia*, *Gillberg v. Sweden* [GC], no. 41723/06, § 53, 3 April 2012, and *Kafkaris*, cited above, § 124, with further references therein). It follows that this complaint falls outside the scope of the case before the Grand Chamber.

## III. APPLICATION OF ARTICLE 41 OF THE CONVENTION

133. Article 41 of the Convention provides:

> "If the Court finds that there has been a violation of the Convention or the Protocols thereto, and if the internal law of the High Contracting Party concerned allows only partial reparation to be made, the Court shall, if necessary, afford just satisfaction to the injured party."

134. The only claim for just satisfaction was that made by the first applicant.

### A. Damage

135. On the basis of the expert report which had been prepared setting out the distress he had suffered in the course of his sentence, the first applicant claimed 1,500 pounds sterling (GBP) (approximately EUR 1,844) in non-pecuniary damage.

136. The Grand Chamber considers that its finding of a violation of Article 3 constitutes sufficient just satisfaction and accordingly makes no award under this head.

### B. Costs and expenses

137. The first applicant claimed for over 120 hours' legal work by his solicitor and over 133 hours' legal work by counsel, at a total cost of GBP 76,646, inclusive of VAT (approximately EUR 88,957).

138. According to the Court's case-law, an applicant is entitled to the reimbursement of costs and expenses only in so far as it has been shown that these have been actually and necessarily incurred and were reasonable as to quantum. In the present case, regard being had to the documents in its possession and the above criteria, the Court considers it reasonable to award the first applicant the sum of EUR 40,000 for the proceedings before the Court.

### C. Default interest

139. The Court considers it appropriate that the default interest rate should be based on the marginal lending rate of the European Central Bank, to which should be added three percentage points.

## FOR THESE REASONS, THE COURT

1. *Holds*, by sixteen votes to one, that there has been a violation of Article 3 in respect of each applicant;

2. *Holds*, unanimously, that the complaint under Article 5 § 4 of the Convention falls outside the scope of its examination;

3. *Holds*, by sixteen votes to one, that the finding of a violation constitutes in itself sufficient just satisfaction for any non-pecuniary damage sustained by the first applicant;

4. *Holds*, by sixteen votes to one,
   (a) that the respondent State is to pay the first applicant, within three months, EUR 40,000 (forty thousand euros), to be converted into pounds sterling at the rate applicable at the date of settlement, in respect of costs and expenses, plus any tax that may be chargeable;
   (b) that from the expiry of the above-mentioned three months until settlement simple interest shall be payable on the above amount at a rate equal to the marginal lending rate of the European Central Bank during the default period plus three percentage points;

5. *Dismisses*, unanimously, the remainder of the first applicant's claims for just satisfaction.

Done in English and in French, and notified at a public hearing in the Human Rights Building, Strasbourg, on 9 July 2013, pursuant to Rule 77 §§ 2 and 3 of the Rules of Court.


        Michael O'Boyle                          Dean Spielmann
        Deputy Registrar                            President


In accordance with Article 45 § 2 of the Convention and Rule 74 § 2 of the Rules of Court, the following separate opinions are annexed to this judgment:
   (a) Concurring opinion of Judge Ziemele;
   (b) Concurring opinion of Judge Power-Forde;
   (c) Concurring opinion of Judge Mahoney;
   (d) Partly dissenting opinion of Judge Villiger.

                                                                        D.S.
                                                                        M.O'B.

## CONCURRING OPINION OF JUDGE ZIEMELE

1. While I voted for the decision not to make any award for damage in this case in view of the nature of the Court's findings summed up in paragraphs 130-131, I cannot fully subscribe to the reasons given by the Court in paragraph 136 and in point 3 of the operative part. I am perfectly aware that this is a long-standing practice of the Court. The wording always used by the Court is to say that "the finding of a violation of [the particular Article] constitutes sufficient just satisfaction".

2. I have in the context of some earlier cases made clear my unease with this approach (see the joint separate opinion of Judges Ziemele and Karakas in *Disk and Kesk v. Turkey*, no. 38676/08, 27

November 2012). My unease relates to the very notion of State responsibility in international law and in fact to the distinction that one draws between an internationally wrongful act and its consequences. Article 28 of the ILC Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001 (the "Draft Articles") provides: "The international responsibility of a State which is entailed by an internationally wrongful act in accordance with the provisions of Part One involves legal consequences as set out in this Part [Part Two]". The wording that the Court uses, in my view, mixes together the establishment of State responsibility by a court based on a violation of the State's obligations under the Convention and the question of the Court's view on the possible legal consequences following the finding of responsibility.

3. According to the rules on State responsibility, the main consequence following the internationally wrongful act is an obligation to make full reparation. This is an independent obligation. The ILC has stated that "the general obligation of reparation [is] the immediate corollary of a State's responsibility" (see commentary on Article 31 of the Draft Articles, § 4). It is true that there are different forms of reparation, which include satisfaction for the injury caused "in so far as it cannot be made good by restitution or compensation" (Article 37 § 1 of the Draft Articles). "Satisfaction may consist in an acknowledgment of the breach, an expression of regret, a formal apology or another appropriate modality" (Article 37 § 2 of the Draft Articles). It is important to keep in mind that satisfaction provided by the responsible State, and not the courts, is not a standard form of reparation and may work only in those cases in which reparation cannot be fully satisfied through restitution or compensation. In any event, satisfaction under the rules on State responsibility should not be confused with what the European Court of Human Rights or other international courts or tribunals have considered to be just satisfaction.

4. As far as the Court is concerned, Article 41 follows the logic of the law on State responsibility since it first of all provides that, in principle, the responsible State should grant full reparation at national level and that it is only when such reparation is not available or possible that the Court may decide on just satisfaction. The Court has explained that where it has found a breach of the Convention in a judgment, the respondent State is under a legal obligation to put an end to that breach and make reparation for its consequences in such a way as to restore as far as possible the situation existing before the breach (see, for example, *Iatridis v. Greece* (just satisfaction) [GC], no. 31107/96, § 32, ECHR 2000 XI). In the case of *Papamichalopoulous and Others v. Greece* (Article 50), 31 October 1995, § 34, Series A no. 330 B, the Court held as follows:

> "The Contracting States that are parties to a case are in principle free to choose the means whereby they will comply with a judgment in which the Court has found a breach. This discretion as to the manner of execution of a judgment reflects the freedom of choice attaching to the primary obligation of the Contracting States under the Convention to secure the rights and freedoms guaranteed (Article 1). If the nature of the breach allows of *restitutio in integrum,* it is for the respondent State to effect it, the Court having neither the power nor the practical possibility of doing so itself. If, on the other hand, national law does not allow – or allows only partial – reparation to be made for the consequences of the breach, Article 50 empowers the Court to afford the injured party such satisfaction as appears to it to be appropriate".

In other words, the Court declares that an action or omission by the State is unlawful in the sense of being contrary to the Convention. At this point a corresponding obligation arises to repair the injury.

5. As far as a judicial declaration of a violation as a form of just satisfaction is concerned, it is true that the ILC has commented that it is "one of the most common modalities of satisfaction provided in the case of moral or non-material injury to the State" (see commentary on Article 37 of the Draft Articles, § 6). At the same time, it is important to note in what specific factual context this practice of international courts and tribunals was established. The ICJ judgment in the *Corfu Channel* case is the main authority for this approach. However, the ICJ ruled that the declaration of a violation by the British Navy was "in itself appropriate satisfaction" in a situation in which Albania had not sought any other form of reparation (see *Corfu Channel*, Merits, ICJ Reports 1949, p.35).

The ILC stated as follows: "However, while the making of a declaration by a competent court or tribunal may be treated as a form of satisfaction in a given case, such declarations are not intrinsically associated with the remedy of satisfaction. Any court or tribunal which has jurisdiction over a dispute has the authority to determine the lawfulness of the conduct in question and to make a declaration of its findings, as a necessary part of the process of determining the case. Such a declaration may be preliminary to a decision on any form of reparation, or it may be the only remedy sought" (see commentary on Article 37 of the Draft Articles, § 6). It should also be pointed out that, while noting the long-established practice of using satisfaction as a remedy, the tribunal in the "*Rainbow Warrior*" arbitration drew the following distinction: "This practice relates particularly to the case of moral or legal damage done directly to the State, especially as opposed to the case of damage to persons involving international responsibilities" (see the "*Rainbow Warrior*" case, UNRIAA, vol. XX, paragraph 122).

6. To sum up, considering that Article 41 indeed addresses the competence of the Court to determine the remedy for a violation, where a human rights court, in a dispute between a State and an individual, establishes a violation and where the individual concerned, an injured party, has claimed damages, the declaration that a finding of a violation is sufficient satisfaction does not answer that claim. It may well be that the Court considers that the compensation sought is unjustified and thus decides not to award it. The Court should therefore say exactly that. The finding of a violation will remain and will not go away with the decision not to make an award in respect of damage. These will be very rare cases and there might still be remedies available at domestic level. I therefore consider that the Court needs to disentangle its language in situations in which it does not consider it appropriate to make an award for damages.

## CONCURRING OPINION OF JUDGE POWER-FORDE

I voted with the majority in this case and wish to add the following.

I understand and share many of the views expressed by Judge Villiger in his partly dissenting opinion. However, what tipped the balance for me in voting with the majority was the Court's confirmation, in this judgment, that Article 3 encompasses what might be described as "the right to hope". It goes no further than that. The judgment recognises, implicitly, that hope is an important and constitutive aspect of the human person. Those who commit the most abhorrent and egregious of acts and who inflict untold suffering upon others, nevertheless retain their fundamental humanity and carry within themselves the capacity to change. Long and deserved though their prison sentences may be, they retain the right to hope that, someday, they may have atoned for the wrongs which they have committed. They ought not to be deprived entirely of such hope. To deny them the experience of hope would be to deny a fundamental aspect of their humanity and, to do that, would be degrading.

## CONCURRING OPINION OF JUDGE MAHONEY

1. I unreservedly subscribe to the conclusions and reasoning of the judgment of the Grand Chamber in the present case ("GCJ"). I would, however, like to add some further words on the questions of the applicability of and compliance with Article 3 in relation to whole life prisoners.

I. Applicability

2. The following comments on applicability concern:

-　the requirement to be read into Article 3 whereby life sentences must be "reducible"; and

-　the moment in time when, to use the language of the Chamber judgment ("CJ") in the present case, "an Article 3 issue" can be said to arise in regard to that implicit requirement.

For the development of the reasoning, it is perhaps easier to begin with the second of these two points.

points.

## 1. The timing

3. In its judgment (at CJ § 92 *in fine* – as cited in GCJ § 87), the Chamber expressed the test for the applicability in time of Article 3 in relation to the applicants' complaints as being that an Article 3 issue would only arise when it could be shown that: (i) the individual prisoner's continued imprisonment could no longer be justified on any legitimate penological grounds; and (ii) the sentence was irreducible in law and in practice.

4. It is of course true that, in relation to prisoners, Article 3 applies only to punishment or ill-treatment that attains a certain level of suffering or humiliation going beyond the suffering and humiliation inevitable in all imprisonment (see *Tyrer v. the United Kingdom*, 25 April 1978, Series A no. 26, § 30) and that a whole life prisoner will not have been subject to any suffering or humiliation attaining that level simply by reason of his or her whole life sentence at the moment of passing of that sentence. The prospect, at the moment of sentencing, of spending the whole of one's remaining life behind bars is not in itself sufficient to generate suffering or humiliation of the requisite level. As was intimated by the Chamber in its judgment (CJ § 92, quoted at GCJ § 86), defendants convicted of very serious crimes of violence such as murder or manslaughter must expect to serve a significant number of years in prison before they can realistically have any hope of release; and life sentence prisoners, even if they benefit from a possibility of release on parole, must know that there is no guarantee of release being granted in their lifetime.

5. That is not to say, however, that the responsibility of a Contracting State can never be engaged under Article 3 until the person concerned is in a position to claim that he or she is actually undergoing punishment or treatment attaining the prohibited level. As illustrated by the early extradition case of *Soering v. the United Kingdom* (7 July 1989, Series A no. 161, §§ 88 and 90), the abhorrence of torture and of inhuman or degrading punishment or treatment in democratic society is such that it requires that the responsibility of the State be engaged not only for actual violations of Article 3 but also for measures foreseeably entailing potential violations in the future, so as to prevent such future violations occurring.

6. In the penal context, there is no reason why this preventive aspect of Article 3 should not enter the picture when a convicted criminal is sentenced, depending on the nature of the sentence imposed. To take one illustration of this, if a sentence of imprisonment that is grossly disproportionate by reason of its length is imposed (it being common ground in the present case that such a sentence would violate Article 3 – see GCJ §§ 83 and 102), the person concerned should be immediately entitled to challenge the compatibility of the sentence with Article 3, without being obliged to wait until the proportionate part of the sentence has been served and the gross disproportionality begins to bite. The prohibition of gross disproportionality can be seen to be a preventive requirement of Article 3 that concerns the nature of the sentence the moment it is passed.

7. Similarly, if it can be said that there is inherent in Article 3 a prohibition on irreducible life sentences, this in itself is a preventive requirement that should logically come into play at the moment of sentencing and not later.

8. To that extent, an "Article 3 issue" arises at the moment of sentencing. That issue is evidently not the substantive question of fact (stated by the Chamber as the first limb of its test – see § 3 above in this separate opinion) whether, for the particular prisoner concerned, the circumstances have so exceptionally evolved that the balance of penological justifications has shifted to the point where continued detention could be claimed by the prisoner to involve inhuman and degrading treatment or punishment contrary to Article 3. That point may in all likelihood never be reached in practice, as the applicants in the present proceedings themselves conceded (see GCJ § 131). What arises on sentencing is the issue of a general character going to the very nature of the sentence imposed, namely whether the sentence as imposed complies with Article 3 in meeting the preventive requirement of reducibility. This issue is quite distinct from the subsequent issue going

to the aleatory circumstances of the ensuing execution of the sentence in the particular case.

9 As I read the Chamber's test for the applicability of Article 3 set out above, it brings together two distinct requirements under Article 3 that arise at different points in time, one being a procedural requirement (as the three dissenters in the Chamber, Judges Lech Garlicki, David Thór Björgvinsson and George Nicolaou, described it in their separate opinion) or a preventive requirement concerning the nature of the sentence (as I have expressed it), the other being a substantive requirement concerning the actual conditions of the serving of the sentence.

2. <u>The requirement of reducibility</u>

10. The Grand Chamber's judgment (GCJ §§ 104-118) explains – at some length – why it is that Article 3 is to be interpreted as requiring reducibility of life sentences, "in the sense of a review which allows the domestic authorities to consider whether any changes in the life prisoner are so significant, and such progress towards rehabilitation has been made in the course of the sentence, as to mean that continued detention can no longer be justified on legitimate penological grounds" (GCJ § 119).

11. In stating reducibility of a life sentence to be a requirement of Article 3, the judgment does not take the case-law in a new direction or impose a new obligation on the Contracting States; rather it takes up principles already enounced in the previous case-law, notably in the Grand Chamber's judgment in *Kafkaris v. Cyprus* ([G.C.], no. 21906/04, ECHR 2008-...). The Court of Appeal in the 2009 case of *Bieber* (summarised, with extracts, at GCJ §§ 47-49) deduced the principle of reducibility from the *Kafkaris* judgment:

> "It seems to us that the Court [in *Kafkaris*] considered that an irreducible life sentence raises an issue under Article 3 in circumstances where it may result in an offender being detained beyond the term that is justified by the legitimate objects of imprisonment. This is implicit in the fact that no issue under Article 3 appears to arise provided that there is, in law and in practice, a possibility of the offender being released, even though it remains possible, or even likely, that no release will be granted in his lifetime. The essential requirement appears to be the possibility of a review that will determine whether imprisonment remains justified." (§ 39 of the Court of Appeal's judgment, quoted at GCJ § 47)

12. The Chamber in the present case, in putting as its second condition for an Article 3 issue to arise that the sentence should be irreducible in law and in practice (see § 3 above), was likewise re-affirming reducibility as an inherent requirement of Article 3, albeit a requirement that, in its view, could only be invoked by a life prisoner at the hypothetical moment in time, which might never come, when he or she could claim that, contrary to Article 3, his or her continued imprisonment could no longer be justified on legitimate penological grounds.

13. What may be said to be a development of the case-law in the present case is that the Grand Chamber's judgment specifies, in a manner differing from the approach taken by the Chamber in its judgment, the moment when an issue may arise under Article 3 as to compatibility of a life sentence with the requirement of reducibility.

II. <u>Compliance</u>

14. The Court of Appeal in *Bieber* "[did] not consider that a whole life term [under English law] should be considered as a sentence that is irreducible", because the Secretary of State's statutory power to release (namely the discretionary power under section 30(1) of the 1997 Act to order a life prisoner's release on licence on compassionate grounds in exceptional circumstances – see GCJ §§ 42–44), read together with the duty incumbent on the Minister under section 6 of the Human Rights Act to comply with the Convention, and notably with the requirements of Article 3, in the exercise of that statutory power, would enable the release of a whole life prisoner if ever the position were reached where his or her continued imprisonment would amount to inhuman or degrading punishment or treatment (§§ 48, 49 of the Court of Appeal's judgment, quoted above at

degrading punishment or treatment (§§ 40–49 of the Court of Appeal's judgment, quoted above at GCJ § 49). As noted above and, more importantly, in the Grand Chamber's judgment (GCJ § 111), the balance between the various penological justifications for life imprisonment (punishment, deterrence, protection of the public and rehabilitation) are susceptible of shifting with the passage of time, such that in exceptional circumstances the point may be reached where it would constitute "inhuman or degrading treatment or punishment", contrary to Article 3, to maintain the prisoner in continued detention.

15. As emerges from the Court of Appeal's judgment in *Bieber*, compliance with this Article 3 requirement of the continuance of a penological justification for the detention would be a relevant consideration that the Secretary of State would be obliged to take into consideration in the exercise of his statutory power to release. Indeed, to quote the Government's own words, "as a matter of English law, when exercising the power the Secretary of State <u>must</u> act compatibly under the Convention" (see the Government's written observations before the Grand Chamber, § 68 - underlining supplied); with the consequence that, if the continued detention of a whole life prisoner is shown to amount to inhuman or degrading treatment, contrary to Article 3, the Secretary of State would not merely be free but would be duty-bound to exercise his power to release the prisoner. The Government have acknowledged that whole life prisoners such as the applicants could contend, in an application to the Secretary of State for exercise in their favour of his power of release under the 1997 Act, that their continued detention is not justified on any penological grounds; and any negative decision by the Secretary of State would be amenable to judicial review and a challenge on Article 3 grounds (see the Government's written observations, § 66).

16. On such a reading of the applicable national law, the Human Rights Act, taken together with the Secretary of State's statutory power to release on compassionate grounds, would enable whole life prisoners to be released if the issue were concluded in their favour, either by the Secretary of State on the initial examination of their application for exercise of the power to release on compassionate grounds or on judicial review by the national courts applying the Convention so as to quash the Minister's negative decision. Despite the apparently exhaustive wording of Prison Service Order 4700, the instrument issued under the authority of the Secretary of State, in which the Minister's policy regarding the possible release of whole life prisoners is set out (see GCJ § 43), life prisoners would have open to them the possibility to make representations to the Secretary of State to exercise his power of release "on compassionate grounds" under the 1997 Act for reasons other than terminal illness and physical incapacity.

17. The Grand Chamber's judgment (at GCJ § 125) recognises that, on the above reading of section 30 of the 1997 Act, there would thus, in principle, be available to whole life prisoners under English law a review mechanism of the kind required by Article 3, a mechanism giving them what has sometimes been referred to as a "faint hope" of release, and what is more, a guarantee that, notwithstanding their whole life sentence, they should not be imprisoned beyond the term that is justified by the legitimate penological purposes of imprisonment.

18. The problem is not only that the official instrument stating the Secretary of State's policy in relation to his exercise of the discretionary power of release under section 30(1) of the 1997 Act, namely Prison Service Order 4700, passes over in silence the possible release avenue of seeking release open to whole life prisoners through reliance on the Human Rights Act, but also that the criteria set out in the Prison Service Order are framed in exhaustive and restrictive terms, as being the only grounds in which the discretion will be exercised. Although as a matter of English law, the restrictive terms of that administrative, "policy" text are overridden by the Secretary of State's duty to act compatibly with the Convention when exercising his discretion, the specific instrument on the statutory power to release "on compassionate grounds" is less than transparent. As the Grand Chamber puts it in its judgment (at GCJ § 128 *in fine* above), "the Prison Service Order is liable to give to whole life prisoners – those directly affected by it – only a partial picture of the exceptional circumstances capable of leading to the exercise of the Secretary of State's power under section 30".

19. The Government had argued in their pleadings (at § 68 of their written observations) that it

"would be apparent at the outset of any sentence" that "if any Article 3 issue arises [in the sense of disappearance of penological justification for continued detention] a mechanism exists by which the prisoners may be released, and the operation of that mechanism is subject to review by the courts". In view of the lack of clarity as to the current state of the domestic law concerning the conditions on which the prospect of release for whole life prisoners exists, the Grand Chamber was unable to accept that submission (see GCJ § 129). The Court's conclusion may be paraphrased as being that the uncertain and ambiguous relationship between the various sources of the applicable domestic law prevents the applicants' life sentences, "at the present time", from being regarded as reducible in law and in practice for the purposes of Article 3 (see GCJ § 130).

III. <u>Concluding remarks</u>

20. The main aspects of the reasoning in the Grand Chamber's judgment that I would want to pinpoint are the following:

- Reducibility (in the sense of the existence of a mechanism affording a not wholly unreal prospect of eventual release) must exist, in law and in practice, at the time of sentencing in order for the requirements of Article 3 to be met in relation to the nature of the sentence passed.

- In principle, in view of the reasoning of the Court of Appeal in *Bieber* as to the effect of the Human Rights Act and of Article 3 on the exercise of the Secretary of State's exceptional power to release under the 1997 Act, such a mechanism could be said to exist under English law in the form of: (a) the possibility for the life prisoner to apply to the Secretary of State for exercise of the statutory power of release on Article 3 grounds (disappearance of penological justification); and (b) the Secretary of State's duty to release if such grounds are shown.

- There was, however, a lack of sufficient clarity existing at the relevant time as to the wider nature of the criteria on which the statutory discretion to release whole life prisoners must, as a matter of English law, be exercised. For this reason, the present applicants, at the moment of their sentencing, could not be expected to harbour the requisite prospect – "faint hope" – of release.

- As consequence of this lack of sufficient clarity in the manner of operation of the applicable domestic law, the whole life sentences in issue, when imposed on the applicants, cannot be regarded as having been "reducible" for the purposes of Article 3; and there has been what the dissenting minority in the Chamber called a procedural breach of Article 3.
- However, as the Chamber (majority) held, none of the applicants has demonstrated on the particular facts, or even argued, that, at present, their continued detention serves no penological purpose and, consequently, no substantive issue under Article 3 arises as yet.

21. The respondent Government are of course free to choose the means whereby they will fulfil their international treaty obligation under Article 46 of the Convention to "abide by" the Grand Chamber's judgment in the present case. Greater clarity in the Prison Service Order (see GCJ §§ 128-129 above) may be one option, for example. Another possible option – in terms of means for ensuring the reducibility required by Article 3 – may be inferred from the passages in the Grand Chamber's judgment analysing the comparative and international law materials adduced before the Court. As the Court observed, these materials show clear support for the institution of a dedicated mechanism, integrated within the sentencing legislation, providing for a review of life sentences after a set period, usually after twenty-five years' imprisonment, with further periodic reviews thereafter (see GCJ §§ 117, 118 and 120 above; see also GCJ § 130). Indeed, prior to 2003 the English sentencing system itself included provision for such a review, albeit one that was carried out in the first place by the executive (see GCJ §§ 46 and 124 above).

out in the first place by the executive (see GCs §§ 48 and 124 above).

## PARTLY DISSENTING OPINION OF JUDGE VILLIGER

I respectfully disagree with the majority of judges in this case.

As a lawyer I can of course agree that an irreducible sentence raises different and at times highly problematic issues. But as a judge bound by the Convention, I am obliged to analyse this issue solely through the prism of Article 3.

My disagreement stems from the method which this judgment chooses to examine the alleged breach of Article 3 of the Convention, namely that the irreducible sentence imposed on the applicants runs counter to this provision as such.

The Court has a time-honoured case-law as to the standards and conditions of applying Article 3, starting with its 1978 judgment in *Ireland v. the United Kingdom* (18 January 1978, § 162, Series A no. 25). In that case and in literally countless subsequent cases it has affirmed that whether or not an issue arises under Article 3 will depend on all circumstances of the individual case; that this provision contains different thresholds (namely "inhuman", "degrading" and "torture"); that a minimum of severity has to be reached to attain the first threshold; and that the assessment of this minimum will be relative (see for a more recent case *M.S.S. v. Belgium and Greece* [GC], no. 30696/09, § 219, ECHR 2011).

In the present judgment, the Court essentially finds a violation of Article 3 as there is currently no prospect of release and no possibility of review of the three applicants' sentences. It adduces, inter alia, the arguments that the balance of the justification for detention may shift over time (at § 111 of the judgment); that whatever the prisoner does in prison, however exceptional his progress towards rehabilitation, his punishment remains fixed and unreviewable (at § 112); and implicitly that an irreducible sentence runs counter to human dignity (at § 113). The crucial point is that the judgment takes the position that the question of an irreducible sentence's compatibility with Article 3 must be analysed from the perspective of the moment when a prisoner begins serving that sentence. Thus, at § 122 of the judgment it is stated:

> "[A] whole life prisoner should not be obliged to wait and serve an indeterminate number of years of his sentence before he can raise the complaint that the legal conditions attaching to his sentence fail to comply with the requirements of Article 3."

In my opinion, this manner of analysing the complaints does not comply with the standards and conditions of Article 3 of the Convention as developed in the Court's case-law for the following reasons.

To begin with, I note that in the judgment (for example, at §§ 121 et seq.) reference is made to the "standards" and "requirements" of Article 3. However, nowhere in the judgment are these standards and requirements explained, analysed and applied.

Second, the judgment assesses the situation for all prisoners serving whole life orders, thus in fact providing for a generalised interpretation of Article 3. However, Article 3 would normally require an individualised assessment of each applicant's situation.

Third, by taking a prospective view of the prisoners' situation - extending to many decades ahead in the prisoners' lives (and also after the Court's examination of the present case) – the judgment provides for an abstract assessment and fails to undertake a concrete examination of the each applicant's situation at the time when it is examining the case. How can the Court know what will happen in ten, twenty or thirty years?

Fourth, this general and abstract application of Article 3 to the present case does not, in my view, square easily with the principle of subsidiarity underlying the Convention, not least when, as the judgment itself recognises, issues relating to just and proportionate punishment are the subject of rational debate and civilised disagreement (§ 105 of the judgment).