**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

LUIS NOEL CRUZ,                          :
      Petitioner,                       :          CIVIL ACTION NO.
                       :          11-CV-787 (JCH)
      v.                                      :
                       :
UNITED STATES OF AMERICA,                 :          MARCH 29, 2018
      Respondent.                       :

**RULING RE: SUCCESSIVE PETITION TO VACATE, SET ASIDE, OR CORRECT**
**SENTENCE (DOC. NO. 37)**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 2

II.   FACTUAL BACKGROUND ................................................................................... 2

III.   PROCEDURAL BACKGROUND ......................................................................... 4

IV.   LEGAL STANDARD ........................................................................................... 7

V.   DISCUSSION ...................................................................................................... 7

   A.   Requirements of Section 2255(h)(2) ............................................................ 8

      1.   Standard of Review Under Section 2255(h) ................................................ 8

      2.   Second Circuit's Mandate Authorizing Successive Petition .......................... 10

      3.   Timeliness .................................................................................................. 12

      4.   Section 2255(h)(2) in the Miller Context ...................................................... 14

      5.   Analogous Interpretation of Section 2255(h) from Cases Under Johnson v.
      United States .................................................................................................. 17

      6.   Interpretation of Section 2255(h) and Application to This Case ................... 26

   B.   Miller's Application to 18-Year-Olds ................................................................ 31

      1.   National Consensus .................................................................................... 39

      2.   Scientific Evidence ..................................................................................... 48

VI.   CONCLUSION ................................................................................................. 57

## I.    INTRODUCTION

The Second Circuit authorized the petitioner, Luis Noel Cruz, to file a successive habeas petition pursuant to section 2255 of title 28 of the United States Code on July 22, 2013.  <u>See</u> Mandate of the USCA (Doc. No. 23).  On August 19, 2014, Cruz filed the Successive Petition to Vacate, Set Aside, or Correct Sentence currently pending before the court.  <u>See</u> Successive Petition to Vacate, Set Aside, or Correct Sentence ("Pet. to Vacate") (Doc. No. 37).  In it, Cruz argues, <u>inter alia</u>, that his sentence of mandatory life imprisonment without the possibility of parole violates the Eighth Amendment of the United States Constitution, relying on the rule announced in <u>Miller v. Alabama</u>, 567 U.S. 460 (2012).  <u>See id.</u> at 10–22.  The respondent, the United States ("the Government"), opposes Cruz's Petition.  <u>See</u> Government's Response to Pet. to Vacate ("Resp. to Pet.") (Doc. No. 64).

For the reasons set forth below, Cruz's Petition is **GRANTED**.

## II.   FACTUAL BACKGROUND

Luis Noel Cruz was born on December 25, 1975.  <u>See</u> Transcript of Evidentiary Hearing ("Cruz Tr.") (Doc. No. 114) at 77.  Beginning on or about November 1991, when Cruz was 15 years old, he joined the Latin Kings, a violent gang with branches of operations in Connecticut.  <u>See</u> Pet. to Vacate, Ex. 1, Indictment (Doc. No. 37-1) at ¶ 14.  Cruz testified at an evidentiary hearing before this court that he never held a position of leadership in the gang and that members were expected to obey the orders, called "missions," of the leaders.  <u>See</u> Cruz Tr. at 14–15, 19.  He testified that a mission could include anything, including murder, and that disobedience would result in the same mission being carried out on the person who disobeyed.  <u>See id.</u> at 14, 19.  Cruz further testified that he attempted to renounce his membership in the Latin Kings prior to

the occurrence of the murders for which he is now serving concurrent life sentences. See id. at 16–17.  While he believed at the time that he had successfully left the gang, he later learned that the leaders of the Latin Kings had viewed his attempt to resign as an act of disrespect and that his status in the gang was uncertain.  See id. at 17, 19.

Cruz turned 18 on December 25, 1993.  On May 14, 1994, when Cruz was 18 years and 20 weeks old, Cruz and another member of the Latin Kings, Alexis Antuna, were given a mission by gang leader Richard Morales.  See United States v. Diaz, 176 F.3d 52, 84 (2d Cir. 1999).  The mission was to kill Arosmo "Rara" Diaz.  See id. Carrying out that mission, Cruz and Antuna shot and killed Diaz and his friend, Tyler White, who happened to be with Diaz at the time.  See id.  Cruz testified at the hearing before this court that he now admits to committing both murders.  See Cruz Tr. at 27. He further testified that Antuna informed him at the time that the leaders of the Latin Kings were debating what would happen to him as a result of his attempt to leave the gang.  See id. at 19.  According to his testimony, Cruz believed that, if he did not carry out the mission, he himself would be killed.  See id.

In December 1994, a grand jury indicted Cruz for, inter alia, three Violent Crimes in Aid of Racketeering ("VCAR"), in violation of section 1959(a) of title 18 of the United States Code.  See Indictment at ¶¶ 75–81; United States v. Millet, No. 94-CR-112, Superseding Indictment (Doc. No. 625) at ¶¶ 74–79.  The three VCAR crimes were the conspiracy to murder Diaz (Count 24), the murder of Diaz (Count 25), and the murder of White (Count 26).  See id.  Cruz and a number of his co-defendants went to trial and, on September 29, 1995, a jury convicted Cruz on all three VCAR counts, in addition to violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

§ 1962(c), conspiracy to violate RICO, and conspiracy to commit a drug offense.  <u>See</u>

<u>Millet</u>, Verdict Form (Doc. No. 945); <u>Millet</u>, Judgment (Doc. No. 1072) at 1.  On January

30, 1996, Cruz was sentenced to, <u>inter alia</u>, four concurrent terms of mandatory life

without parole for the two VCAR murders, the RICO violation, and the conspiracy to

violate RICO.  <u>See</u> Judgment at 2.

Cruz is now 42 years old.  He testified at the hearing before this court that, during

his incarceration, he renounced the Latin Kings and has been a model inmate, teaching

programs to other inmates and receiving only one disciplinary ticket during his 24 years

of incarceration.  <u>See</u> Cruz Tr. at 23, 70.  His testimony is supported by letters from the

staff at the Bureau of Prisons.  <u>See</u> Pet. to Vacate, Ex. 2, 3.

## III.   PROCEDURAL BACKGROUND

On May 4, 1999, the Second Circuit affirmed Cruz's conviction on appeal.  <u>See</u>

<u>Diaz</u>, 176 F.3d at 73.  Cruz subsequently filed four habeas petitions under section 2255

of title 28 of the United States Code, from 2001 to 2013, each of which was denied.

<u>See</u> Resp. to Pet. at 4–6.  On July 22, 2013, the Second Circuit granted Cruz's request

to file a successive petition under section 2255(h)(2) to raise a claim under <u>Miller</u>.  <u>See</u>

Mandate of USCA.  The Second Circuit determined that Cruz made a <u>prima facie</u>

showing that he satisfied the requirements of section 2255(h) and directed this court to

address "whether the United States Supreme Court's decision in <u>Miller</u> announced a

new rule of law made retroactive to cases on collateral review."  <u>Id.</u> at 1.

Cruz filed his Petition on August 18, 2014.  <u>See</u> Pet. to Vacate.  In it, he raised

two arguments.[1]  First, Cruz argued that he was 15 years old when he first joined the

Latin Kings and, because membership in a RICO enterprise is an element of his VCAR

conviction, he was a juvenile at the time that he committed the element of the crime that

triggers mandatory life imprisonment, thereby making his sentence unconstitutional

under <u>Miller</u>.  <u>See</u> <u>id.</u> at 4–9.  Second, he argued that <u>Miller</u>'s prohibition of mandatory

life imprisonment for adolescents should also be applied to those who were 18 at the

time of their crimes because scientific research and national consensus indicate that 18-

year-olds exhibit the same hallmark features of youth that justified the decision in <u>Miller</u>.

<u>See</u> <u>id.</u> at 10–22.

On May 12, 2015, this court granted Cruz's Motion to Stay the proceedings,

pending the Supreme Court's decision on the retroactivity of <u>Miller</u>.  <u>See</u> Order Granting

Motion to Stay (Doc. No. 49).  In 2016, the Supreme Court held in <u>Montgomery v.

Louisiana</u>, 136 S. Ct. 718 (2016), that <u>Miller v. Alabama</u> announced a new substantive

constitutional rule that was retroactive on collateral review.  <u>See</u> <u>Montgomery</u>, 136 S.

Ct. at 734.

On April 3, 2017, after briefing and argument, the court granted Cruz's Motion for

a Hearing.  <u>See</u> Ruling re: Motion for Hearing and Supplemental Section 2255 Motion

("Ruling re: Mot. for Hr'g") (Doc. No. 86).  The court held that there was no issue of fact

regarding Cruz's first argument, finding that Cruz remained a member of the Latin Kings

---

[1] Cruz also filed a Supplemental Section 2255 Motion seeking relief pursuant to <u>Montcrieffe v. Holder</u>, 133 S. Ct. 1678 (2013).  <u>See</u> Supplemental Memorandum of Law (Doc. No. 43).  This court denied relief on Cruz's supplemental argument.  <u>See</u> Ruling re: Motion for Hearing and Supplemental Section 2255 Motion (Doc. No. 86) at 29–30.

after turning 18 and committed the murders at age 18.  See id. at 19–22.  Therefore, he was 18 "during his commission of each of the elements of the crime of VCAR murder." Id. at 21.  Accordingly, the court declined to grant him a hearing to offer evidence in support of that theory.  See id. at 22.  The court found, however, that an issue of fact existed as to whether Miller's protections should apply to an 18-year-old and ordered the parties to present evidence of national consensus and scientific research on this issue.  See id. at 23–29.  The court denied the Government's Motion for Reconsideration of its decision.  See Ruling re: Motion for Reconsideration ("Ruling re: Reconsideration") (Doc. No. 99).

On September 13 and 29, 2017, the court held evidentiary hearings at which an expert witness, Dr. Laurence Steinberg, testified about the status of scientific research on adolescent brain development and Cruz testified about the trajectory of his life.[2]  See Transcript of Evidentiary Hearing ("Steinberg Tr.") (Doc. No. 111); Cruz Tr.  After the hearing, the court permitted the parties to file supplemental briefings and held oral argument on February 28, 2018.  See Petitioner's Post-Hearing Memorandum in Support of Pet. to Vacate ("Post-Hr'g Mem. in Supp.") (Doc. No. 115); Government's Post-Hearing Memorandum in Opposition to Pet. to Vacate ("Post-Hr'g Mem. in Opp.")

---

[2] The Government objected to the relevance of Cruz's testimony, arguing that "his specific characteristics have no bearing on whether this Court is authorized to rethink the Supreme Court's decision in Miller, much less whether any change would be warranted in Eighth Amendment jurisprudence."  See Government's Post-Hearing Memorandum in Opposition to Pet. to Vacate ("Post-Hr'g Mem. in Opp.") (Doc. No. 117) at 29.  The Government argues that such evidence is appropriately addressed only at a resentencing hearing for Cruz, should the court grant Cruz's petition.  See id.

The court notes that Cruz's testimony was admitted only as a case study, or as one example, of the trajectory of adolescent brain development.  See Miller, 567 U.S. at 478 (describing the facts surrounding each defendant's case as "illustrat[ing] the problem").  The court does not base this Ruling on the specific facts of Cruz's case.

(Doc. No. 117); Petitioner's Reply to Government's Post-Hr'g Mem. in Opp. ("Post-Hr'g Reply in Supp.") (Doc. No. 120); Minute Entry, Oral Argument Hearing (Doc. No. 124).

## IV.    LEGAL STANDARD

Section 2255 of title 28 of the United States Code permits a federal prisoner to move to vacate, set aside, or correct his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a) (2016).  Therefore, relief is available "under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)).  The petitioner bears the burden of proving that he is entitled to relief by a preponderance of the evidence.  See Skaftouros v. United States, 667 F.3d 144, 158 (2d Cir. 2011).

## V.    DISCUSSION

The court adopts the analysis in its prior Ruling finding no issue of fact regarding Cruz's first argument that he was under the age of 18, when at least one element of the VCAR murders was committed.  See Ruling re: Mot. for Hr'g at 19–22.  Accordingly, Cruz's Petition is denied on that ground.  The court undertakes in this Ruling to address Cruz's second argument: that Miller applies to him as an 18-year-old.

A.    Requirements of Section 2255(h)(2)

      1.    Standard of Review Under Section 2255(h)

Before reaching the merits of Cruz's Petition, the court must first address the threshold issue of whether the requirements of section 2255(h)(2) have been satisfied. When a petitioner is filing a second or successive petition for habeas relief under section 2255(h), as here, the petitioner must receive authorization from the appropriate Court of Appeals to file the petition. See 28 U.S.C. § 2255(h). The Court of Appeals may certify the petition if it finds that the petition has made a prima facie showing that the petition "contain[s] . . . a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." Id.; 28 U.S.C. § 2244(b)(3)(C) (establishing a prima facie standard, which section 2255(h) incorporates); see also Bell v. United States, 296 F.3d 127, 128 (2d Cir. 2002). Without such certification by the Court of Appeals, the district court lacks jurisdiction to decide the merits of the petition. See Burton v. Stewart, 549 U.S. 147, 157 (2007).

Once the Court of Appeals has certified the petition, however, this court must conduct a "fuller exploration" of whether the petition has satisfied the requirements of section 2255(h). See Bell, 296 F.3d at 128 (quoting Bennett v. United States, 119 F.3d 468, 469–70 (7th Cir. 1997)). In doing so, the court is serving a gate-keeping function prior to determining the merits of the peition. If the court finds that the Petition has not satisfied the requirements of section 2255(h), the court must dismiss the Petition. See 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section."); In re Bradford, 830 F.3d 1273, 1276 (11th Cir. 2016) (holding that section 2255(h)

8

incorporates section 2244(b)(4)).  "Even where the Court of Appeals has authorized the

filing of a successive petition, its order authorizing the district court to review the petition

does not foreclose the district court's independent review of whether the petition

survives dismissal."  Ferranti v. United States, No. 05-CV-5222 (ERK), 2010 WL

307445, at *10 (E.D.N.Y. Jan. 26, 2010), aff'd, 480 Fed. App'x 634 (2d Cir. 2012).

Although Ferranti cites section 2244(b)(4) for the proposition that the district court is

authorized to dismiss a claim that does not meet the requirements of section 2255(h),

id., the language of section 2244(b)(4) actually requires the district court to dismiss the

claim in such situations.  See 28 U.S.C. § 2244(b)(4) (stating that the district court "shall

dismiss" such a claim); Ferranti v. United States, 480 Fed. App'x 634, 636–37 (2d Cir.

2012) (stating that such a claim "will be dismissed").

      While the Court of Appeals' inquiry is limited to whether the petitioner has made

a prima facie showing that the requirements are met, the district court must determine

that they are actually met.  See id.; see also Tyler v. Cain, 533 U.S. 656, 661 n.3

(2001).  Because the standards used by the Court of Appeals and the district court are

different, this court must determine de novo that the requirements of section 2255(h) are

satisfied.  See In re Moore, 830 F.3d 1268, 1271 (11th Cir. 2016) ("We rejected the

assertion that the district court owes 'some deference to the court of appeals' prima

facie finding that the requirements have been met." (citation omitted)); In re Pendleton,

732 F.3d 280, 283 (3d Cir. 2013) ("However, we stress that our grant is tentative, and

the District Court must dismiss the habeas corpus petition for lack of jurisdiction if it

finds that the requirements for filing such a petition have not been met."); Johnson v.

United States, 720 F.3d 720, 720–21 (8th Cir. 2013).

9

2.      Second Circuit's Mandate Authorizing Successive Petition

In this case, the Second Circuit authorized Cruz to "file a § 2255 motion raising his proposed claim based on Miller v. Alabama."  Mandate of USCA at 1.  The Mandate then directs this court to "address, as a preliminary inquiry under § 2244(b)(4), whether the United States Supreme Court's decision in Miller announced a new rule of law made retroactive to cases on collateral review."[3]  Id.  The Government argues that the Mandate only authorizes Cruz to file a successive petition on his claim that Miller applies to him because he was under the age of 18 at the time of the crime—that is, the claim rejected by this court in its Ruling on the Motion for a Hearing.  See Motion for Reconsideration ("Mot. for Recons.") (Doc. No. 94) at 2–3.  However, at oral argument on the Petition before this court, the Government acknowledged that the Mandate is ambiguous as to the nature of the proposed claim.

Cruz's Memorandum in Support of Application to File a Second or Successive Section 2255 Petition, filed before the Second Circuit, is unclear as to the exact nature of the argument he intended to raise.  See Cruz v. United States (Second Circuit Court of Appeals), No. 13-2457, Memorandum of Law in Support of Application to File a Second or Successive Section 2255 Petition ("App. to File Successive Pet.") (Doc. No. 2).  However, Cruz does state in the Memorandum that "the case involves conduct that is open to much speculation and interpretation, in that the charges include juvenile and non-juvenile conduct."  Id. at 8.  He also quotes a case stating that "modern scientific research supports the common sense notion that 18-20-year-olds tend to be more

---

[3] The Mandate focuses on retroactivity because the Petition was authorized prior to the Supreme Court's ruling in Montgomery v. Louisiana, 136 S. Ct. 718 (2016), and likely also because Cruz's Memorandum likewise focused on the issue of retroactivity.  See App. to File Successive Pet. at 2–8.

impulsive than young adults ages 21 and over."  <u>Id.</u> (quoting <u>Nat'l Rifle Assoc. of Am. v.</u>

<u>Bureau of Alcohol</u>, 700 F.3d 185, 209 n.21 (5th Cir. 2012)).  Additionally, Cruz states in

a Supplemental Memorandum that his crime involved two predicate acts—"one juvenile

and the other 5 months after Applicant's 18th birthday."[4]  <u>Cruz v. United States</u> (Second

Circuit Court of Appeals), No. 13-2457, Supplementary Papers to Motion for Successive

Petition (Doc. No. 14) at 2.  Based on these statements, this court concludes that, when

the Second Circuit authorized Cruz to file a successive petition, it was aware that he

was at least 18 years old during an element of the offense.

Therefore, the court reads the Second Circuit's Mandate as authorizing this

court's jurisdiction over both of Cruz's arguments under <u>Miller</u>.  This reading of the

Mandate is especially appropriate because Cruz was proceeding <u>pro se</u> when he

petitioned the Second Circuit for certification to bring his successive petition.  The court

must interpret <u>pro se</u> filings liberally "to raise the strongest arguments that they

suggest."  <u>See</u> <u>Willey v. Kirkpatrick</u>, 801 F.3d 51, 62 (2d Cir. 2015).  Therefore, the court

liberally reads any ambiguity in Cruz's filings before the Second Circuit to include the

claim now before the court and reads the Second Circuit's Mandate to include the claim

now before the court.  It will proceed to analyze whether such a claim satisfies the

requirements of section 2255(h).[5]

---

[4] Like Cruz's original Memorandum in Support of Application to File a Successive Petition, the Supplemental Memorandum is also ambiguous.  It does appear to reference the argument that he was under the age of 18 for one of the predicate acts of the offense.  <u>See</u> <u>Cruz v. United States</u> (Second Circuit Court of Appeals), No. 13-2457, Supplementary Papers to Motion for Successive Petition (Doc. No. 14) at 2.  However, the Supplemental Memorandum does not elaborate the argument with much clarity, nor is the rest of the Memorandum clear as to whether other arguments are also raised.  In the face of such ambiguity, the court reads Cruz's <u>pro se</u> filings liberally to raise the strongest arguments that they suggest, as explained above.  <u>See</u> <u>Willey v. Kirkpatrick</u>, 801 F.3d 51, 62 (2d Cir. 2015).

[5] Even if Cruz's Application before the Second Circuit is read not to contain the current claim that <u>Miller</u> applies to him as an 18-year-old, the court would nonetheless likely proceed to its gate-keeping

As noted previously, the court makes such a determination <u>de novo</u>.  <u>See, e.g.</u>, <u>In re Moore</u>, 830 F.3d at 1271.  Thus, Cruz's argument that section 2255(h) is satisfied because "the Second Circuit's 2013 order is, by now, <u>res judicata</u>" is unavailing.  <u>See</u> Post-Hr'g Reply in Supp. at 2.  The Second Circuit's certification of the Petition under a <u>prima facie</u> standard does not determine the court's current, <u>de novo</u> inquiry of whether the Petition meets the requirements of section 2255(h).

   3. Timeliness

   Cruz also argues that the court should reject as untimely the Government's argument that section 2255(h) has not been satisfied because the Government failed to raise the argument at the outset of the case.  <u>See</u> Post-Hr'g Reply in Supp. at 1.  The court already addressed the Government's untimeliness in its prior Ruling.  <u>See</u> Ruling re: Mot. for Recons. at 6–7.  The court again reiterates that, by failing to raise this issue prior to oral argument, the Government "unnecessarily delayed and complexified this

---

inquiry of whether the claim satisfies the requirements of section 2255(h).  By way of comparison, while Cruz's current successive petition was pending before this court, Cruz moved for leave before the Second Circuit to file another successive 2255(h) petition based on <u>Moncrieffe v. Holder</u>, 133 S. Ct. 1678 (2013), an entirely separate claim unrelated to either of his <u>Miller</u> claims.  <u>See</u> Supplemental Memorandum of Law (Doc. No. 43) at 2; Response to 2255 Motion (Doc. No. 64) at 7.  The Second Circuit denied his motion because it had already granted him leave to file the current petition, which was then already pending before this court.  <u>See</u> Response to 2255 Motion at 7.  In doing so, the Second Circuit stated, "If a § 2255 motion is already pending in district court pursuant to this Court's authorization under § 2255(h) motion, the movement [sic] may seek to amend that motion to add claims without first requesting leave of this Court."  <u>Id.</u> (quoting the Second Circuit).

   Therefore, the court considers it likely that, even if it found that Cruz's current <u>Miller</u> argument were not included in his Application to File Successive Petition before the Second Circuit, the Second Circuit would treat this claim in a similar manner as Cruz's <u>Moncrieffe</u> claim and permit him to seek permission from this court to include the claim in his Petition without seeking leave from the Circuit.  As such, the court would then proceed to consider whether the claim satisfies the requirements of section 2255(h), leading to the same analysis the court conducts in this Ruling.  Therefore, it is not significant to the outcome of this case whether Cruz's Memoranda before the Second Circuit expressly included the current claim or not.

proceeding." Id. at 6.  However, the court is not prepared to go so far as to treat the Government's untimeliness as a waiver of the argument.

Other district courts in this Circuit have held that a district court lacks subject matter jurisdiction to rule on the merits of a successive petition under section 2255(h) if the petition has not been certified by the Court of Appeals according to the procedure set out in section 2244(b)(3).  See Canini v. United States, No. 10 CIV. 4002 PAC, 2014 WL 1664240, at *1 (S.D.N.Y. Apr. 17, 2014); Otrosinka v. United States, No. 12-CR-0300S, 2016 WL 3688599, at *3 (W.D.N.Y. July 12, 2016), certificate of appealability denied, No. 16-2916, 2016 WL 9632301 (2d Cir. Dec. 14, 2016).  To that extent, the requirements of section 2255(h) are jurisdictional and not subject to waiver.  Whether the district court's responsibility to dismiss a petition certified under section 2244(b)(4) is also jurisdictional, however, is less clear.  One case from the Third Circuit contains language indicating that section 2244(b)(4) is also jurisdictional.  See In re Pendleton, 732 F.3d 280, 283 (3d Cir. 2013) ("[T]he District Court must dismiss the habeas corpus petition for lack of jurisdiction if it finds that the requirements for filing such a petition have not been met." (emphasis added)).  Cruz has not pointed the court to any contrary case in which the Government's failure to timely raise the issue waived the argument and absolved the court of its responsibility to dismiss the claim under section 2244(b)(4).

Even if the 2255(h) issue as raised by the government is not jurisdictional, the court still declines to treat the Government's tardy raising of the argument as a waiver. The issue has since been thoroughly briefed by both parties, such that no party has been prejudiced by the Government's untimeliness.  See Mot. for Recons.; Opposition

to Mot. for Recons. (Doc. No. 95); Post-Hr'g Mem. in Opp.; Post-Hr'g Reply in Supp.

Therefore, the court proceeds to consider whether section 2255(h) has been satisfied.

        4.     Section 2255(h)(2) in the <u>Miller</u> Context

To find that section 2255(h) has been satisfied, the court must determine that the

Petition contains "a new rule of constitutional law, made retroactive to cases on

collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. §

2255(h)(2). The Government does not disagree that <u>Miller</u> satisfies these three

requirements. The Supreme Court in <u>Montgomery v. Louisiana</u> held that <u>Miller</u>

establishes a new substantive rule that applies retroactively on collateral review. <u>See</u>

<u>Montgomery</u>, 136 S. Ct. at 734. That rule was previously unavailable to Cruz prior to

the <u>Miller</u> decision in 2012.

However, the Government argues that <u>Miller</u> does not apply to Cruz's Petition

because the Government reads the "new rule" in <u>Miller</u> to protect only defendants under

the age of 18. <u>See</u> Post-Hr'g Mem. in Opp. at 2–6. According to the Government,

<u>Miller</u> held the following: "We therefore hold that mandatory life without parole for those

under the age of 18 at the time of their crimes violates the Eighth Amendment's

prohibition on cruel and unusual punishments." <u>Id.</u> at 3 (emphasis omitted) (quoting

<u>Miller</u>, 567 U.S. at 465). Therefore, the Government argues that Cruz's Petition does

not rely on <u>Miller</u>, as <u>Miller</u> would not grant him relief as an 18-year-old. <u>See id.</u> at 2–6.

Instead, the Government characterizes Cruz's Petition as asking the court to create a

new rule expanding <u>Miller</u>, which the Government argues the court cannot do on a 2255

petition. <u>See id.</u>

The threshold inquiry before the court, then, is whether the Petition "contains" the

new rule in <u>Miller</u>, according to the requirement of section 2255(h). This inquiry turns on

whether "contains" is read to require a petition to raise the specific set of facts addressed by the holding in <u>Miller</u> or whether it permits a petition to rely on the principle of <u>Miller</u> to address a new set of facts not specifically addressed by <u>Miller</u>, but also not excluded by it.  Neither party has pointed the court to any binding case law addressing what it means for a petition "to contain" a "new rule" of constitutional law.

The Government has, however, identified two cases in which the courts determined that section 2255(h) did not authorize the filing of a successive petition under <u>Miller</u> for defendants who were 18 years old or older.  <u>See</u> Post-Hr'g Mem. in Opp. at 5 (citing <u>In re Frank</u>, 690 Fed. App'x 146 (Mem.) (5th Cir. 2017); <u>La Cruz v. Fox</u>, No. CIV-16-304-C, 2016 WL 8137659, at *6 (W.D. Okla. Dec. 22, 2016), <u>report and recommendation adopted</u>, No. CIV-16-304-C, 2017 WL 420159 (W.D. Okla. Jan. 31, 2017)).  In <u>Frank</u>, the Fifth Circuit declined to certify a petition under section 2255(h)(2) for a defendant who was 18 and 19 years old at the time of two of the murders for which he was sentenced to mandatory life without parole.  <u>See</u> <u>In re Frank</u>, 690 Fed. App'x at 146.  In <u>La Cruz</u>, the district court for the Western District of Oklahoma declined to transfer the case to the Court of Appeals for the Tenth Circuit to consider whether to authorize a successive 2255 petition.  The court determined that such a transfer would be futile, as <u>Miller</u> did not apply to the petitioner, who was not under the age of 18 at the time of his crime.  <u>See</u> <u>La Cruz</u>, 2016 WL 8137659, at *6.

The court also located two other cases with a similar outcome.  <u>See</u> <u>White v. Delbalso</u>, No. 17-CV-443, 2017 WL 939020, at *2 (E.D. Pa. Feb. 21, 2017) (finding that the defendant was not entitled to file a second habeas petition under section 2244(b)(2) because he was 23 years old at the time of the crime); <u>United States v. Evans</u>, No.

15

2:92CR163-5, 2015 WL 2169503, at *1 (E.D. Va. May 8, 2015) (denying a successive 2255 motion, after certification by the Court of Appeals, because <u>Graham</u> did not apply to the 18-year-old petitioner).

 The court is not bound by these precedents.  To the extent that they may serve as persuasive authority, the court finds them unpersuasive because none of these opinions discuss what it means for the petition to "contain" a new rule in <u>Miller</u>.  The cases assume, without analysis, that section 2255(h) only permits a petition to directly apply the <u>holding</u> of <u>Miller</u>.  Rather than following such assumptions, this court will conduct its own analysis of what it means for a petition to "contain" a "new rule" of constitutional law.

 In doing so, the court first notes that the D.C. Circuit reached the opposite conclusion on this question than the Fifth Circuit did in <u>Frank</u>.  <u>See</u> <u>In re Williams</u>, 759 F.3d 66, 70–72 (D.C. Cir. 2014).  In <u>Williams</u>, the petitioner was sentenced to life without parole for his role in a conspiracy to participate in a racketeer influenced corrupt organization ("RICO") and to distribute illegal drugs.  <u>See</u> <u>id.</u> at 67.  Like Cruz, Williams was a juvenile for the early years of his participation in the conspiracy from 1983 to 1987, but turned 18 in 1987 and continued to participate in the conspiracy until 1991.  <u>See</u> <u>id.</u>  Williams moved for authorization to file a successive petition raising claims under both <u>Miller</u> and <u>Graham v. Florida</u>, 560 U.S. 48, 74 (2010), which held life imprisonment without parole unconstitutional for juvenile non-homicide offenders.  <u>See</u> <u>id.</u> at 68.  The government in <u>Williams</u> argued that "Williams cannot rely on <u>Graham</u>, and therefore is not entitled to relief on the basis of <u>Graham</u>, because <u>Graham</u>'s holding does not extend to conspiracies straddling the age of majority."  <u>See</u> <u>id.</u> at 70; <u>see also</u>

16

id. at 71 (making the same argument for Williams's <u>Miller</u> claim).  The D.C. Circuit rejected the government's argument, however, and granted certification on both claims. <u>See</u> <u>id.</u> at 70–72.

In doing so, the D.C. Circuit reasoned that the government's argument "goes to the merits of the motion, asking us in effect to make a final determination of whether the holding in <u>Graham</u> will prevail for Williams." <u>Id.</u> at 70.  As such, the D.C. Circuit held that such an argument was not an appropriate inquiry for the court to consider in deciding whether the petitioner had made a <u>prima facie</u> case that the petition "contain[s] . . . a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  <u>See</u> <u>id.</u>  The court finds the D.C. Circuit's approach in <u>Williams</u> more persuasive than the Fifth Circuit's approach in <u>Frank</u> because <u>Williams</u> expressly considers what it means for a petition to "rely on" a new rule and articulates its reasons for certifying the position.

As none of these cases are binding on this court, however, the court does not end its inquiry here, but also considers other cases reviewing successive habeas petitions based on other "new rules" of constitutional law beyond <u>Miller</u>, to the extent that those cases offer guidance in interpreting the requirements of section 2255(h).

5.   Analogous Interpretation of Section 2255(h) from Cases Under <u>Johnson v. United States</u>

Thus, in addition to <u>Williams</u>, the court looks to an analogous situation in which courts have considered the meaning of section 2255(h), that is, in the context of successive habeas petitions following <u>Johnson v. United States</u>, 135 S. Ct. 2551 (2015). While these cases consider a different "new rule" than the one contained in <u>Miller</u>, the circuits in the <u>Johnson</u> context have more thoroughly engaged with the meaning of

17

section 2255(h)'s requirement that the petition "contain" a new rule and therefore

provide relevant guidance to the court's analysis here.[6]  Before addressing the circuits'

various interpretations of section 2255(h), the court first briefly explains the context in

which the question arises in the Johnson context.

In Johnson, the Supreme Court held "that imposing an increased sentence under

the residual clause of the Armed Career Criminal Act [("ACCA")] violates the

Constitution's guarantee of due process."  Johnson, 135 S. Ct. at 2563.  The Supreme

Court then held that Johnson announced a new substantive rule that applies

retroactively in cases on collateral review.  See Welch v. United States, 136 S. Ct. 1257,

1265 (2016).  Following Johnson and Welch, Courts of Appeals were faced with

applications to file successive petitions under section 2255, seeking relief from

sentences determined under the residual clause of section 4B1.2 of the Sentencing

Guidelines.  That section was not itself addressed by Johnson, but contains similar

---

[6] At oral argument, the Government argued that the Johnson line of cases is distinguishable from the Miller context.  The Government argued that, because the language of the residual clause of the Armed Career Criminal Act ("ACCA") is nearly identical to the language of the residual clause in the Sentencing Guidelines, applying the rule in Johnson to petitions based on the Sentencing Guidelines is different than applying the rule in Miller to petitions of defendants who were 18 years old at the time of their crimes.

The court, however, does not consider this distinction significant.  Just as Miller said nothing about defendants who were 18 years old at the time of the crime, Johnson says nothing about the Sentencing Guidelines.  Thus, like Cruz's Petition here, successive 2255(h) petitions seeking to rely on Johnson to vacate convictions under the Sentencing Guidelines require the courts to consider whether section 2255(h) is limited to petitions raising the specific set of facts addressed in Johnson or whether it permits petitions to rely on the rule of Johnson to address a new set of facts not specifically addressed by that case.  Cases considering that question provide relevant guidance for this court's inquiry because they address the meaning of the statutory words "to contain" in section 2255(h), which should maintain the same meaning regardless of the content of the new rule of constitutional law at issue.

Additionally, the court notes that, even if the analogy between the Johnson and Miller contexts for considering the section 2255(h) requirements is not perfect, there is no binding Second Circuit precedent indicating how the court should interpret section 2255(h) in the context of Miller.  In such a situation, the court finds it helpful to consider persuasive authority interpreting the statute at issue, even in different contexts, in order to best anticipate how the Second Circuit would decide the question before the court.

language to the residual clause of the ACCA that was held to be unconstitutionally vague in <u>Johnson</u>.  <u>See, e.g.</u>, <u>Blow v. United States</u>, 829 F.3d 170, 172–73 (2d Cir. 2016), <u>as amended</u> (July 29, 2016); <u>In re Hubbard</u>, 825 F.3d 225, 235 (4th Cir. 2016); <u>In re Arnick</u>, 826 F.3d 787, 788 (5th Cir. 2016); <u>In re Patrick</u>, 833 F.3d 584, 588–89 (6th Cir. 2016); <u>In re Embry</u>, 831 F.3d 377, 379, 382 (6th Cir. 2016); <u>Donnell v. United States</u>, 826 F.3d 1014, 1015–17 (8th Cir. 2016); <u>In re Encinias</u>, 821 F.3d 1224, 1226 (10th Cir. 2016); <u>In re McCall</u>, 826 F.3d 1308, 1309 (11th Cir. 2016).

Analogous to the case here, those cases required the circuit courts to consider whether a successive petition under section 2255(h)(2) "contains" a new rule of constitutional law only when the petition involved the same statute as the holding in <u>Johnson</u>, or also when it relied on <u>Johnson</u> as applied to similar language in another statute.  On this question, the circuits split.  <u>Compare</u> <u>Blow</u>, 829 F.3d at 172–73 (certifying the successive petition and holding it in abeyance pending the Supreme Court's decision in <u>Beckles v. United States</u>, 137 S. Ct. 886 (2017)); <u>In re Hubbard</u>, 825 F.3d at 235 (certifying the successive petition); <u>In re Patrick</u>, 833 F.3d at 588 (same); <u>In re Encinias</u>, 821 F.3d at 1226 (same); <u>with</u> <u>In re Arnick</u>, 826 F.3d at 788 (denying the application to file a successive petition); <u>Donnell</u>, 826 F.3d at 1017 (same); <u>In re McCall</u>, 826 F.3d at 1309 (same).

In 2016, the Supreme Court in <u>Beckles v. United States</u> held that the rule in <u>Johnson</u> did not apply to the Sentencing Guidelines, as made advisory by <u>United States v. Booker</u>, 543 U.S. 220, 233 (2005).  <u>See</u> <u>Beckles</u>, 137 S. Ct. at 890.  The <u>Beckles</u> Court held that the advisory Sentencing Guidelines are not subject to vagueness challenges under the Due Process Clause, but did not reach the question of whether

the Sentencing Guidelines, as applied mandatorily prior to Booker, could be subject to such a challenge under Johnson.  See id.  Notably, because Beckles was decided on certiorari from a first petition under section 2255, not a second or successive petition implicating section 2255(h), see id. at 891, the Court did not address whether the circuits that certified successive petitions under Johnson had correctly interpreted section 2255(h).

As a result, after Beckles, the circuits faced similar applications to file successive petitions under section 2255(h), seeking relief under Johnson from sentences imposed when the Sentencing Guidelines were mandatory.  The circuits have again split on whether authorizing such petitions would be an appropriate application of section 2255(h)(2).  Compare Moore v. United States, 871 F.3d 72, 74 (1st Cir. 2017) (certifying the successive petition); In re Hoffner, 870 F.3d 301, 309–12 (3d Cir. 2017) (same); Vargas v. United States, No. 16-2112, 2017 WL 3699225, at *1 (2d Cir. May 8, 2017) (certifying the successive petition and directing the district court to consider staying the proceeding pending the Supreme Court's decision in Lynch v. Dimaya, 137 S. Ct. 31 (Mem.) (2016)); with Mitchell v. United States, No. 3:00-CR-00014, 2017 WL 2275092, at *4–*5, *7 (W.D. Va. May 24, 2017) (dismissing the petition as failing to satisfy the requirements of section 2255(h)); United States v. Gholson, No. 3:99CR178, 2017 WL 6031812, at *3 (E.D. Va. Dec. 5, 2017) (denying the petition as barred by section 2255(h)).

This court looks to these cases addressing <u>Johnson</u> as instructive for analyzing the reach of section 2255(h).[7]  In the absence of binding precedent reviewing district court decisions made in the court's current posture, the reasoning of the circuit courts in deciding certification can provide relevant guidance in interpreting the meaning of section 2255(h) before this court.  The court briefly summarizes below the interpretation and analysis of each side of the circuit split.

The most thorough analysis in favor of reading 2255(h) broadly is found in the Third Circuit case of <u>In re Hoffner</u>.  In <u>Hoffner</u>, the Third Circuit interpreted section 2255(h), which requires that the claim "contain" a new rule of constitutional law," in accordance with the Supreme Court's reading of similar language in section 2244(b)(2)(A), which requires that the claim "<u>relies on</u> a new rule of constitutional law." <u>See</u> <u>In re Hoffner</u>, 870 F.3d at 308 (quoting <u>Tyler v. Cain</u>, 533 U.S. 656, 662 (2001)).  In interpreting "relies on," the Third Circuit held that "whether a claim 'relies' on a qualifying new rule must be construed permissively and flexibly on a case-by-case basis." <u>Id.</u>

At a policy level, the court reasoned that construing the new rule flexibly advances "the need to meet new circumstances as they rise and the need to prevent injustice," which it concluded are particularly salient concerns in the context of a section 2255(h)(2) motion dealing with new substantive rules addressing the potential injustice of an unconstitutional conviction or sentence.[8] <u>Id.</u> at 309.  Additionally, <u>Hoffner</u> cites

---

[7] In doing so, the court recognizes that its task requires a higher bar than that of the Court of Appeals because this court must determine that the requirements of section 2255(h) are actually met, not merely that the Petition has put forth a <u>prima facie</u> showing.

[8] The <u>Hoffner</u> court additionally made pragmatic arguments based on the <u>prima facie</u> standard of the Court of Appeals' inquiry and the protections of a fuller exploration by the district court.  <u>See</u> <u>In re Hoffner</u>, 870 F.3d at 308–09.  This court acknowledges that these arguments are irrelevant to its current inquiry due to the different standard and posture of the Court of Appeals' inquiry, but the court does not

Montgomery for the proposition that the state's countervailing interest in finality is not implicated in habeas petitions that retroactively apply substantive rules.  See id. (quoting Montgomery, 136 S. Ct. at 732 (noting that "the retroactive application of substantive rules does not implicate a State's weighty interests in . . . finality")).

Accordingly, the Hoffner court describes its reading of section 2255(h) as follows:

> [A] motion relies on a qualifying new rule where the rule substantiates the movant's claim.  This is so even if the rule does not conclusively decide [ ] the claim or if the petitioner needs a non-frivolous extension of a qualifying rule.  Section 2255(h)(2) does not require that qualifying new rule be the movant's winning rule, but only that the movant rely on such a rule.

Id. (internal quotation marks and citations omitted) (quoting In re Arnick, 826 F.3d at 789 (5th Cir. 2016) (Elrod, J., dissenting)).

The Third Circuit then concludes that the question of whether the new rule applies to the facts in the specific case is not part of the preliminary, gate-keeping inquiry under section 2255(h), but is instead a "merits question for the district court to answer in the first instance."  Id. at 310–11 (emphasis added).  In this way, the Third Circuit agrees with the D.C. Circuit's decision in Williams discussed previously.  See In re Williams, 759 F.3d at 70–72.  To support its distinction between the preliminary, gate-keeping inquiry and the merits question, the Hoffner court further draws support from other circuits that have likewise certified successive petitions in analogous situations by finding that whether the rule applies to the facts is a merits question.  See In re Hoffner, 870 F.3d at 310–11 (citing In re Pendleton, 732 F.3d 280, 282 n.1 (3d Cir. 2013); In re

---

consider these arguments to undermine the rest of the Third Circuit's analysis, which is relevant to this court's inquiry into the meaning of section 2255(h)(2).

Sparks, 657 F.3d 258, 260 n.1 (5th Cir. 2010); In re Williams, 759 F.3d at 70–72); see

also In re Hubbard, 825 F.3d at 231; United States v. Garcia-Cruz, No. 16CV1508-

MMA, 2017 WL 3269231, at *3–*4 (S.D. Cal. Aug. 1, 2017) (finding that the petitioner

had satisfied the "statutory prerequisite for filing a second or successive motion" under

section 2255, but denying the motion on the merits).[9]

In line with the Third Circuit's analysis, the First Circuit reasoned in Moore v.

United States that Congress used the words "rule" and "right" in section 2255 rather

than the word "holding" for a reason:

> Congress presumably used these broader terms because it
> recognizes that the Supreme Court guides the lower courts
> not just with technical holdings but with general rules that are
> logically inherent in those holdings, thereby ensuring less
> arbitrariness and more consistency in our law.

Moore, 871 F.3d at 82.  Therefore, the Moore court held that, while the "technical

holding" of Johnson was that the residual clause in the ACCA is unconstitutionally

vague, the "new rule" it established was broader than that and "could be relied upon

directly to dictate the striking of any statute that so employs the ACCA's residual clause

to fix a criminal sentence."  Id.  In so distinguishing the new rule from the holding,

Moore supports the Third Circuit's broader reading of section 2255(h).

Additionally, the Tenth Circuit in In re Encinias considered and rejected the

government's argument that the petition challenging the Sentencing Guidelines relied

not on Johnson, but on a later Tenth Circuit decision applying Johnson to the

---

[9] The Government argues to the contrary that whether Miller applies to Cruz is a preliminary gate-keeping question that should be decided under the requirements of section 2255(h).  See Post-Hr'g Mem. in Opp. at 2–6.  However, if the gate-keeping inquiry under section 2255(h) includes whether the new rule of constitutional law applies to the petitioner, there would often likely remain no issue to be decided on the merits.

Guidelines.  See In re Encinias, 821 F.3d at 1225–26.  The Tenth Circuit concluded that

the petition was "sufficiently based on Johnson to permit authorization under §

2255(h)(2)" because of "the similarity of the clauses addressed in the two cases and the

commonality of the constitutional concerns involved."  Id. at 1226.  Not restricting

section 2255(h) to Johnson's narrow holding, the Tenth Circuit granted the certification

and stated, "[A]lthough the immediate antecedent for Encinias' challenge to the career-

offender Guideline is our decision in Madrid, that decision was based, in turn, on the

seminal new rule of constitutional law recognized in Johnson and now made retroactive

to collateral review by Welch."  Id. at 1225–26.

　　　The court recognizes, however, that the answer to the question before it is, as

with many issues of statutory construction, not clear cut.  The clearest contrary

argument for reading section 2255(h) narrowly is found in the Eighth Circuit's decision in

Donnell v. United States.  Donnell held that "to contain" in section 2255(h) means that

"the new rule contained in the motion must be a new rule that recognizes the right

asserted in the motion."  Donnell, 826 F.3d at 1016.  In the Eighth Circuit's view, mere

citation of a new rule without such a nexus to the right would be insufficient.  See id.

Like the Third Circuit in In re Hoffner, the Eighth Circuit in Donnell also reasons from

context that section 2255(h)(2) should be read to be consistent with section

2244(b)(2)(A), which requires that the claim "relies on" a new rule.  See id.  However,

the Donnell court adopts a narrower interpretation of the words "relies on" than the

approach endorsed by the Hoffner court.  Compare Donnell, 826 F.3d at 1016–17; with

In re Hoffner, 870 F.3d at 309.  The Donnell court concludes that the claim cannot

depend on the district court's creation of a second new rule different from that

specifically articulated by the Supreme Court.  See id.  The Eighth Circuit states that the new rule created by Johnson "must be sufficient to justify a grant of relief" and cannot "merely serve[ ] as a predicate for urging adoption of another new rule that would recognize the right asserted by the movant."  Id. at 1017.

The Sixth Circuit in In re Embry recognized a similar logic and looked to Teague v. Lane, 489 U.S. 288 (1989), to determine whether the petition relies on a new rule recognized by the Supreme Court or requires the district court to create a second new rule.  See In re Embry, 831 F.3d at 379.  A "new rule" is one that is "not dictated by precedent."  Id. (quoting Teague, 489 U.S. at 301).  "A rule is not dictated by precedent . . . unless it is 'apparent to all reasonable jurists.'"  Id. (quoting Chaidez v. United States, 133 S. Ct. 1103, 1107 (2013)).  Therefore, a rule is a new rule "unless all reasonable jurists would adopt the rule based on existing precedent."  Id. (internal quotation marks omitted).[10]  On the other hand, "a case does not announce a new rule, when it is merely an application of the principle that governed a prior decision to a different set of facts."  Id. (quoting Chaidez, 133 S. Ct. at 1107).

Like the Sixth Circuit, the Government at oral argument urged this court to look to Teague in interpreting the requirements of section 2255(h).  While there is no question that Teague is binding on this court, Teague does not address the issue currently before

---

[10] The Supreme Court has clarified, however, that the mere existence of disagreement does not necessarily indicate that the rule is new.  See Beard v. Banks, 542 U.S. 406, 416 n.5 (2004) ("Because the focus of the inquiry is whether reasonable jurists could differ as to whether precedent compels the sought-for rule, we do not suggest that the mere existence of a dissent suffices to show that the rule is new." (emphasis in original)); id. at 423 (Souter, J., dissenting) (noting that the majority acknowledges that the all-reasonable-jurists standard "is objective, so that the presence of actual disagreement among jurists and even among Members of this Court does not conclusively establish a rule's novelty"); see also Moore, 871 F.3d at 81 ("In fact, it would not necessarily be a new rule of constitutional law even if we did disagree on the constitutional issue." (citing Beard, 542 U.S. at 416 n.5)).

the court.  <u>Teague</u> enunciated the above definition of a "new rule" in the context of determining whether a new rule should be applied retroactively on collateral review. <u>See</u> <u>Teague</u>, 489 U.S. at 301.  <u>Teague</u> does not address the question of whether a successive habeas petition "contains" or "relies on" a new rule for the purposes of satisfying the requirements of section 2255(h).  Rather, it is the Sixth Circuit in <u>Embry</u> and the Eighth Circuit in <u>Donnell</u> that read the section 2255(h) inquiry to require courts to determine whether the petition asks the district court to recognize "a 'new rule' of its own."  <u>See</u> <u>In re Embry</u>, 831 F.3d at 379; <u>Donnell</u>, 826 F.3d at 1017.  Unlike <u>Teague</u>, <u>Embry</u> and <u>Donnell</u> are not binding on this court.[11]

Additionally, the language in <u>Embry</u> indicating that courts should determine whether a petition requires a second new rule is <u>dicta</u>.  The Sixth Circuit articulated that reasoning, but declined to so hold.  <u>See</u> <u>id.</u> at 381.  Instead, the court granted Embry's application to file a successive petition and instructed the district court to hold the petition in abeyance, pending the Supreme Court's then-anticipated decision in <u>Beckles</u>. <u>See</u> <u>id.</u> at 382.  The Sixth Circuit did so in part because it recognized that "[t]he inquiry is not an easy one."  <u>Id.</u> at 379.  The Sixth Circuit stated, "When it comes to deciding whether Embry has made a <u>prima facie</u> showing of a right to relief, there are two sides to this debate, each with something to recommend it."  <u>Id.</u>

      6.     Interpretation of Section 2255(h) and Application to This Case

This court likewise acknowledges that the question of which of the above two approaches correctly interprets the requirements of section 2255(h) is a difficult one,

---

[11] If, of course, <u>Donnell</u> had been a Second Circuit opinion, the court's duty to address the difficult question now before it would have been easy.

and one on which the Supreme Court has not yet spoken.[12]  In the absence of

additional guidance, however, this court finds persuasive the Third Circuit's reading of

section 2255(h) and applies in this case its approach to determining whether Cruz's

petition contains the new rule enunciated by Miller for the following reasons.[13]

First, the court considers the Third Circuit's approach in Hoffner to be more

supported by the statutory text.  The text of section 2255(h) contains only three

prerequisites and does not expressly require that the court additionally "scrutinize a

motion to see if it would produce a second new rule."  In re Hoffner, 870 F.3d at 311

(internal quotation marks omitted).  The court agrees with the First Circuit in Moore that

Congress's use of "rule" rather than "holding" indicates that it did not intend to limit the

reach of the phrase "new rule" required by section 2255(h)(2) strictly to a case's

"technical holding."  See Moore, 871 F.3d at 82.  The words "new rule" must then be

read "in their context and with a view to their place in the overall statutory scheme."

See Food & Drug Admin. V. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133

---

[12] The Supreme Court has granted certiorari in the case of Lynch v. Dimaya.  See Lynch v. Dimaya, 137 S. Ct. 31 (Mem.) (2016).  In Lynch, the Supreme Court will decide whether the residual clause of 18 U.S.C. § 16(b), using language similar to that struck down by Johnson in the ACCA, is unconstitutionally vague.  See Dimaya v. Lynch, 803 F.3d 1110, 1111 (9th Cir. 2015).

While this decision may add clarity to the circuit split discussed above, it will do so by resolving the merits issue, not by determining the correct approach to section 2255(h).  Lynch reaches the Supreme Court on certiorari from an appeal of a decision by the Board of Immigration Appeals, not on a successive habeas petition under section 2255.  See id.

[13] Again, the court recognizes that its responsibility to review the requirements of section 2255(h) requires it to apply a higher standard than the prima facie showing required of the Court of Appeals in certifying a successive petition.  See, e.g., Ferranti, 2010 WL 307445, at *10.  Therefore, the court acknowledges that these circuit precedents considering certification are imperfect guides for the court's current inquiry under section 2255(h).  However, because there is no binding precedent reviewing a district court's assessment of the section 2255(h) requirements, the court nonetheless looks to these certification cases as persuasive authority.  As such, the court looks to the Court of Appeals cases discussed above for guidance in interpreting the language of section 2255(h).  See, e.g., In re Moore, 830 F.3d at 1271.

(2000).  The Sixth Circuit in <u>Embry</u> fails to do this when it focuses exclusively on the words "new rule" without engaging with the meaning of the rest of the sentence, which requires the petition "to contain" the new rule or, as in section 2244, to "rely on" the new rule.  The court agrees with the Third Circuit that the meaning of "contain" requires the petition to rely on the new rule to substantiate its claim, but does not require the new rule to conclusively decide the claim on its facts.  <u>See</u> <u>In re Hoffner</u>, 870 F.3d at 309.

Second, the court considers the <u>Hoffner</u> approach to be more consistent with the purposes of the Great Writ.  "It (the Great Writ) is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty."  <u>Schlanger v. Seamans</u>, 401 U.S. 487, 491 n.5 (1971).  Thus, in the Supreme Court's decisions "construing the reach of the habeas statutes," "[t]he Court uniformly has been guided by the proposition that the writ should be available to afford relief to those 'persons whom society has grievously wronged' in light of modern concepts of justice" and "has performed its statutory task through a sensitive weighing of the interests implicated by federal habeas corpus adjudication of constitutional claims."  <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 447–48 (1986).  While the Antiterrorism and Effective Death Penalty Act has narrowed the scope of the writ, the court agrees with the Third Circuit's weighing of the interests.  In the context of retroactive application of a substantive rule, the state's countervailing interest in finality is less compelling, and the purpose of the Great Writ in preventing unjust confinement tips the scales in favor of a less narrow reading of section 2255(h).  <u>See</u> <u>In re Hoffner</u>, 870 F.3d at 309 (citing <u>Montgomery</u>, 136 S. Ct. at 732).

Finally, in interpreting section 2255(h), this court seeks to anticipate how the Second Circuit would decide the issue.  The Second Circuit cases addressing successive habeas petitions under Johnson did not address the question to the same analytical extent as the Third, Eighth, or Sixth Circuits.  In two instances, however, the Second Circuit granted the application to file the successive petition and instructed the district court to consider staying the proceedings pending a Supreme Court decision in a potentially relevant case.  See Blow, 829 F.3d at 172–73; Vargas, 2017 WL 3699225, at *1.  Although the Second Circuit's order to stay the proceedings makes the import of these cases less compelling, such an outcome is certainly more in line with the reading of section 2255(h) adopted by the Third Circuit in Hoffner than by that of the Eighth or Sixth Circuits in Donnell or Embry.

Additionally, the Second Circuit denied certification to file a successive petition in Jackson v. United States and, in doing so, reasoned:

> Johnson does not support Petitioner's claim because he was not convicted under the statute involved in Johnson, 18 U.S.C. § 924(e), and he has not made a showing that any of the statutes under which he was convicted and sentenced contains language similar to the statutory language found unconstitutional in Johnson.

Jackson v. United States, No. 3:14-CV-00872-JCH, Mandate from USCA (Doc. No. 16) at 1–2.  The second half of the above sentence implies that the Second Circuit would have considered certification appropriate if the petitioner had identified such a statute. This indicates that the Second Circuit does not read section 2255(h) as limited to the holding in Johnson.  As such, the Mandate in Jackson is again more consistent with the Third Circuit's interpretation of section 2255(h) in Hoffner than the interpretations of the Eighth or Sixth Circuits in Donnell or Embry.

For all of the above reasons, the court interprets section 2255(h) using the approach articulated by the Third Circuit.  Applying that reading of section 2255(h) to this case, the court finds that Cruz has satisfied the requirements for filing a successive petition.[14]  See In re Hoffner, 870 F.3d at 308.  As noted above, Miller is a "new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  See 28 U.S.C. § 2255(h)(2); Montgomery, 136 S. Ct. at 734.  Cruz's Petition "contains" and "relies on" Miller because Miller "substantiates [his] claim."  See In re Hoffner, 870 F.3d at 309.  Even if Cruz's claim may require a "non-frivolous extension of [Miller's] qualifying rule" to a set of facts not considered by the Miller Court, see id., his claim, nonetheless, depends on the rule announced in Miller.  Miller's holding applies to a defendant under the age of 18, but the principle underlying the holding is more general: "[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Miller, 567 U.S. at 479.  Thus, who counts as a "juvenile" and whether Miller applies to Cruz as an 18-year-old are better characterized as questions on the merits, not as preliminary gate-keeping questions under section 2255(h).

---

[14] The court acknowledges that, in its previous Orders and Rulings, it used the language of "expanding" Miller, rather than "containing" or "relying on" the new rule in Miller.  See, e.g., Order on Motion for Appointment of Counsel (Doc. No. 20) at 3 ("Counsel shall file a federal habeas motion and supporting memorandum . . . addressing whether Miller . . . may be expanded to apply to those who were over the age of 18 at the time of their crimes . . . ."); Ruling re: Mot. for Hearing at 23 ("Cruz argues that Miller's protection should be expanded to individuals who were under 21 at the time they committed their crimes.").  The court does not, however, consider itself bound in this current Ruling by its less-than-thoughtful choice of language in prior Rulings, which could admittedly have been the result of sloppy drafting.  At the time of the Order and Ruling cited above, the court was not considering the issue of whether Cruz's Petition "relied on" the new rule in Miller and therefore may have been less mindful of its choice of language in that regard.

B.     Miller's Application to 18-Year-Olds

Having found that Cruz has satisfied the requirements of section 2255(h), the court now turns to the merits of Cruz's Petition.  Cruz asks the court to apply the new rule in Miller to his case, arguing that the national consensus disfavors applying mandatory life imprisonment without parole to 18-year-olds and that the science indicates that the same indicia of youth that made mandatory life imprisonment without parole unconstitutional for those under the age of 18 in Miller also applies to 18-year-olds.

Before the court addresses the evidence of national consensus and scientific consensus, it first considers a preliminary argument raised by the Government.  The Government argues that the court is prevented from applying Miller to an 18-year-old because it must follow the Supreme Court's binding precedents.  See Post-Hr'g Mem. in Opp. at 6–8.  It goes without saying that the court agrees that it is bound by Supreme Court precedent.  However, it does not consider application of Miller to an 18-year-old to be contrary to Supreme Court (or Second Circuit) precedent.

As noted previously, Miller states, "We therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  Miller, 567 U.S. at 465. The court does not infer by negative implication that the Miller Court also held that mandatory life without parole is necessarily constitutional as long as it is applied to those over the age of 18.  The Miller opinion contains no statement to that effect. Indeed, the Government recognizes that, "The Miller Court did not say anything about exceptions for adolescents, young adults, or anyone else unless younger than 18." Post-Hr'g Mem. in Opp. at 8.  Nothing in Miller then states or even suggests that courts

31

are prevented from finding that the Eighth Amendment prohibits mandatory life without parole for those over the age of 18.  Doing so would rely on and apply the rule in <u>Miller</u> to a different set of facts not contemplated by the case, but it would not be contrary to that precedent.[15]

Such a reading of <u>Miller</u> is consistent with the Supreme Court's traditional "reluctance to decide constitutional questions unnecessarily."  <u>See</u> <u>Bowen v. United States</u>, 422 U.S. 916, 920 (1975).  In <u>Miller</u>, it was unnecessary for the Court to address the constitutionality of mandatory life imprisonment for those over the age of 18 because both defendants in <u>Miller</u> were 14 years old.  <u>See</u> <u>Miller</u>, 567 U.S. at 465. Therefore, the question of whether mandatory life imprisonment without parole is constitutional for an 18-year-old was not before the Court in <u>Miller</u>, and it would be contrary to the Court's general practice to opine on the question unnecessarily.

The Government argues nonetheless that <u>Miller</u> drew a bright line at 18 years old, which prevents this court from applying the rule in <u>Miller</u> to an 18-year-old.  <u>See</u> Post-Hr'g Mem. in Opp. at 8; <u>see also</u> <u>Roper v. Simmons</u>, 543 U.S. 551, 574 (2005) (recognizing that the line may be over- and under-inclusive, but stating nonetheless that "a line must be drawn").  However, in so arguing, the Government fails to recognize that there are different kinds of lines.  By way of illustration, in <u>Thompson v. Oklahoma</u>, 487 U.S. 815 (1988), the Supreme Court held that the death penalty was unconstitutional for

---

[15] The Government argues that the court should not deviate from the bright line drawn in <u>Miller</u> at age 18, "even where it believe[s] that the underlying rationale of that precedent ha[s] been called into question by subsequent cases."  Post-Hr'g Mem. in Opp. at 6–7 (citing, <u>inter alia</u>, <u>Agostini v. Felton</u>, 521 U.S. 203, 237–38 (1997)).  Distinct from this case, however, <u>Agostini</u> involved Supreme Court precedent that "directly control[led]" the case.  <u>See</u> <u>Agostini</u>, 521 U.S. at 237.  As noted above, <u>Miller</u> does not hold that mandatory life imprisonment without parole is constitutional as long as it is applied to those over the age of 18.

offenders under the age of 16.  Id. at 838.  It was not until Stanford v. Kentucky, 921

U.S. 361 (1989), rev'd by Roper, 543 U.S. at 574, however, that the Supreme Court

held that the Eighth Amendment did not prohibit the execution of offenders ages 16 to

18.  Id. at 380.  In Stanford, the Court did not say that the ruling it set forth was found in

the Thompson holding.  Indeed, Stanford was not redundant of Thompson because the

line drawn in Thompson looked only in the direction of offenders under the age of 16

and found them to be protected by the Eighth Amendment.  Thompson's line did not

simultaneously apply in the other (i.e. older) direction to prohibit the Eighth Amendment

from protecting those over the age of 16.  In contrast, Stanford's line did.

This distinction between the type of line drawn in Thompson and the type of line

drawn in Stanford is reflected in the difference in the Supreme Court's treatment of

these two cases in Roper v. Simmons.  In deciding that the death penalty was

unconstitutional as applied to offenders under the age of 18, the Roper Court

considered itself to be overturning Stanford, but not Thompson.  Compare Roper, 543

U.S. at 574 ("Stanford v. Kentucky should be deemed no longer controlling on this

issue."); with id. ("In the intervening years the Thompson plurality's conclusion that

offenders under 16 may not be executed has not been challenged.  The logic of

Thompson extends to those who are under 18.").  If the Government's argument that

the line drawn in Miller prevents this court from applying its rule to an 18-year-old were

correct, the same logic applied to the line drawn in Thompson would have required

Roper to overturn Thompson rather than relying on and endorsing it.  The language in

Roper, however, makes clear that the court endorsed, rather than overturned,

Thompson.  See Roper, 543 U.S. at 574.

33

In drawing the line at 18, then, <u>Roper</u>, <u>Graham</u>, and <u>Miller</u> drew lines similar to that in <u>Thompson</u>, protecting offenders that fall under the line while remaining silent as to offenders that fall above the line.  In the case of mandatory life imprisonment without parole, no Supreme Court precedent draws a line analogous to that in <u>Stanford</u>. Therefore, while this court recognizes that it is undoubtedly bound by Supreme Court precedent, it identifies no Supreme Court precedent that would preclude it from applying the rule in <u>Miller</u> to an 18-year-old defendant.

The Government also points in its Memorandum to a number of cases in which courts, faced with the question of applying <u>Miller</u> to defendants ages 18 or over, declined to do so.  <u>See</u> Post-Hr'g Mem. in Opp. at 8–9, 10 n.1 (citing, <u>inter alia</u>, <u>United States v. Marshall</u>, 736 F.3d 492, 498 (6th Cir. 2013); <u>Cruz v. Muniz</u>, No. 2:16-CV-00498, 2017 WL 3226023, at *6 (E.D. Cal. July 31, 2017); <u>Martinez v. Pfister</u>, No. 16-CV-2886, 2017 WL 219515, at *5 (N.D. Ill. Jan. 19, 2017); <u>Meas v. Lizarraga</u>, No. 15-CV-4368, 2016 WL 8451467, at *14 (C.D. Cal. Dec. 14, 2016); <u>Bronson v. Gen. Assembly of State of Pa.</u>, No. 3:16-CV-00472, 2017 WL 3431918, at *5 (M.D. Pa. July 17, 2017); <u>White v. Delbalso</u>, No. 17-CV-443, 2017 WL 939020, at *2 (E.D. Pa. Feb. 21, 2017)).  The Government argues that this court should do the same.

In response, Cruz offers a number of reasons for distinguishing those cases from his, including that some of the cases cited by the Government did not involve mandatory life without parole, some involved defendants over the age of 21, and all but one did not involve expert testimony.[16]  <u>See</u> Post-Hr'g Reply in Supp. at 6–7.  While the court is

---

[16] The one case that Cruz identifies as including expert testimony is <u>United States v. Marshall</u>, 736 F.3d 492 (6th Cir. 2013).  <u>See</u> Post-Hr'g Reply in Supp. at 6–7.  The expert testimony in <u>Marshall</u>, however, was substantially different from the expert testimony before this court, as the testimony in <u>Marshall</u> did not focus on the science of typical adolescent brain development.    Although the expert in

34

cautious in disagreeing with these other courts, it agrees with Cruz that very few of the

courts that declined to apply Miller to 18-year-olds had before them a record of scientific

evidence comparable to the one that this court now has before it.  As to the few courts

that did consider scientific evidence on adolescent brain development and nonetheless

declined to apply Miller,[17] this court respectfully acknowledges those decisions to the

---

that case did testify that "the adolescence period does not end at 18 but actually extends into an individual's mid-20s," id. at 496, his testimony did not focus on the scientific evidence of development in typical 18-year-olds.  Rather, the expert's testimony focused on a condition unique to the defendant in Marshall called Human Growth Hormone Deficiency, which "basically prevents maturation."  See id. Therefore, the defendant in Marshall argued that his condition made him different from others who shared his chronological age.  See id. at 497 (describing the defendant's developmental delay as "unique").  He was not arguing that 18-year-olds generally present the same hallmark characteristics of youth as 17-year-olds, as Cruz is arguing here.  Thus, while the Marshall court considered expert testimony, it did not consider expert testimony comparable to that presented by Dr. Steinberg before this court.

[17] The court notes three cases cited by the Government that do consider scientific evidence.  The petitioner in White v. Delbaso argued that "validated science and social science adopted by the high court has established that the human brain continues to develop well into early adulthood, specifically until the age of 25," but the district court for the Eastern District of Pennsylvania rejected such an argument and found that the petitioner was not entitled to file a second habeas petition based on Miller.  See White v. Delbalso, No. 17-CV-443, 2017 WL 939020, at *2 (E.D. Pa. Feb. 21, 2017).  That case differs from Cruz's in two key respects.  First, the petitioner in White was 23 years old at the time of his crime, while Cruz was 5 months past his 18th birthday.  As noted by the scientific evidence discussed in this Ruling, the evidence of continued development is stronger for 18-year-olds than it is for 23-year-olds.  See Steinberg Tr. at 70–71 (indicating that he is "[a]bsolutely certain" that the scientific conclusions concerning juveniles also apply to 18-year-olds, but not as confident about 21-year-olds).  Second, the court in White notes that the petitioner made an argument based on "validated science and social science," but does not discuss whether such evidence was presented to the court.  Therefore, the court is unable to compare the depth or robustness of the evidence considered in White, if any.

At oral argument, the Government also cited two additional cases in which scientific evidence of adolescent brain development was presented.  The Government noted that, in Adkins v. Wetzel, the petitioner cited to Dr. Steinberg's research to support the petitioner's argument that Miller's protections should apply to him despite the fact that he was 18 years old at the time of his underlying offenses.  See Adkins v. Wetzel, No. 13-3652, 2014 WL 4088482, at *3–*4 (E.D. Pa. Aug. 18, 2014).  The opinion states:

> In his habeas petition, he asserted that convicted eighteen year olds are
> similarly situated to younger teenagers because the frontal lobes of their
> brains are still developing.  (Doc. No. 1 at 7) (citing Laurence Steinberg &
> C. Monahan, Age Differences in Resistance to Peer Influence, 43
> Developmental Psychology 1531 (2007)).  Likewise, in his objections,
> Petitioner contends that at the time of the underlying offenses, he
> suffered from the same diminished culpability as teenagers under the
> age of eighteen.  (Doc. No. 26 at 25.)  Petitioner did not submit any
> evidence in support of these arguments.

extent that they constitute persuasive authority, but recognizes its duty to decide this

case on the law and record now before this court.[18]

The court now turns to the evidence presented by Cruz and the standard of cruel

and unusual punishment under the Eighth Amendment.  The Eighth Amendment's

prohibition of cruel and unusual punishment requires that "punishment for crime should

be graduated and proportioned to [the] offense."  Roper, 543 U.S. at 560 (internal

quotation marks omitted).  This proportionality principle requires the court to evaluate

---

Id. at *4.  While the petitioner in Adkins cited to one of Dr. Steinberg's articles from 2007, the Adkins court's above description of the lack of evidence reflects a record that is not comparable to the one before this court.  The evidence presented by Cruz here includes numerous articles and studies by Dr. Steinberg and others, as well as Dr. Steinberg's expert testimony before the court.  Among other things, Dr. Steinberg testified that most of the research on adolescent brain development for late adolescents beyond age 18 did not emerge until the end of the 2000s and early 2010s.  See Steinberg Tr. at 14.  Therefore, it is unlikely that one article from 2007 could capture the breadth or depth of scientific evidence on late adolescence presented before this court, which includes, inter alia, research published in 2016 and 2017.  See Alexandra Cohen et al., When Does a Juvenile Become an Adult? Implications for Law and Policy, 88 Temple L. Rev. 769 (2016) (introduced by Cruz at the evidentiary hearing before this court in Marked Exhibit and Witness List (Doc. No. 113)); Post-Hr'g Mem. in Supp., Ex. 1, Laurence Steinberg et al., Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation, Developmental Science 00 (2017) (Doc. No. 115-1)

Finally, the Government points to United States v. Lopez-Cabrera, No. S5-11-CR-1032 (PAE), 2015 WL 3880503 (S.D.N.Y. June 22, 2015), appeal docketed, No. 15-2220(L) (2d Cir. July 13, 2015).  The court acknowledges that the Lopez-Cabrera court had before it "voluminous scientific evidence," as does the court here.  See id. at *4.  However, it is not clear to the court from the docket in Lopez-Cabrera whether the district court in that case also had the benefit of expert testimony.  To the extent that this court's Ruling differs from Lopez-Cabrera, the court respectfully disagrees with its sister court in the Southern District of New York.  The court notes that Lopez-Cabrera is now pending before the Second Circuit on appeal, but the Second Circuit has yet to issue a decision in the case.

[18] As noted in the previous footnote, the Government has identified one case currently pending before the Second Circuit, in which the Circuit will consider whether Miller should prohibit mandatory life without parole sentences for those just over the age of 18.  See United States v. Lopez-Cabrera, No. S5-11-CR-1032 (PAE), 2015 WL 3880503 (S.D.N.Y. June 22, 2015), appeal docketed, No. 15-2220(L) (2d Cir. July 13, 2015).  The court, in its previous Ruling on the Motion for Reconsideration, declined to stay this case pending the resolution of Lopez-Cabrera by the Second Circuit.  See Ruling re: Mot. for Recons. at 9–10.  In doing so, the court reasoned in part that Cruz is entitled to a prompt hearing on the evidence.  See id.  The court now considers this same reasoning determinative in its decision to issue this Ruling rather than stay the case pending the Second Circuit's decision.  Not only has oral argument not yet been set in Lopez-Cabrera, but parts of the case itself have been stayed pending the Supreme Court's decision in Lynch v. Dimaya, No. 15-1498, and the Second Circuit's decision in United States v. Hill, No. 14-3872.  See Lopez-Cabrera, Motion Order Granting Motion to Hold Appeal in Abeyance (Doc. No. 153).  As the court noted in its prior Ruling, "the court will not make [Cruz] wait longer than the four years he has already waited" to have his Petition decided.  See Ruling re: Mot. for Recons. at 10.

"'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." Id. at 561 (quoting Trop v. Dulles, 356 U.S. 86, 100–01 (1958)). In its prior Ruling, the court traced the development of Eighth Amendment jurisprudence as applied to juveniles. See Ruling re: Mot. for Hr'g at 5–19. Rather than repeat its lengthy discussion of that history, the court incorporates herein the relevant discussion and focuses here on comparing the evidence relied on in Roper and the additional evidence presented to the court by Cruz.

In 2005, the Roper Court held the death penalty unconstitutional for persons under the age of 18 and, in drawing that line, stated:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality in Thompson drew the line at 16. In the intervening years the Thompson plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of Thompson extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

Roper, 543 U.S. at 574. The Roper Court relied on national consensus and the diminished penological justification resulting from the hallmark characteristics of youth. See id. at 567, 572–73. In Roper, the defendant was 17 years and 5 months old at the time of the murder. Id. at 556, 618.

In 2010, the Supreme Court in Graham v. Florida extended the reasoning in Roper to find that life imprisonment without parole is unconstitutional for juvenile

37

nonhomicide offenders.  See Graham v. Florida, 560 U.S. 48, 74 (2010).  Like the

Roper Court, the Graham Court again considered national consensus and the fact that

the characteristics of juveniles undercut the penological rationales that justified life

without parole sentences for nonhomicide offenses.  See id. at 62–67, 71–74.  In

Graham, the defendant was 16 at the time of the crime.  See id. at 53.  Thus, the

Graham Court did not need to reconsider the line drawn at age 18 in Roper, but rather

adopted that line without further analysis, quoting directly from Roper.  See id. at 74–75

("Because '[t]he age of 18 is the point where society draws the line for many purposes

between childhood and adulthood,' those who were below that age when the offense

was committed may not be sentenced to life without parole for a nonhomicide crime."

(quoting Roper, 543 U.S. at 574)).

In 2012, as noted earlier in this Ruling, the Supreme Court in Miller further

extended Graham to hold that mandatory life imprisonment without parole is

unconstitutional for juvenile offenders, including those convicted of homicide.  See

Miller, 567 U.S. at 465.  The defendants in Miller were 14 years old at the time of the

crime, and the Miller Court, like the Graham Court, adopted the line drawn in Roper at

age 18 without considering whether the line should be moved or providing any analysis

to support that line.  See id. at 465 ("We therefore hold that mandatory life without

parole for those under the age of 18 at the time of their crimes violates the Eighth

Amendment's prohibition on 'cruel and unusual punishments.'").

Because Cruz was 18 years and 20 weeks old at the time of the murders in this

case, this court is now presented with a set of facts the Supreme Court has not yet had

need to consider—whether the new rule in Miller can be applied to an 18-year-old.  In

considering this question, the court looks to the same factors considered by the

Supreme Court in Roper, Graham, and Miller—national consensus and developments in

the scientific evidence on the hallmark characteristics of youth.  The court notes that it

need only decide whether the rule in Miller applies to an 18-year-old.  On the facts of

this case, it need not decide whether Miller also applies to a 19-year-old or a 20-year-

old, as Cruz was 18 years old at the time of his crime.  Although Cruz asks the court to

draw the line at 21, the court declines to go any further than is necessary to decide

Cruz's Petition.

> 1.    National Consensus

The decisions in Roper, Graham, and Miller all address "whether 'objective

indicia of society's standards, as expressed in legislative enactments and state

practice,' show a 'national consensus' against a sentence for a particular class of

individuals."  Miller, 567 U.S. at 482 (quoting Graham, 560 U.S. at 61).  In Roper, the

Supreme Court identified three "objective indicia of consensus" in determining that

societal standards considered the juvenile death penalty to be cruel and unusual: (1)

"the rejection of the juvenile death penalty in the majority of States;" (2) "the infrequency

of its use even where it remains on the books;" and (3) "the consistency in the trend

toward abolition of the practice."  Roper, 543 U.S. at 567.  The court considers each of

these indicia in turn.

> a.    Legislative Enactments

"[T]he clearest and most reliable objective evidence of contemporary values is

the legislation enacted by the country's legislatures."  Graham, 560 U.S. at 62 (internal

quotation marks and citation omitted).  The Government argues that 24 states and the

federal government have statutes prescribing mandatory life imprisonment without the

39

possibility of parole for offenders who commit murder at the age of 18 or older.  See

Post-Hr'g Mem. in Opp. at 22; see also id., Ex. A.  The Government further claims that

Congress has enacted 41 statutes with a sentence of mandatory life without parole for

premeditated murder.  See Post-Hr'g Mem. in Opp. at 23 (citing five examples).  Based

on this tally, the Government concludes that there is no national consensus that a

mandatory life sentence without the possibility of parole is unconstitutional as applied to

persons aged 18 or older.  See id. at 22–23.

However, the Supreme Court in both Graham and Miler indicated that merely

counting the number of states that permitted the punishment was not dispositive.  See

Graham, 560 U.S. at 66 ("The evidence of consensus is not undermined by the fact that

many jurisdictions do not prohibit life without parole for juvenile nonhomicide

offenders."); Miller, 567 U.S. at 485 (relying on reasoning in Graham and Thompson to

"explain[ ] why simply counting [the statutes] would present a distorted view").  The

Miller Court specifically noted that "the States' argument on this score [is] weaker than

the one we rejected in Graham."  Miller, 567 U.S. at 482.  In Graham, 39 jurisdictions

permitted life imprisonment without parole for juvenile nonhomicide offenders, see

Graham, 560 U.S. at 62, while, in Miller, 29 jurisdictions permitted mandatory life

imprisonment without parole for juvenile homicide offenders, see Miller, 567 U.S. at 482.

The Government has cited the court to 25 jurisdictions in this case, a lower number than

that in Graham or Miller.

Moreover, the reasoning of the Court in Miller that the tally of legislative

enactments is less significant than other considerations to its ultimate conclusion is also

applicable to the current issue before the court.  The Miller Court reasoned:

40

> For starters, the cases here are different from the typical one in which we have tallied legislative enactments. Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in <u>Roper</u> or <u>Graham</u>. Instead, it mandates only that a sentence follow a certain process—considering an offender's youth and attendant circumstances—before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of <u>Roper</u>, <u>Graham</u>, and our individualized sentencing cases that youth matters for purposes of meting out the laws' most serious punishments. When both of those circumstances have obtained in the past, we have not scrutinized or relied in the same way on legislative enactments.

<u>Miller</u>, 567 U.S. at 483. Because the issue before the court now is whether to apply <u>Miller</u> to an 18-year-old, the same circumstances identified above in <u>Miller</u> are necessarily also true here, so the court need not rely too heavily on legislative enactments. Cruz asks this court to rule that the mandatory aspect of the sentence applied to him be held to be unconstitutional. He does not seek a ruling that would prevent such a sentence from being applied in the discretion of the sentencing judge, after consideration of a number of sentencing factors, including his youth and immaturity at the time of the offense.

Additionally, Cruz argues that, beyond the context of statutes pertaining specifically to mandatory life imprisonment without parole, states have enacted a number of statutes providing greater protections to offenders ages 18 into the early 20s than to adults. For example, while the Government indicates that no state treats individuals aged 18 to 21 differently than adults for homicide offenses, <u>see</u> Post-Hr'g Mem. in Opp. at 23, the Government acknowledges that a number of states do recognize an intermediate classification of "youthful offenders" applicable to some other crimes. <u>See</u> <u>id.</u>, Ex. A (indicating that 18-year-olds are classified as "youthful offenders"

41

in California, Colorado, Florida, New Mexico, and New York).  Cruz also identifies 16

states that provide protections, such as expedited expungement, Youth Offender

Programs, separate facilities, or extended juvenile jurisdiction, for offenders who are 18

years old up to some age in the early 20s, depending on the state.  See Post-Hr'g Mem.

in Supp. at 34–38; see also, e.g., Cal. Penal Code § 3051(a)(1) (providing a youth

offender parole hearing for prisoners under the age of 25); Va. Code. Ann. § 19.2-

311(B)(1) (permitting persons convicted of nonhomicide offenses under the age of 21 to

be committed to a state facility for youthful offenders in lieu of any other penalty

provided by law).  Although the Government argues that these protections often do not

apply to youthful offenders who commit the most serious crimes, such as the double

homicide for which Cruz was convicted, see Post-Hr'g Mem. in Opp. at 23, these

statutes nonetheless indicate a recognition of the difference between 18-year-olds and

offenders in their mid-twenties for purposes of criminal culpability.

  The Government also argues that these statutes are not persuasive of a national

consensus because the question is not whether there is a national consensus that the

adolescent brain is not mature until the mid-20s, but rather whether there is a national

consensus about the sentencing practice at issue.  See Post-Hr'g Mem. in Opp. at 26

n.10 (quoting Graham, 560 U.S. at 61 (describing the inquiry as whether "there is a

national consensus against the sentencing practice at issue")).  While the court agrees

with the Government that the issue before it is whether a national consensus exists as

to the practice of sentencing 18-year-olds to mandatory life imprisonment without

parole, the court considers other evidence of line-drawing between juveniles and adults

still to be relevant.  In drawing the line at age 18, the Roper Court pointed to evidence

beyond the strict context of the death penalty.  See Roper, 543 U.S. at 574 ("The age of

18 is the point where society draws the line for many purposes between childhood and

adulthood.  It is, we conclude, the age at which the line for death eligibility ought to

rest.").  Therefore, while the court places greater weight on national consensus about

mandatory life imprisonment without parole, the court, like the Roper Court, considers

"where society draws the line for many purposes between childhood and adulthood" to

be a relevant consideration.  Id.

　　　　　　　　　　b.　　Actual Use

In finding the government's reliance on counting to be "incomplete and

unavailing," the Graham Court emphasized the importance of actual sentencing

practices as part of the Court's evaluation of national consensus.  Graham, 560 U.S. at

62.  Along these lines, Cruz points to a 2017 Report by the United States Sentencing

Commission on offenders ages 25 or younger who were sentenced in the federal

system between 2010 and 2015.  See Post-Hr'g Mem. in Supp., Ex. 3, United States

Sentencing Commission, Youthful Offenders in the Federal System, Fiscal Years 2010

to 2015 ("Youthful Offenders") (Doc. No. 115-3).

The Sentencing Commission reported that 86,309 youthful offenders (aged 25

and under) were sentenced in the federal system during that five-year period.  See id. at

2.  Of those, 2,226 (2.6%) were 18 years old, 5,800 (6.7%) were 19 years old, and

8,809 (10.2%) were 20 years old.  See id. at 15.  Of the 86,309 youthful offenders, 96

received life sentences.  See id. at 48.  Of those 96, 85 were 21 years or older at the

time of sentencing, 6 were 20 years old, 4 were 19 years old, and only one was 18

years old.  See id.  Although the Sentencing Commission's findings are imperfectly

tailored to the question before the court,[19] they nonetheless indicate the rarity with

which life sentences are imposed on 18-year-olds like Cruz, at least in the federal

system.

The Government argues that the court should not place weight on the

Sentencing Commission's Report because it is "simply a report on statistics regarding

offenders aged twenty-five or younger.  It makes no recommendation to the

Commission to change the Sentencing Guidelines.  Nor does it establish anything about

trends regarding mandatory life sentences."  Post-Hr'g Mem. in Opp. at 27.  In so

arguing, the Government would overly restrict the type of evidence that the court may

consider in determining whether a national consensus exists.  Notably, the Graham

---

[19] The court acknowledges that these statistics are incomplete and are not perfectly tailored to the question before the court for a number of reasons.  First, the Sentencing Commission reports on those that received life sentences, without distinguishing whether those sentences were with or without the possibility of parole.  Nor does the Report indicate whether the life sentence was mandatory or discretionary.  However, the court notes that the number of youthful offenders receiving a mandatory sentence of life without the possibility of parole is likely fewer than those reported by the Sentencing Commission as receiving a life sentence, as the category of offenders receiving life sentences also includes those receiving discretionary life sentences and those sentenced to life with the possibility of parole.  As in Miller, the court's Ruling would not prohibit life imprisonment without parole for 18-year-olds, but would merely require the sentence to follow a certain process before imposing such a penalty.

Second, the Report tracks age at sentencing rather than at the time of the crime.  Because the court does not have available the time between crime, plea, and sentencing, the Report is at best an approximation.  Third, the Report reflects only sentencing practices in the federal system.  Cruz has not provided comparable information for the states.

Finally, the Report does not indicate how many of the 86,309 offenders were eligible for life sentences, which would be the appropriate denominator for comparison with the 96 youthful offenders who received life sentences.  The Report does indicate that 91.9% of the offenses were nonviolent.  See Youthful Offenders at 23.  Nonetheless, the Graham Court faced the same situation and stated: "Although it is not certain how many of these numerous juvenile offenders were eligible for life without parole sentences, the comparison suggests that in proportion to the opportunities for its imposition, life without parole sentences for juveniles convicted of nonhomicide crimes is as rare as other sentencing practices found to be cruel and unusual."  Graham, 560 U.S. at 66.

Thus, while acknowledging the limitations of the Sentencing Commission's Report, this court likewise considers it relevant evidence of the infrequency of the use of life imprisonment on 18-year-old offenders.

Court also considered actual sentencing practices, as reported by a study done by the United States Department of Justice.  See Graham, 560 U.S. at 62–63.  The Graham Court did not mention whether the study recommended legislative changes or reported trends over time, but rather considered its findings about the infrequency of life without parole as a sentence for juvenile nonhomicide offenders to be significant evidence of a national consensus regardless.  See id.; see also Roper, 543 U.S. at 567 (including as a separate indicia of consensus "the infrequency of [the punishment's] use even where it remains on the books," independent of the indicia for legislative enactments or directional trends).  Thus, while certainly not dispositive of national consensus, the Sentencing Commission's Report is relevant evidence in the court's consideration on that issue.  To that end, the Report clearly indicates the extreme infrequency of the imposition of life sentences on 18-year-olds in the federal system.

c.    Directional Trend

Cruz additionally points to evidence of trends since Roper indicating a direction of change toward recognizing that "late adolescents require extra protections from the criminal law" and more generally that society "treats eighteen- to twenty-year-olds as less than fully mature adults."  Post-Hr'g Mem. in Supp. at 38, 40.  As noted previously, the Government challenges Cruz's reliance on such evidence because the issue is whether "there is a national consensus against the sentencing practice at issue," not whether there is a national consensus that adolescent brains are not fully mature until the mid-20s.  Post-Hr'g Mem. in Opp. at 26 n.10 (quoting Graham, 560 U.S. at 61).

The court acknowledges that the most persuasive evidence of a directional trend would be changes in state legislation prohibiting mandatory life imprisonment without parole for 18-year-olds.  Cruz has not provided evidence of this.  However, the court

again looks for guidance to the Roper Court, which drew the line at age 18 based on

"where society draws the line for many purposes between childhood and adulthood."

Roper, 543 U.S. at 574.  Thus, trends as to where society draws that line are relevant,

and the court is not confined to consider only evidence in the strict context of mandatory

life imprisonment without parole.

While Roper emphasized that society draws the line at age 18 for many

purposes, including voting, serving on juries, and marrying without parental consent,

Cruz identifies other important societal lines that are drawn at age 21, such as drinking.

See Post-Hr'g Mem. in Supp. at 40–41 (citing 23 U.S.C. § 158); Roper, 543 U.S. at 569.

Some lines originally drawn at age 18 have also begun to shift to encompass 18- to 20-

year-olds.  For example, a Kentucky state court in Bredhold v. Kentucky declared the

state's death penalty statute unconstitutional as applied to those under the age of 21,

based on a finding of a "consistent direction of change" that "the national consensus is

growing more and more opposed to the death penalty, as applied to defendants

eighteen (18) to twenty-one (21)."  Post-Hr'g Mem. in Supp., Ex. 5, Bredhold v.

Kentucky (Doc. No. 115-5) at 6.  The Kentucky court cited the fact that, in the 31 states

with a death penalty statute, a total of only 9 defendants under the age of 21 at the time

of the offence were executed between 2011 and 2016.

Likewise, recognizing the same directional trend, the American Bar Association

("ABA") issued a Resolution in February 2018, "urg[ing] each jurisdiction that imposes

capital punishment to prohibit the imposition of a death sentence on or execution of any

individual who was 21 years old or younger at the time of the offense."  See Petitioner's

Notice of Supplemental Authority, Ex. A ("ABA Resolution") (Doc. No. 121-1) at 1.  In

doing so, the ABA considered both increases in scientific understanding of adolescent brain development and legislative developments in the legal treatment of individuals in late adolescence.  See id. at 6–10.  For example, it recognized "a consistent trend toward extending the services of traditional child-serving agencies, including the child welfare, education, and juvenile justice systems, to individuals over the age of 18."  Id. at 10.

Additionally, Cruz points out that, between 2016 and 2018, 5 states and 285 localities raised the age to buy cigarettes from 18 to 21.  See Campaign for Tobacco-Free Kids, States and Localities That Have Raised the Minimum Legal Sale Age for Tobacco Products to 21, http://www.tobaccofreekids.org/assets/content/what_we_do/state_local_issues/sales_21/states_localities_MLSA_21.pdf.  Furthermore, as of 2016, all fifty states and the District of Columbia recognized extended age jurisdiction[20] for juvenile courts beyond the age of 18, in comparison to only 35 states in 2003.  See Post-Hr'g Mem. in Supp., Ex. 8, National Center for Juvenile Justice, U.S. Age Boundaries of Delinquency 2016 (Doc. No. 115-8) at 2; Elizabeth Scott, Richard Bonnie & Laurence Steinberg, Young Adulthood as a Transitional Legal Category, 85 Fordham L. Rev. 641, 666 n.156 (2016).

---

[20] "Extended age boundaries are statutory provisions that indicate the oldest age a juvenile court can retain or resume jurisdiction over an individual whose delinquent conduct occurred before the end of the upper age boundary."  U.S. Age Boundaries of Delinquency 2016 at 3.  "The upper age boundary refers to the oldest age at which an individual's alleged conduct can be considered delinquent and under original juvenile court jurisdiction."  Id. at 1.  Cruz's argument focuses on extended age boundaries rather than upper age boundaries.  Most upper age boundaries remain at 17, but many states that previously had upper age boundaries below 17 recently raised the age to 17.  See id. at 2.

While there is no doubt that some important societal lines remain at age 18, the changes discussed above reflect an emerging trend toward recognizing that 18-year-olds should be treated different from fully mature adults.

        2.     Scientific Evidence

"Community consensus, while entitled to great weight, is not itself determinative of whether a punishment is cruel and unusual." Graham, 560 U.S. at 67 (internal quotation marks omitted). The court retains the responsibility of interpreting the Eighth Amendment. Id. (citing Roper, 543 U.S. at 575). To that end, "[t]he judicial exercise of independent judgment requires consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." Id. at 67.

The Court in Roper, Graham, and Miller thus looked to the available scientific and sociological research at the time of the decisions to identify differences between juveniles under the age of 18 and fully mature adults—differences that undermine the penological justifications for the sentences in question. See Roper, 543 U.S. at 569–72; Graham, 560 U.S. at 68–75; Miller, 567 U.S. at 471 ("Our decisions rested not only on common sense—on what "any parent knows"—but on science and social science as well."). The Supreme Court in these cases identified "[t]hree general differences between juveniles under 18 and adults": (1) that juveniles have a "lack of maturity and an underdeveloped sense of responsibility," often resulting in "impetuous and ill-considered actions and decisions;" (2) that juveniles are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure;" and (3) that "the character of a juvenile is not as well formed as that of an adult." Roper, 543 U.S. at 569–70; see also Graham, 560 U.S. at 68; Miller, 567 U.S. at 471–72.

Because of these differences, the Supreme Court concluded that juveniles are less culpable for their crimes than adults and therefore the penological justifications for the death penalty and life imprisonment without the possibility of parole apply with less force to them than to adults.  See Roper, 543 U.S. at 570–71; Graham, 560 U.S. at 69–74; Miller, 567 U.S. at 472–73.  Retribution is less justifiable because the actions of a juvenile are less morally reprehensible than those of an adult due to diminished culpability.  See Graham, 560 U.S. at 71.  Likewise, deterrence is less effective because juveniles' "impetuous and ill-considered actions" make them "less likely to take a possible punishment into consideration when making decisions."  Id. at 72.  Nor is incapacitation applicable because juveniles' personality traits are less fixed and therefore it is difficult for experts to "differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."  Id. at 72–73 (quoting Roper, 543 U.S. at 572).  Finally, rehabilitation cannot be the basis for life imprisonment without parole because that "penalty altogether forswears the rehabilitative ideal" by "denying the defendant the right to reenter the community."  Id. at 74.

In reaching its decision, the Roper Court relied on the Court's prior decision in Thompson v. Oklahoma, 487 U.S. 815 (1988), which held that the Eighth Amendment prohibited the execution of a defendant convicted of a capital offense committed when the defendant was younger than 16 years old.  See Roper, 543 U.S. at 570–71.  The Roper Court pointed to the Thompson Court's reliance on the significance of the distinctive characteristics of juveniles under the age of 16 and stated, "We conclude the same reasoning applies to all juvenile offenders under 18."  Id.  The court now looks to

49

the Roper Court's reliance on these same characteristics and concludes that scientific developments since then indicate that the same reasoning also applies to an 18-year-old.  See Steinberg Tr. at 70–71 (stating that he is "[a]bsolutely certain" that the scientific findings that underpin his conclusions about those under the age of 18 also apply to 18-year-olds); Alexandra Cohen et al., When Does a Juvenile Become an Adult? Implications for Law and Policy, 88 Temple L. Rev. 769 (2016); Post-Hr'g Mem. in Supp., Ex. 1, Laurence Steinberg et al., Around the World, Adolescence is a Time of Heightened Sensation Seeking and Immature Self-Regulation, Developmental Science 00 (2017) (Doc. No. 115-1).

As to the first characteristic identified by the Roper Court—"lack of maturity and an underdeveloped sense of responsibility" as manifested in "impetuous and ill-considered actions and decisions"—the scientific evidence before the court clearly establishes that the same traits are present in 18-year-olds.  See Roper, 543 U.S. at 569.  Cruz's evidence consists of the expert testimony of Dr. Laurence Steinberg and scientific articles offered as exhibits.  See, e.g., Cohen et al., When Does a Juvenile Become an Adult?; Steinberg et al., Around the World.[21]

In his testimony, Dr. Steinberg defined early adolescence as occurring between the ages of 10 and 13, middle adolescence between the ages of 14 and 17, and late adolescence between the ages of 18 and 21.  See Steinberg Tr. at 11.  He distinguished between two different decision-making processes: cold cognition, which occurs when an individual is calm and emotionally neutral, and hot cognition, which

---

[21] The court notes that the Government has not challenged Dr. Steinberg's expertise or his "scientific opinion on these matters."  See Post-Hr'g Mem. in Opp. at 15; Steinberg Tr. at 6.

occurs when an individual is emotionally aroused, such as in anger or excitement.  See id. at 9–10.  Cold cognition relies mainly on basic thinking abilities while hot cognition also requires the individual to regulate and control his emotions.  See id. at 10.  While the abilities required for cold cognition are mature by around the age of 16, the emotional regulation required for hot cognition is not fully mature until the early- or mid-20s.  See id. at 10, 70; see also Cohen et al., When Does a Juvenile Become an Adult?, at 786 (finding that, "relative to adults over twenty-one, young adults show diminished cognitive capacity, similar to that of adolescents, under brief and prolonged negative emotional arousal").

Dr. Steinberg also testified that late adolescents "still show problems with impulse control and self-regulation and heightened sensation-seeking, which would make them in those respects more similar to somewhat younger people than to older people."  Steinberg Tr. at 19.  For example, he testified that impulse control is still developing during the late adolescent years from age 10 to the early- or mid-20s.[22]  See id. at 20; Post-Hr'g Mem. in Supp. at 10; Cohen et al. at 780.  Additionally, late adolescents are more likely to take risks than either adults or middle or early adolescents.  See Steinberg Tr. at 20.  According to Dr. Steinberg, risk-seeking behavior peaks around ages 17 to 19 and then declines into adulthood.  See id.; Steinberg et al., Around the World, at 10 (graphing the trajectory of sensation-seeking behavior, as related to age, as an upside-down "U" with the peak at age 19).  The

---

[22] Cruz's materials differ as to whether development in impulse control plateaus at age 21 or age 25.  See Steinberg Tr. at 19 (describing a linear development in impulse control from age 10 to age 25); Post-Hr'g Mem. in Supp. at 10 (stating in one sentence that impulse control plateaus sometime after age 21 and in another sentence that it does not plateau until about age 25).  The inconsistency does not impact the court's decision here, as both plateau ages are several years beyond Cruz's age at the time of his offense.

scientific evidence therefore reveals that 18-year-olds display similar characteristics of immaturity and impulsivity as juveniles under the age of 18.

The same conclusion can be drawn for susceptibility of 18-year-olds to outside influences and peer pressure, the second characteristic of youth identified in Roper.  Dr. Steinberg testified that the ability to resist peer pressure is still developing during late adolescence.  See Steinberg Tr. at 20–21.  Therefore, susceptibility to peer pressure is higher in late adolescence than in adulthood, but slightly lower than in middle adolescence.  See id.  According to Dr. Steinberg's research, up until the age of 24, people exhibit greater risk-taking and reward-sensitive behavior when in the presence of their peers.  See id. at 24–25.  Adults after the age of 24 do not exhibit this behavior, but rather perform the same whether they are by themselves or with their peers.  See id. Therefore, like juveniles under the age of 18, 18-year-olds also experience similar susceptibility to negative outside influences.

Finally, on the third characteristic of youth identified by Roper—that a juvenile's personality traits are not as fixed—Dr. Steinberg testified that people in late adolescence are, like 17-year-olds, more capable of change than are adults.  See id. at 21.

Thus, in sum, Dr. Steinberg testified that he is "absolutely confident" that development is still ongoing in late adolescence.  See id. at 62.  In 2003, Dr. Steinberg co-wrote an article, the central point of which was that adolescents were more impetuous, were more susceptible to peer pressure, and had less fully formed personalities than adults.  See id. at 22; see also Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished

Responsibility, and the Juvenile Death Penalty, 58 Am. Psychol. 1009 (2003). Although the article focused on people younger than 18, Dr. Steinberg testified that, if he were to write the article today, with the developments in scientific knowledge about late adolescence, he would say "the same things are true about people who are younger than 21." Steinberg Tr. at 22.

The court today is not asked to determine whether the line should be drawn at age 20. Rather, the issue before the court is whether the conclusions of Miller can be applied to Cruz, an 18-year-old. To that end, Dr. Steinberg testified that he was not aware of any statistically significant difference between 17-year-olds and 18-year-olds on issues relevant to the three differences identified by the Court in Roper, Graham, and Miller. See id. at 69; see also, supra, at 48–49. When asked whether he could state to a reasonable degree of scientific certainty that the findings that underpinned his conclusions as to the defendants in Graham and Miller, who were under the age of 18, also applied to an 18-year-old, Dr. Steinberg answered that he was "[a]bsolutely certain." See id. at 70–71.

The Government does not contest Dr. Steinberg's scientific opinion or with Cruz's presentation of the scientific findings. See Post-Hr'g Mem. in Opp. at 15 ("To be clear, the Government did not, and has not, taken issue with Professor Steinberg's scientific opinion on these matters. Nor, generally, does the Government dispute the scientific findings presented by the petitioner in his brief, which largely mirror those to which Professor Steinberg testified.").[23] Rather, the Government argues only that the court

---

[23] The Government does note in a footnote that the science is "not as convincing for individuals aged 18 to 21 as it is for individuals younger than 18," but it does not argue that the scientific evidence

has before it the same scientific evidence that was before the Supreme Court in Miller,
so the court should draw the same line at age 18 as did the Miller Court. See id. at 12–
20. The Government presents a side-by-side comparison of some of the facts
presented by Dr. Steinberg at the evidentiary hearing before this court and the facts
presented in two amicus briefs submitted in Miller. See id. at 16–18.[24]

---

pertaining to 18-year-olds is insufficient to support the conclusions drawn by the court. See Post-Hr'g
Mem. in Opp. at 15 n.5.

[24] The Government makes much of the fact that the Miller Court cited a 2003 scientific article
authored by Professor Steinberg and two amicus briefs in support of its conclusion that "developments in
psychology and brain science continue to show fundamental differences between juvenile and adolescent
minds." See Post-Hr'g Mem. in Opp. at 15 (quoting Miller, 567 U.S. at 471–72); Brief for the Am. Psych.
Ass'n et al., Nos. 10-9646, 10-9647, 2012 WL 174239 (Jan. 17, 2012); Brief of Amici Curiae J. Lawrence
Aber et al., Nos. 10-9646, 10-9647, 2012 WL 195300 (Jan. 17, 2012). However, the court disagrees with
the importance that the Government attributes to these citations in the Miller opinion and does not
consider them to indicate that the Court considered whether 18-year-olds exhibit the same hallmark
characteristics of youth as those under the age of 18 in Miller.

First, the court notes that the 2003 article, while authored by Steinberg, does not contain the
same findings about which he testified before this court. The aim of that article was to argue that "[t]he
United States should join the majority of countries around the world in prohibiting the execution of
individuals for crimes committed under the age of 18." Laurence Steinberg & Elizabeth Scott, Less Guilty
by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile
Death Penalty, 58 Am. Psychol. 1009, 1017 (2003); see also Steinberg Tr. at 22 ("The focus of the article
was about people younger than 18. If we were writing it today, I think we would say that the same things
are true about people who are younger than 21.").

Second, where the Miller Court cites to the two amicus briefs, it cites to portions of those briefs
that support the conclusions of the Roper and Graham Courts. See Miller, 567 U.S. at 472 n.5 ("The
evidence presented to us in these cases indicates that the science and social science supporting Roper's
and Graham's conclusions have become even stronger." (citing Brief for Am. Psych. Ass'n et al.; Brief for
J. Lawrence Aber et al.)). While the Government's Memorandum identifies sentences in the briefs that
refer to late adolescence or young adulthood, see Post-Hr'g Mem. in Opp. at 16–18, the Miller Court does
not cite or refer to those aspects of the briefs. Indeed, the APA Brief, from which the Government draws
all but one of its references to late adolescence and young adulthood, expressly states:

> We use the terms 'juvenile' and 'adolescent' interchangeably to refer to
> individuals aged 12 to 17. Science cannot, of course, draw bright lines
> precisely demarcating the boundaries between childhood, adolescence,
> and adulthood; the "qualities that distinguish juveniles from adults do not
> disappear when an individual turns 18." Roper, 543 U.S. at 574.
> Likewise, younger adolescents differ in some respects from 16- and 17-
> year olds. Nonetheless, because adolescents generally share certain
> developmental characteristics that mitigate their culpability, and because
> "the age of 18 is the point where society draws the line for many
> purposes between childhood and adulthood," this Court's decisions have
> recognized age 18 as a relevant demarcation. Graham, 130 S. Ct. at

The Government's comparison is misguided, however, because the Supreme Court in <u>Miller</u> did not have occasion to consider whether the indicia of youth applied to 18-year-olds.  As discussed above, the Supreme Court has historically been "reluctan[t] to decide constitutional questions unnecessarily."  <u>See</u> <u>Bowen</u>, 422 U.S. at 920.  In <u>Miller</u>, both defendants were 14 years old at the time of their crimes.  <u>See</u> <u>Miller</u>, 567 U.S. at 465.  The issue before the Court in <u>Miller</u> was whether mandatory life imprisonment without the possibility of parole was unconstitutional for juvenile offenders who committed homicides.  <u>See</u> <u>id.</u>  Thus, the <u>Miller</u> Court merely adopted without analysis the line at age 18, drawn seven years earlier by the <u>Roper</u> Court, because the facts before the Court did not require it to reconsider that line.  <u>See</u> <u>Miller</u>, 567 U.S. at 471–80.  As evidence of this, when the Supreme Court asked counsel for Miller where to draw the line, rather than pointing to any scientific evidence, counsel answered, "I would draw it at 18 . . . because we've done that previously; we've done that consistently."  <u>See</u> <u>Miller</u>, Oral Argument Transcript, at 10, available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/ 2011/10-9646.pdf.

A more appropriate comparison, then, would be the evidence before the court today and the evidence before the <u>Roper</u> Court in 2005.  Dr. Steinberg testified that, in

---

2030; <u>see</u> <u>Roper</u>, 543 U.S. at 574.  The research discussed in this brief accordingly applies to adolescents under age 18, including older adolescents, unless otherwise noted.

Brief for Am. Psych. Ass'n et al., 2012 WL 174239, at *6 n.3.  Thus, consistent with the issue to be decided in <u>Miller</u>, both the briefs and the <u>Miller</u> opinion were primarily concerned with the scientific evidence to the extent that it corroborated the conclusions in <u>Roper</u> and <u>Graham</u> as to the immaturity and diminished culpability of those under the age of 18.

the mid- to late-2000s, "virtually no research . . . looked at brain development during late adolescence or young adulthood."  Steinberg Tr. at 14.  He stated:

> People began to do research on that period of time toward the end of that decade and as we moved into 2010 and beyond, there began to accumulate some research on development in the brain beyond age 18, so we didn't know a great deal about brain development during late adolescence until much more recently.

Id.  Therefore, when the Roper Court drew the line at age 18 in 2005, the Court did not have before it the record of scientific evidence about late adolescence that is now before this court.

Thus, relying on both the scientific evidence and the societal evidence of national consensus, the court concludes that the hallmark characteristics of juveniles that make them less culpable also apply to 18-year-olds.  As such, the penological rationales for imposing mandatory life imprisonment without the possibility of parole cannot be used as justification when applied to an 18-year-old.

The court therefore holds that Miller applies to 18-year-olds and thus that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole" for offenders who were 18 years old at the time of their crimes. See Miller, 567 U.S. at 479.  As applied to 18-year-olds as well as to juveniles, "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." See id.  As with Miller, this Ruling does not foreclose a court's ability to sentence an 18-year-old to life imprisonment without parole, but requires the sentencer to take into account how adolescents, including late adolescents, "are different, and how those

differences counsel against irrevocably sentencing them to a lifetime in prison." <u>See</u> <u>id.</u> at 480.

## VI.    CONCLUSION

For the reasons stated above, Cruz's Petition to Vacate, Set Aside, or Correct Sentence (Doc. No. 37) is **GRANTED**.

**SO ORDERED**.

Dated at New Haven, Connecticut, this 29th day of March, 2018.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge